## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVAMIA

| | | |
|---|---|---|
| **Larry Carter, et al** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 18-4404** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia** | : | |
| | : | |
| **Defendant** | : | |

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs by and through their counsel move pursuant to Fed R. Civ. P 56  for entry of partial summary judgment against Defendant City of Philadelphia.

As demonstrated in the following memorandum of law, which is incorporated by reference herein.  there is no genuine issue of material fact as to the duties of the Plaintiffs and as a matter of law there is no issue regarding liability of the Defendant under the Fair Labor Standards Act, 29 U.S.C. §201, et seq.  Therefore, the Plaintiffs are entitled to summary judgment as a matter law that (1) the Plaintiffs are not exempt employees (2) that the City of Philadelphia failed to pay the Plaintiffs standby time at 1.5 times their hourly rate and (3) the conduct of the City of Philadelphia  was willful, (4)  and  the Plaintiffs are entitled to liquidated damages for three years.

July 19, 2019
Date

/s/ Howard K. Trubman, Esq.
Howard K. Trubman, Esq.
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVIA**

| | | |
|---|---|---|
| **Larry Carter, et al** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 18-4404** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY**

_____
HOWARD K. TRUBMAN, ESQ.
THE EMPLOYMENT LAW FIRM OF
    PENNSYLVANIA
1500 Market Street
EAST TOWER, 12TH FLOOR
PHILADELPHIA, PA.   19102
PHONE  215 206-5306
EMAIL: HTRUBMAN@GMAIL.COM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………i

LIST OF EXHIBITS……………………………………………………………..……iii

I  INTRODUCTION……………………………………………………………....1

A. Professional Exemption…………………………………………………… 2

B.  Administrative Exemption…………………………………………………...3

II. UNDISPUTED FINDINGS OF FACT…………………………………………3

III. FACTUAL BACKGROUND………………………………………...……………3

A. General Background………………………………………………………….6

B. Education and Prior Work Experience……………………………………… 12

C. Training…………………………………………………………………………17

1.  The Coordinators Agree With Ms. Taylor That Experience And Training, Not Their Formal Education, Prepared Them for Their Position…………………………………....19

D.  Delegate Line…………………………………………………………………21

1. Involuntary Commitments……………………………………………..……21

a. 302 Procedure…………………………………………………………..21

b. Approving Or Denying The 302………………………………………..23

c. Mobile Teams…………………………………………………………..25

d.  Information On The Delegate Line……………………………………27

E. Suicide Lines-Local And National……………………………………………27

F.  Data Entry……………………………………………………………...……31

G. The Illustrative Examples Of The Work And Job Responsibilities Are Not Accurate In The Position Specifications, Nor Is The Acute Service Delegate Task List Accurate …..…32

**IV. The SUMMARY JUDGMENT STANDARD**……………………………………………44

**V. ARGUMENT**………………………………………………………….....……...47

**A. Summary of Argument**………………………………………………………47

**B. The Bona Fide Professional Capacity Exemption Does Not Apply**………………………50

**1. Work Requiring Advanced Knowledge in Field of Science or Learning Through a Course of Specialized Leaning**……………………………………………………...52

**2. The Coordinators Required Knowledge is Not Customarily   Acquired by a Prolonged Course of Specialized Knowledge and Instead Is Based On   Experience and Skill Derived From Training And On The Job Experience**………………… …………………………57

**3. The Coordinators Did Not Perform Work Requiring Advanced Knowledge or Discretion**………………………………………………………………………63

**C. The Bona Fide Administrative Exemption Does Not Apply**……………………………...67

**1. What Do the Coordinators Do Besides Work Long Hours**

**2. The Coordinators Work Is Not Directly Related To Management Or General Business Operations**………………………………………………………………73

**3. The Coordinators' Job Duties Do Not Involve The Exercise Of Discretion On Matter of Significance To Their Employer**………………………………………………80

**D. The Accountability Provision Should Not Be Utilized To Justify Deduction**……………89

**E. The Violation of the FLSA-Damages**……………………………………………   91

**1. Defendants are Liable for Liquidated Damages in an Amount Equal to their Liability for Back Wages**…………………………………………………………………91

**2. The City Acted With Reckless Disregard Therefore Damages Should Be Awarded for Three Years**…………………………………………………………………..93

**VI.  CONCLUSION**…………………………………………………...…96

## TABLE OF AUTHORITIES

**I. CASES**

Ahle v. Veracity Research Co., 738 F.Supp.2d 896, 908 (D. Minn. 2010)……………………..81

Alev.TVA, 209 F. 3d  686 (6th Cir. 2011)…………………………………………………………85

Anderson v. Liberty Lobby, Inc., 477 US. 242 106 S.Ct. (1986)………………………………….33

Antenor v. D & S Farms, 88 F.3d 925, 933 (11th Cir. 1996)…………………………………….47

Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800 (11th Cir. 1991)…………………………………………………………………………………………………………..71

Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S. Ct. 453 (1960) ……………………………46

4
Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)………..57

Bothell v. Phase Metrics, Inc., 299 F.3d 1120  (9th Cir. 2002)………………………………74, 80

Bratt v. County of  Los Angeles, 912 F.2d 1088  (9th Cir. 1990) cert. denied, 498 U.S. 1086 (1991)**……………………………………………………………………………passim**

Brock v. Claridge Hotel and Casino, 846 F.2d 180,  (3rd Cir. 1980)……………………………91

Brock v. Wilamowsky, 833 F.2d 11  (2d Cir. 1987)………………………………………………92.

Brock v. . Int'l  Unionn. of Operating Engineers. 140 F. Sipp. 2d. 432 (E.D. Pa. 2015)…. 45,.92

Brooks v. Village of Ridgefield Park, 185 F.3d 130, 137 (3d Cir. 1999)…………………………92

Buckner v.  Gen  Signal Tech , Co., 163 F. Supp. 2d 617 (E.D. PA. 2011)………………..45, 92

**Bullard v.Babock & Wilcox,  20009 Fed Appx.  224**

Calderon v. Geico,  Ins., Co., Inc, 809 F. 3d 111 (4th Cir.  2011) ……

Carr v. Flower, Food, Inc., 2019 U.S. .Dist. Lexis 77571 (E.D. Pa. 2019)…………………47

Celotex Corp. v. Cartrett, 477 U.S. 317, 106. S.Ct. 2548 (1986)……………45. 46


Chambers v. School Dist. of Phil. Bd. of Educ., 827 F. 2d Supp. 2d 409 (E.D. Pa. 2011)…55.65

Chatfield v Children's Social Services, 555 F .Supp. 2d532 (E.D. Pa. 2008)…………………..54


Christopher v. SmithKline Beckham Corp., 567 U.S. 142, 132 S.Ct. 54 (2012)…42

Clark v. J. M. Benson Co., Inc., 789 F.2d 282, 287 (4th Cir. 1986)…………76, 88


Clark v. Centene Co. of Tex., LP, 656 Fed. App'x 688 (5th Cir. 2016)……………………   57


Cole v Farm Fresh Poultry,Inc, 824 F.2d 823. (11th Cir 1097)……. 93


Copas v. East Bay Mun. Utilities, 61 F. Supp. 2d 1017 (D.C.C. 1999)……   76


Cooke v. Gen. Dynamics Corp., 993 F. Supp. 50, 53-55 (D. Conn. 1997)……   90


Davis v. J.P. Morgan, Chase & Co., 587 F.3d 529 (Cir. 2002),………… 74


Dalheim v. KDFW-TV, 918 F.2d 1220 (5th Cir 1990)……. . 71. 74,75


Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1998) ….   94


Dybach v. Florida Department of Corrections, 942 F.2d 1562, 1564-65 (11th Cir. 1991…  76


Fife v. Harmon,  171 F.. 3d 1173 (8th Cir. 1999) ……………………………..   53


Flood v. Premier Internal Med. Assoc., 2000 U.S. Dist. Lexis, 8493  (M.D. Fla.) ………64


Harris v. District of Columbia, 741 F. Supp. 254, 262 (D.D.C. 1990)……..  76

Hunt v Cromartie,526 U.S. 541.,  119 S. Ct. 1545  (1999) …………..45

Hickton v. Enterprise Rent-A-Car,,2012   U.S. Dist. Lexis 136252  (W.D. Pa. 2012)…..   76

Iaria v.Metro Fuel Corp., 2009 U.S. Dist  Lexis 6844 (E.D.NY.)…………        80

Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709,  106  S..Ct. 1527(1986). …… 2

Ingram v. Hagen, 161 F. Supp. 3d 639, 646 (S.D. Ill. 2015) ………..        84

Internat'l Ass'n of Firefighters v. City of Rome, 682 F.2d 522, 532 (11th Cir. 1988)……. ,,93

Jonas v. Judge Tech Servs, 2013 U.S. Dist. Lexis 153343 (E.D. Pa ) ,,,,,47

Kadden v. Visualex LLC., 910  F,Supp. 2d 523 (S.D.N.Y  2012)……   64

Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992)……………..59

Karali v..Branch Banking & Trust Co., 2018 U..S. Dist. Lexis 167690 (D.N.J) ….71

Kreig v. Pell's Incorporated, 2002 WL 449797 (S.D. Ind. Jan. 28, 2002)…...   93

Lawrence v. City of Philadelphia, 527 F.3d 299  (3rd Cir. 2008)'''' 46

 Levine v. Unity Health System, 847 F.Supp.2d 507  (W.D.N.Y.2012) 56, 66 , 68

Malibu Media LLC v. Poe, 82 F. Supp. 3d 650 (E.D. PA.  2015)……   45,46

Manuele v. City of Springfield, Ill., 718 F.Supp.2d 939, (C.D. Ill. 2010)…….   71

Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).  passim

Marshall v. Brunner ,668 F 2d 748 (3rd Cir. 1981)……………94

Marshall v. Nat'l Freight, Inc., 1979 WL 1977 (D.N.J. 1979)……………

Marshall v. Western Union Tel,. Co; 621 F. 2d  1245 (3rd Cir)…….    88

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 106 S. Ct. 1348   (1986)…..44

 **M**azareella v.  Fast Rig Support**,** LLC, 823 F.3d 786 (3rd  Cir. 2016)…………………………47

McComb v. Robert W. Hunt Co., 172 F.2d 751, 752 (7th Cir. 1949),….,,85

McGrath v. City of Philadelphia, 864 F. Supp. 466 (E.D. Pa. 1994)  ……….46

 McLaughlin v. Richland Shoe Co., 486 U.S. 128, 106  S.Ct. 1677 (1988)…………………94

 McKee v. CBF Corp., 299 Fed. App'x 426  (5th Cir. 2008)  …………………..44

McKinney v.  Storage All Centr's  LLC,  656 F.Supp. 114 ((D.D. C. 2000)………………88

Mitchell v  City of Pittsburgh, 995  F .Supp.22d. 420 (W. D. Pa.  2014)……………44

Myers v. Mercy Health System of Southeastern Penn.2017 U.S. Dist. Lexis 160970 (E.D. Pa)...47

Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606 (D. Conn. 2007)………74

In re  Novartis Wage and Hour Litigation, 611 F. 2d 141, 157 (2d Cir. 2010)……………87, 88

Owsley v San Antonio  Indep . School Dist. 187  F. 3d 521 (5th Cir. 1999)/…………55, 57

Perez v. Davison Design and Development, 2014 U.S. Dist. Lexis, 147571 (W.D. Pa) …46

Peruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224 (3d Cir. 1993)….45

Pippins v. KPMG, LLP, 759 F.3d 235, 251 (2d Cir. 2014)…………………………………58

Raimondi v. Central DuDupage Hospital,  2017  U.S. Dist. Lexis 47499 (N.D. Ill)……..57. 58

Rego v.  Liberty Mutual Managed Care,  367  F.Supp. 3d  849 ( E.D. Wis,.2019)……….78

Reich v. American Int'l Adjustment Co., Inc., 902 F. Supp. 321  (D. Conn. 1994)  76,80

 Reich  v. Brenaman Elec Society , 1997 WL 164235, at *8 (E.D. Pa. Mar. 28, 1997) ..92

Reich v. Chicago Title Ins. Co., 853 F. Supp. 1325  (D. Kan. 1994)…………………73,62

Reich .v. Gateway, Press, Inc.,  13 F. 3d  685, 691( 3rd Cir 1994….46

Reich v. Karpf's   Coaches, Inc, 7845 F 3d 869 (3rd Cir. 2015)……

Resch v. State of New York, 3 F.3d 581 (2d Cir. 1993), cert. denied, 510 U.S. 1163 (1994) …80

Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238 (3d Cir. 1999)….,,,,45

;Roe  v. Debt Reduction Services, 2007  U.S. Dist. Lexis 31503 (E.D Wash.)  …75,76

Roney v. United States, 790 F. Supp. 23 (D.D.C. 1992)…………………..76

Rutlin v. Prime Succession,    220 F.  3d 737 (6th Cir 2000)…………………………..55,57

Schaefer v Ind. Mich. Power, 358 F, 3d 401(6th  Cir. 2004)……………………………64, 83

Sec'y United States DOL,v. AM Future Sys, 873  F. 3d 420 (3rd Cir 2017)…..47

Smiley v. DuPont de Nemours, & Co.. 839  F.3d  325 (3rd Cir 2018)…………..47

Solis v. A-1 Mortgage,Corp, 934 F.Supp. 2d 778 (W.D.Pa. 2013). ,,,,,82

Solis v. Washington State, 656 F. 3d 1079 (9th Cir  2011) …54,59

Solis v. Sunroc, Inc., 49 F. Supp. 3d 50  (N.D. Ohio 2014)……59

Spradling v. City of Tulsa, Oklahoma, 95 F. 3d 1492 (11ith Cir 1996)…………….90

<u>Stell v. Eng'g & Fire Investigations, Inc.,</u>  2007  WL 1295838 (S.D.Tex)……..58 ,64

<u>Williams  v Tri-County Growers, Inc.,</u> 744  F.2d 121 (3rd Cir. 1980)…..92

<u>Urnikis-Negro v. Am. Family Prop. Servs., Inc.,</u> 2008 WL 5539823 (N.D. Ill. July 21, 2008)..84
 83-<u>Frazier v. CHHS Hosp. Co., LLC,</u> 2010 U.S. Dist. LEXIS 387, at *21 (E.D. Pa. 2010).

<u>Walton v. United Consumers Club,</u> 786 F.2d 303  (7th Cir. 1986). …92.94
 <u>Zannikos v. Oil Inspections (U.S.A.), Inc.,</u> 605 F. App'x 349, 354-59 (5th Cir. 2015)  83

## II.  STATUTES

. 29 U.S.C § 207.  …..48

29 U.S.C §213(a )…… 2..50,63, 71

29 U.S.C.. . §216…(1)

29  U.S., C. §259……………49

50 P.S § 7301…78 ,9

55 P. S. 7301(b)  … 8

55 P.S. §  7301(b)(ii) ………………,,,,,,8

63 P.S.  1907..55

## III.  REGULATIONS

29 CF.R. § 541.2  …..87

29 C.F.R. $541.200, et. seq ..77

29 C.F.R. § 541.200(a)……4, 43,  77,80. .88

229 C.F.. R . §541.201((b)…24

29  C.F.R.  §541.201(c)

29 C.F.R. § 541.202(a)… .77

29 C.F.R. § 541.202(b)… 4, 74, 82

29 C.F.R. § 541.202 (c)…4, 74

29 C.F.R. § 541.202  (e)   ..75

29 C.F.R. § 541.203…4

29 C.F. R. § 541.203(j)..

29 C.F.R. § 541.300-304

29  C.F.R.   §541.300…. 2,50

29 C.F.R. §541.301(a),,, 63

29 C.F.R. § 541.301(b). ….58,68

 29 C.F.R. §541.301(c)…58,68

29 C.F.R. §541.301(d)…. 50, .57,58, 59, 60

29 C.F.R. §541.301(e ) …..56

29 C.F.R. §54.1302 (a),,52

29 C.F. R. §541.700(a),,,,

29 C.F.R.  §541.704……61,84

29 C.F.R. §541.710…..49,90

55 Pa. Code § 5100.84……9

**IV. RULES**

Fed. R. Civ. P. 56….1

Fed R. Civ. P. 56(A)………44

## V. OTHER SOURCES

  Department of Labor Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed.Reg. 22122, 22138 (April 23, 2004)…84

Wage and Hour Opinion Letter, 2007 WL 852752,,………,76

Wage and Hour Opinion Letter, March 11, 1998, 1998 WL 852755,,,85

 Wage and Hour Opinion Letter, February 19, 1998, 1998 WL 852701…85

 Wage & Hour Opinion Letter, February 19, 1998, 1998 WL 852691….85

 Wage and Hour Opinion Letter, February 14, 2003, 2003 WL 23374602…85.

Wage & Hour Div., Opinion Letter, (Jan. 23, 1998) 1998 WL 85275..75

## LIST OF EXHIBITS

Exhibit A-Deposition of Sandra Vasko

Exhibit B-Deposition of Tiara Council

Exhibit C-Deposition of Larry Carter

Exhibit D-Coordinator I Job Specifications City 001658-1661

Exhibit E-Coordinator II- Job Specifications City 001662-1665

Exhibit F-Deposition of Pattie Stewart-Taylor

Exhibit G-Deposition of Leslie Davis

Exhibit H-Deposition of Catherine Mackey-Gaither

Exhibit I-Deposition of Kimberly Rodriquez

Exhibit J-Rules for Standby Time

Exhibit K-Deposition of Gregory Garner

Exhibit L-Deposition of Jennifer Jubilee

Exhibit M-Letter from Chris Rider re: 30(b)(6)

Exhibit N-Standby Pay Contracts

Exhibit O-Answer to Second Set of Interrogatories

Exhibit P-Answer to First Set of Interrogatories

Exhibit Q-City Response to Request for Admissions

Exhibit R-Deposition of Rochelle Morris

Exhibit S-Mental Health Training Material

Exhibit T-Form Filled out 302 From Training

Exhibit U-Crisis Center Memo City 001906-08

Exhibit V-Memorandum on Pay 1997

Exhibit W-Memorandum on Pay 2017

Exhibit X-Affidavits of Coordinators

Exhibit Y-Agenda Civil Service Commission 2017

## I. INTRODUCTION

Plaintiffs, by and through their counsel, move for partial summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have brought this cause of action for overtime pay that is owed to them under the Fair Labor Standards Act (hereinafter FLSA).   The Acute Services Unit (hereinafter "Unit") is part of the Department of Behavioral Health, is staffed 24-7 by the Plaintiffs who have the job title of Mental Health Emergency Services Coordinators. They work regular hours at an office and work evening and weekends, called standby time. Standby time is mandatory. This standby work is performed at home and they are required to answer the phone within three rings. For this standby work the Plaintiffs are not paid time and a half as required by the FLSA. Despite working all night, the coordinators must be at work in the office within minutes from the time their night standby shift ends. If they are late, time is deducted from their vacation or compensation bank or they must work late under the asserted justification of accountability for government workers.

Plaintiffs seek in this lawsuit the difference in the amount they are paid for standby time and the 1.5 times their hourly rate, which is mandated by the FLSA. They also seek a determination that the deductions for lateness from their vacation or compensation bank are not proper. These deductions are inconsistent with the principal purpose for which accountability provisions recognized by the FLSA were enacted. Accordingly, they seek reinstatement of time to their vacation or compensation bank.

The Defendant has simply asserted in its answer that the Plaintiffs are exempt from the overtime requirements, thereby, leaving the Plaintiffs to speculate as to which exemption the Defendant is asserting.  The educated guess of the Plaintiff is that the Defendant will argue either the professional exemption or the administrative exemption. It is the burden of the Defendant to

establish the affirmative defense that the employees fall within the exemption. Plaintiffs maintain that neither exemption is applicable. The issue of how an employee spends their time is a question of fact while the question of whether their activities fall within an exemption is a question of law. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714. 106 S.Ct. 1527, 1530 (1986).

When the actual job requirements are examined it is clear the Coordinators do not perform exempt work and that there are no material disputed facts. The Defendant cannot meet its burden to establish that the job duties are exempt under the FSLA; therefore, summary judgment should be granted as a matter of law. The Plaintiffs are entitled to damages for two years as a matter of law, which includes liquidated damages. Additionally, the Plaintiffs maintain that the conduct was willful under the act. Therefore, the three-year statute of limitation plus an additional year of liquidated damages is appropriate. Finally, time should be returned to their vacation and compensation banks

**A.  The Professional Exemption**

To qualify for the learned professional exemption under 29 U.S.C. §213(a)(1), Department of Labor Regulations require that the employee's primary duty meets three elements (1) the employee must perform work requiring advanced knowledge (2) the advanced knowledge must be in a field of science or learning and (3) that the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction, 29 C.F.R. § 541,300. The field of science or learning includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where

in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning, § 29 C.F.R. 541.301(a).

The FLSA regulations define "customarily acquired by a prolonged course of specialized intellectual instruction" as:

> The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession.

The determination will be fact specific and the Coordinator's job as a whole must be examined. 29 C.F. R. §541.700(a). It is the position of the Plaintiffs that the Defendant cannot meet the burden for several reasons (1) there is no specialized knowledge requirement as for course of study (2 the position could be filled with a degree and job experience and (2) the work performed does not require advanced knowledge. Far more relevant to their duties is the knowledge acquired through training, as the Coordinators rely on their in-house training and experience to do their job.

## B.  The Administrative Exemption

The governing regulations provide that administrative employees are determined by a salary basis test, which is not the focus of this litigation, and a duties test. In order to be exempt, an employer must establish all three prongs. The first prong of the test is the requirement by statute of a weekly salary-based test of $455.00 a week, which has been met and is not an issue. The regulation's remaining two prong duty tests is:

> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). Additionally, the Code of Federal Regulations provides, that generally, public employees are not subject to the administrative regulation.  29 C.F. R. §541.203(j)

It is the Plaintiffs' position that the Coordinators cannot satisfy the second prong of the regulation because they are not engaged in work directly related to general business of the City of Philadelphia, their Department or the Unit. This FLSA, 29 C.F.R. § 541.201(b,) identifies functions that must be performed no matter what the business produces, such as:

> work concerning tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory  compliance; and similar activities.

It is clear that the Plaintiffs are not performing these types of functions to support their employer. Here, it cannot be disputed that the Plaintiffs' job duties have nothing to do with performing administrative work for the general business operations of the City, the Department of Behavioral Health or their Unit., therefore, the administrative exemption is inapplicable.  It is the Plaintiffs position that the second prong cannot be met; therefore it is not necessary to examine the third prong. However, even if the second prong could be met the Plaintiff would not fall within the exemption.

 To satisfy the third prong, Defendant must prove that Coordinator's primary duty involves "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id*. § 541.202(a). Exercising discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate discretion or supervision. *Id*. § 541.202(c). This

4

discretion and judgment must be exercised on *matters of significance as defined by the applicable regulations.* The DOL regulations provide:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

These factors cannot be established when assessed against the job responsibilities of the Plaintiffs which primarily involve gathering information, providing information on services of the unit to callers, answering information calls, dispatching mobile teams, entering data into the computer, including all phone calls and 302 commitments subject to automatic approval, approving or denying petitions for involuntary commitments, subject to a legal criteria, as well as answering calls on the suicide lines, both local and national.

## II. UNDISPUTED FINDINGS OF FACT

The Undisputed Findings of Fact are filed in a separate document and are incorporated by reference herein.

## III. FACTUAL BACKGROUND

## A. General Background

The Plaintiffs are employed by the Acute Services Unit of the Behavioral Department of the City of Philadelphia (hereinafter "The Unit" or "Acute Services"). The Plaintiffs all hold the position of Mental Health Emergency Services Coordinator II, (hereinafter referred to as the "Plaintiffs" or the "Coordinators" or "Delegates"). Originally hired as Mental Health Emergency Coordinators I, the Plaintiffs were all promoted to a Coordinator II. In fact, the work that a Coordinator 1 and II perform are virtually the same. The Coordinators have the same objectives (Exhibit A-Deposition of Sandra Vasko at page 27 line 11-15, hereinafter referred as "Exh. A Vasko"). The time period for the promotion ranges from two to ten years (Exhibit B-Deposition of Tiara Council at page 12 line 16-18, hereinafter referred to as "Exh. B Council"); (Exhibit-C Deposition Larry Carter at page 11 line 11-24, hereinafter referred to as "Exh. C Carter").

In order to be hired, Coordinators were required to have a Master's Degree and experience, or a combination of a degree and experience upon approval by the Human Resources Department (Exhibit D-Coordinator I Job Specifications City 001658-1661, hereinafter referred to as "Exh. D Coord. I"); (Exhibit E-Coordinator II- Job Specifications City 001662-1665, hereinafter referred to as "Exh. E Coord II"). There are no mandated courses to take in the degrees deemed acceptable (Exhibit F-Deposition of Pattie Stewart-Taylor page 55 line 9-13, hereinafter referred to as "Exh. F. Taylor"). The Coordinators are not licensed by the Commonwealth of Pennsylvania (Id. at page 55 lines 9-12). The Coordinators do not have to obtain any certification or accreditation to obtain their position or be promoted. There was no testimony indicating that there was a standardized state test to be hired for this position by the Commonwealth. In fact, the only test for the position is a civil service test. (Id page 54 line 20 to page 56 line 21).

After being hired, the coordinators received training to become a delegate for 302[1] involuntary commitments, as well as training on both the local and national suicide lines, which is discussed herein at pages 17 to 23. The Coordinators answer calls on three, previously two lines.  The lines are identified as the delegate line and the suicide/crisis line which has a local and a national line. On the delegate line, the Coordinators answer the following types of calls: (1) addressing informational inquiries about 302 involuntary commitments from members of the public, agencies, or people involved with involuntary commitments, (2) dispatching mobile teams and diverting mobile teams, which require approval of a supervisor, (3) reviewing of 302s which are automatic approvals of petitions filed by police officers, prisons and doctors which are entered into the computer, and (4) approving or denying 302 involuntary commitment petitions received based on the four criteria set forth in the Mental Health Act (Exh. F Taylor at page 14 line 9 to page 15 line 5).

Ms. Taylor, the head of the Unit and Ms. Vasko, the acting head of the department testified that the Coordinators apply the legal criteria to the 302 commitments, (Exh. A Vasko at page 60 line 6 to page 61 line 12; page 65 line 7 to page 65 line 13); (Exh. F. Taylor at page 7 line 24 to page 7 line 18). The Coordinators are examining the petition to determine that the facts meet the criteria of the Act and that there is proof that a dangerous condition is set forth in the petition. The Act requires (1) harm to self or others, (2) inability to care for oneself, (3) suicide attempts or ideations, and (4) self-mutilation that will lead to bodily harm This criterion for a 302 involuntary commitment is set forth in 50 P.S § 7301. Also, there are governing regulation in the Pa. Code. Both the Act and the Code provide examples that meet the standard of proof for

---

[1] The Coordinators when acting on an involuntary commitment petition under the Mental Health Procedures Act are referred to as delegates. A petition for an involuntary commitment is commonly referred to a 302, which corresponds to the number of the Act.

example, clear and present danger to others may be demonstrated by proof that the person made threats of harm to other or committed acts in furtherance of the threat and as to suicide there have been threats or an actual attempt. See 55 P. S. § 7301(b) and (b)2 (ii')[2].

_____

[2] 50 P.S. § 7301

(a)  Persons Subject.--Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment.  A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so *lessened that he poses a clear and present danger of harm to others or to himself.*

(b)  Determination of Clear and Present Danger.-(1)   Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated…. .   In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated.   *For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.*

(2)  Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i)  *the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act;  or*

(ii)  *the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act.   For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or*

(iii)  *the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act.   For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.* (Emphasis supplied).

Additionally, 55 Pa. Code §5100.84 provides follows:

The other lines are the suicide/crisis lines, also referred to as intervention lines, which are local and national, sometimes referred to as Lifeline. (Exh. F. Taylor at page 32 line 3 to page 34 line 21). Neither the Coordinators I or II provide counseling to the person who is calling in on the suicide lines, (Id. at page 32 line 7 to page 32 line13). Nor did either of the City department managers suggest that the Coordinators are involved in treatment to anyone on the delegate line. The Coordinators do not follow up with anyone who calls in on either line, nor do they make a diagnosis, make recommendations for treatment, and they not know the person's outcome or treatment plans.  See discussion at pages 28, 37, 42-43, infra.  The Coordinators spend all day on the phone (Exh. C Carter page 103 line 23 to page 105 line 20); (Exhibit G-Deposition of Leslie Davis at page 10 lines 10-22, hereinafter "Exh. G Davis**")**; (Exhibit H-Deposition of Catherine

---

 (d)  The standards of clear and present danger may be met when a person has made a threat of harm to self or others; has made a threat to commit suicide; or has made a threat to commit an act of mutilation and has committed acts in furtherance of any such threats.

 (f)   When the petition for commitment filed under section 301(b)(2)(i) alleges that a person poses a clear and present danger to himself, clinical or other testimony may be considered which demonstrates that the person's judgment and insight is so severely impaired that he or she is engaging in uncontrollable behavior which is so grossly irrational or grossly inappropriate to the situation that such behavior prevents him from satisfying his need for reasonable nourishment, personal care, medical care, shelter or self-protection and safety, and that serious physical debilitation, serious bodily injury or death may occur within 30 days unless adequate treatment is provided on an involuntary basis

 (g)  An attempt under sections 301(b)(2)(ii) and (iii) of the act (50 P. S. § 7301(b)(2)(ii) and (iii)), occurs:

   (1)  When a person clearly articulates or demonstrates an intention to commit suicide or mutilate himself and has committed an overt action in furtherance of the intended action; or

   (2)  When the person has actually performed such acts.

Mackey-Gaither at page 55 lines 3-9, hereinafter "Exh. H Gaither"). The Coordinators also record logs of calls and enter data into the computer. (Id Gaither at page 54 line 9 to page 55 line 2).

The delegate line is intended to handle and answer questions about involuntary commitment; however, other calls do come into the delegate line that do not pertain to any 302 issues. These could be questions about insurance or a question intended for the suicide line. In that instance, the coordinators will answer questions if they can. (Exhibit-I Deposition Kimberly Rodriquez at page 85 lines 3-13, hereinafter "Exh. I Rodriquez"). The number and type of calls each Coordinator receives can vary greatly (Exh. I Rodriquez at page 44 lines 8 to 21); (Exh. H. Gaither at page 11 line 12 to page 13 line 3; page 44 lines 9-24). The calls are directed to the Coordinator, and they do not know the nature of the incoming call in advance. (Exh. I Rodriquez at page 85 lines 3-13). Ms. Rodriquez described the delegate line as a kind of 911 for mental health. (Exh. I Rodriquez at page 16 lines 8-24).

The Unit is staffed 24/7. The Coordinators work in the office Monday through Friday for two scheduled shifts. Evenings and weekends, they work from home. The hours for the regular shifts are 7:30 A.M. to 4:00 P.M. The evening shift come in at 4:00 P.M. or 4:30 P.M. and works to 12:30 A.M. or 1:00 A.M. The arrival times are staggered and departure time is staggered. (Exh. C Carter at page 45 line 22 to page 47 line 24; page 80 lines 14-20). The mandatory weekend and evening shifts are referred to as "standby" (Id at page 97 line 13 to page 98 line 2). The weekday night standby shift starts at 12:30 A.M. and ends at 7:30 A.M. There are three different standby shifts on the weekends and the last shift ends at 7:30 A.M. (Id. at page 45 line 9 to page 47 line 24).

There is an overlap with the regular and standby hours at the beginning of the day and at the end of the day. The standby night hours are 12:30 A.M to 7:30 A.M. If one of the coordinators works a standby shift and they are working a morning shift at 7:30 A.M, they must still be in at their regularly scheduled time. If not, they are docked vacation pay or must work late. (Exh. C Carter at page 48 line 1 to page 49 line 12). The standby work that is done at night is the same as the work done during the day, as they are answering the same lines and the Coordinators must have everything to do their job, such as forms. The Coordinators must answer the phone within three rings, and they are required to maintain a quiet environment (Exhibit J Rules for Standby Time). Their movements around the house are restricted because the Blue Tooth will disconnect (Exhibit K-Deposition of Gregory Garner page 33 lines 7-20, hereinafter "Exh. K Garner").

The "standby time" is mandatory and the Coordinators had to sign a written agreement that they would work the mandated shifts (Exhibit N-Standby Contracts). For the mandatory standby shifts the Coordinators are not paid time and a half. (Exh. F Taylor at page 40 line 18 to page 41 line 17). In contrast, for work during the day, the Coordinators can get overtime for their day shift work upon approval by a supervisor, as well as overtime for attending meetings not in their scheduled time, such as meetings about the standby schedule, and for training (Exh. B Council at page 33 line 4 to page 35 line 21); (Exh. I Rodriquez at page 35 line 13 to page 36 line 17). They also get double time for attending an event such as the suicide walk. For this activity they can get comp time or cash (Id Rodriquez). If one of the Coordinators engages in community outreach by talking to groups, they are paid overtime at 1.5 hours (Exh. G Davis at page 48 line 10 to page 49 line 1).

The job specifications contain a broad list of illustrative examples of work that the Coordinators are expected to do (Exh D Coord. I and Exh. E Coord II) *As set forth herein at pages 32-43, these job descriptions do not accurately reflect the work that they actually do.* The Coordinators spend almost 100% of their time on the phone lines and at the same time enter records of the calls (Exh. G Davis at page 10 lines 11-21). Notably, the department's documents refer to their work location as a "call center" (Exh. J Standby Guidelines); (Exh. H Gaither at page 62 line 16 to page 63 line 4).

The Coordinators liken their job to a dispatcher for 9ll services (Exh. I Rodriquez at page 46 line 8 to page 47 line 24); (Exh. C Cater at page 110 line 14 to page 111 line 5). As Larry Carter testified, his job is similar to a police dispatcher. In response to a call he will send an emergency mobile team, police or fire rescue, depending on the circumstances. He described his job is gathering information (Id.). The Unit manager, Ms. Taylor, agrees that the job of the Coordinators is to gather information and direct the caller to the appropriate service (Exh. F Taylor at page 17 lines 4-6). When asked to describe the position of the Coordinators, she defined the Coordinators' job as a facilitative service (Id. Taylor at page 47 line 29 to page 49 line 8).

**B**. **Education and Prior Work Experience**

When the Plaintiffs were hired, the City of Philadelphia required a Master's Degree, or in the absence of a Master's Degree, a combination of education and a Bachelor's degree. No license is required for this position by the Commonwealth or the City (Exh. F. Taylor at page 55 lines 8-12). Ms. Taylor testified that all people have a major coursework in psychology, sociology, mental health counseling or social work (Id. Taylor at page 24 line 18 to page 25 line 2). The Mental Health Coordinator II has similar requirements, and is basically an in-position

12

promotion. No one has been hired directly as a Mental Health Coordinator II, and all the positions have been filled from within the department.

Ms. Taylor testified that there is a requirement of a master's degree and at least two years working experience related to emergency services for mental health. Ms. Taylor's preference is to hire a person with a master's degree (Exh. F Taylor at page 98 line 17 to page 99 line 12). In reality, some of the Coordinators who have satisfactorily done the job for years, only had a bachelor's degree that was not in the required field, or not the requisite experience, or both, or even a bachelor's degree but not a master's degree and not the experience required. In the opinion of Ms. Taylor, *it was not possible to be hired into the unit without experience* (Id. at page 19 lines 11-19). The need for experience is reflected in the candidate interviews and training. Prior to being hired, all of the potential candidates are interviewed. The interview consisted largely of questions and scenarios. Ms. Mackey Gaither testified that very specific questions were asked, and that you would not be able to answer the questions without experience with the City's involuntary commitment procedures (Exh. H Gaither at page 52 line 11 to page 54 line 8). Jennifer Jubilee testified that questions were asked about how to handle situations (Exhibit L Deposition of Jennifer Jubilee at page 7 line 20 to page 8 line 21, hereinafter "Exh L Jubilee").

Notably, the City is unable to say how these job specifications were created. They do not know who wrote the specification requiring a master's degree, experience, or the work description (Exh A Vasko at page 74 lines 1 to 14).  The City was unable to produce anyone in response to the notice of the 30(b)(6) deposition to testify as to how these were created. Most importantly, the City was unable to provide any job audits, studies or classification studies. (Exhibit P-Answer to First Set of Interrogatories and Exhibit O-Answer to Second Set of

Interrogatories); (Exh. F Taylor at page 57 line 23 to page 58 line 13). While the City cannot produce any responsive documents, there is no indication as to what efforts were made to locate the information. This speaks volume, and is really an admission that no such documents exist (Exhibit P-Answer to First Set of Interrogatories and Exhibit Q-City Response to Request for Admissions).

The description for the education requirement and work experience are similar for both positions.

| COORDINATOR I | COORDINATOR II |
|---|---|
| EDUCATION: Completion of a master's degree program at an accredited college or university with major course work in psychology, sociology, mental health counseling or social work. | EDUCATION:  Completion of a master's degree program at an accredited college or university with major course work in psychology, sociology, mental health counseling or social work. |
| AND EXPERIENCE: Two years of experience providing emergency services in the mental health field which has included processing voluntary and involuntary psychiatric commitments, working on a psychiatric mobile team, working in a crisis response center, answering calls in a mental health crisis or suicide prevention hotline, or providing mental health case management. | AND EXPERIENCE:  Two years of experience providing emergency services in the mental health field which has included processing voluntary and involuntary psychiatric commitments, working on a psychiatric mobile team, working in a crisis response center, answering calls in a mental health crisis or suicide prevention hotline, or providing mental health case management. |
| OR: Any equivalent combination of education and experience determined to be acceptable by the Office of Human Resources, which has included the completion of a master's degree as an educational minimum. | AND SPECIFIC EXPERIENCE:  Two years of full performance level experience consulting, advising, and providing mental and behavioral health crisis and suicide intervention in the twenty-four hour, seven days a week crisis call center for the City of Philadelphia's Department of Behavioral Health and Intellectual Disability Services. |
| | OR:  Any equivalent combination of education and experience determined to be acceptable by the Office of Human Resources, which has |

|  | included the specific experience and completion of a bachelor's degree as an educational minimum. |

In fact, while some of the Coordinators do have a master's degree, contrary to Ms. Taylor's belief, not all of them do.

.

| EMPLOYEE | EDUCATION | EXPERIENCE |
|---|---|---|
| LARRY CARTER | Bachelor degree in early childhood (for children K-8) and a minor in psychology. He did not take classes in clinical psychology or mental health counseling (Exh. C Carter at page 91 line 7 to page 92 line 24). | Prior to being hired he worked in a camp and om 2004 he worked in case management at the Einstein Crisis Center/ He interviewed individuals who came in to determine whether it was for a voluntary commitment or for a 302. He took a history, including mental, drug and alcohol, any current situations, why they were coming here and passed it on to the charge nurse. The charge nurse would examine them, pass this on to a doctor who would determine what treatment was required (Id. at page 6 L. 15 to page 10 line 3). |
| TIARA COUNCIL | Bachelor's degree in social work from Mansfield and a master's degree in social work from Temple in 2013. (Exh. B Council at page 50 line 12 to page 51 line 16). | Worked at Resources for Human Development. She helped people in shelters that have a mental health diagnosis to meet their goals. She does not do any clinical counseling and has no license (Id. Council at page 50 line 12 to page 52 line 4). |
| LESLIE DAVIS | She has a bachelor's degree in sociology. She does not have a higher degree (Exh. G Davis at page 8 lines 9 to 10). | Prior to this she was a social worker at DHS with the City for 18 months (Id. Davis at page 7 line 2 to page 8 line 7). |
| GREGORY GARNER | Master's degree in human service from Springfield College in | His first position at the City was a recreational leader as an |

| | | |
|---|---|---|
| | Massachusetts in 2003, and a bachelor's degrees in therapeutic recreation. Master's degree is genera focused around social work and behavioral health, the study of modifying one's behavior through various techniques. He took classes in psychology, but not specific counseling classes. He took classes in abnormal psychology, which is the study in part of mental illness (Exh. K Garner at page 7 line 13 to page 9 line 5). | independent contractor. He went to the recreation center because he has a degree in Therapeutic Recreation (Exh. K Garner at page 6 line 8 to page 9 line 10). |
| JENNIFER JUBILEE | Bachelor's degree in psychology and a master's degree in clinical counseling. She is a licensed counselor by the state (Exh. L Jubilee at page 7 line 22 to page 8 line 6). | Previously she was a case manager on a team for a mental health agency working to bring children therapeutic services. (Exh. L Jubilee at page 21 lines 3 to 11). |
| CATHY MACKEY GAITHER | A bachelor's degree in psychology from Temple (Exh. H Gaither at page 5 line 17 to page 6 line 12). | Before the City, she worked at Einstein Crisis Center and before that United Behavioral Health. At Einstein, she was a psychology tech. This involved taking a person's blood pressure and pulse, calling insurance for a pre-screen, and being involved with 302s. She took down information from the petitioner as to why they believed a 302 was needed. At United she was a team assistant which is basically an administrative assistant. United had contracts with companies for mental health treatment (Exh. H Gaither at page 6 Line 13 to page 7 line 21; page 13 line 20 to page 14 line 20). |
| ROCHELLE MORRIS | Received her undergraduate degree in sociology and black studies at University of Southern California at Santa Barbara and a master's degree in sociology from the State University of New York | She taught an emotional support class at Samuel Fels High School and that directed her to work in the mental health field. She also worked at United Behavioral Health. She answered |

| | | |
|---|---|---|
| | in Binghamton (Exhibit R-Deposition of Rochelle Morris at page 70 line 24 to page 71 line 13 hereinafter referred as "Exh. R Morris"). | a high volume of calls about insurance (Id. at page 43 line 6 to page 44 line 3; page 46 line 4 to 13). |
| KIMBERLY RODRIGUEZ | Received her bachelor's degree from Temple in psychology and a minor in criminal justice (Exh. I Rodriquez at page 48 Line 6 to page 49 line 16). | She prepared 302 petitions at Friends Hospital. Prior to that she worked at PATH, a community health agency, in the intake Department. That occasionally involved a person in a crisis (Exh. I Rodriquez at page 9 lines 11-23). |

## C. Training

When the Plaintiffs were hired, they underwent extensive training concerning how to handle an involuntary commitment based on the criteria set forth in the Act, as well as office policies and procedures about involuntary commitments. They also received training on the suicide line (Exh. C Carter at page 105 line 6 to page 103 line 8). There was also separate training on the National Suicide Line by a third-party provider (Exh A. Vasko at page 34 line 20 to page 33 line 22). During the training they received a binder with information on 302 commitments and office policies (Exh. Morris at page 67 line 22 to page 68 line 21; page 70 lines 1-13. They relied heavily on this binder to answer questions when they were first hired (Exh. L Jubilee at page 25 lines 20-21)[3]. Ms. Taylor testified that the 302 commitments are

---

[3]While they do not use the binder as frequently today, the Coordinators still turn to binder to address situations (Exh. G Davis at page 28 lines 24 to page 29 lines 6). If they have a non-routine matter they will bring it to the attention of their supervisor (Exh. L Jubilee at page 17 lines 9-16). In fact, at night, unusual matters or issues about which the Coordinators have doubts are to be brought to the attention of their supervisor. There is no reason that this is different during the day (Exh J Rules for Standby Time).

governed by the Act and the policies set forth in the binder (Exh. F Taylor at page 101 lines 8-13).

The in-house Coordinator training is generally six months (Exh. F Taylor at page 17 line 21 to page 18 line 12). As an example, Ms. Council passed her probation period of six months, which would have been the requisite six months of training, but did not get her delegate number for a year, and continued with training (Exh. B Council at page 11 line 20 to page 13 line 4). During the training the Coordinators role-played suicide calls and involuntary commitment calls with supervisors, consultants and colleagues (Exh. L Jubilee at page 22 line 5 to page 23 line 17). A Coordinator cannot approve or deny a petition for a 302 without obtaining a delegate number. While in training, the Coordinators would use the number of their supervisor (Exh. B Council at page 13 lines 4-21**).** In order to act on a 302, they would present the call to his supervisor, who would ask for the Coordinator's opinion, and give direction as to whether it was appropriate or not (Exh. K Garner at page 64 line 23 to page 65 line 9). Similar training was provided for the suicide line. Coordinators would go through scenarios with a supervisor and would act as if talking to a person on the line (Exh. I Rodriquez at page 47 line 14 to page 48 line 5; page 53 lines 4-10). It is clear that the on the job training was a major factor in their ability to perform their job.

The Coordinators also learned during training the four criteria set forth in the Mental Health Act were asked how to handle situations. There are no specific actions pointed out in the Act however. Guidance is provided for meeting the criteria of clear and present danger for harm to oneself and others, the meaning of harm for self-mutilation, as well as the inability to care for oneself (See 50 P.S. §7301). Many of the criteria are apparent and are black and white. Their

application with experience becomes routine (Exh K Garner at page 22 line 4 to 22**); (**Exh. B Council page 15 line 17 to page 19 line 10).

It is the on-job training and skill developed from years in their position that enables the Coordinators to perform their job, not any formal education. Ms. Vasko agreed that with respect to the 302 commitments, the Coordinators listen to the facts and base their assessment on their experience with the law (Exh A Vasko at page 65 lines 8-13). The unit supervisor, Ms. Taylor, confirms that the Coordinators develop their skills through training. She testified the coordinators first job is to investigate what the problem is, and there are certain guidelines they must. Ms. Taylor testified, "they are assessing a situation and that comes from experience, training—and training basically" (Exh. F Taylor at page 17 L 3 to 20).

**1. The Coordinators Agree With Ms. Taylor That Experience And Training, Not Their Formal Education, Prepared Them for Their Position**

Uniformly, all the Coordinators testified that their education did not prepare them for the position to deal with a 302 involuntary commitment or suicide calls.  When asked how necessary training was to perform her job as opposed to education, Ms. Rodriquez testified that 90% of what she does on the job comes from training.  (Exh I. Rodriquez at page 77 line 21 to page 78 line 3).

• Larry Carter testified what he does on the job he did not learn in college. It was the training on the job. His education in early childhood did not aid him in approving at 302. His education did not prepare him for involuntary commitments. It was all on the job training  (Exh. C Carter at page 94 line 9 to page 95 line 17; page 104 lines 9-12).

• Tiara Council, who does have a master's degree in social work, testified that she learned how to do her job as a delegate by on the job training, and she developed her skills by working (Exh B Council at page 58 line 13 to page 60 line 16).

- Leslie Davis learned how to do her job at the office and not in college. She has developed those skills after the past 14 years in her role as a delegate (Exh. C Davis at page 59 lines 7-15). Her decision-making became repetitive as the job requires that you keep doing the same thing over and over (Id. at page 47 line 7 to page 48 line 16). Because of her on the job experience and training, it has been awhile since she has had to deal with a new situation (Id. at page 59 lines 1-10).

- Katherine Mackey-Gaither does not believe that she uses anything she learned in her college courses to help with the lifeline or suicide line. She does not know of any school or college that would teach you to talk someone off a bridge. She had some psychotherapy classes but that is a different, as you can be schizophrenic and not want to kill yourself (Exh. H Gaither at page 39 line 3 to page 40 line 3). She learned her delegate job through training and on the job experience (Id. at page 19 lines 8-17). When she has an issue she has not seen before, she takes that to her supervisor. For example, the week before her deposition she had a new issue about a paraplegic that could not sign a 302, which she brought to her supervisor (Id. at page 19 line 19 to page 21 line 2). With respect to the 302 criteria under the Mental Health Act, when approving or denying a petition, she is looking for the four criteria embedded in the Act. She learned that on the job. (Id. page 16 line 19 to page 19 line 17).

- Gregory Garner testified that he uses his on the job experience to justify the granting or denial of a 302. He has run through a lot of scenarios in the past, and he knows what category to put each type of call in. This was not always the case and in the beginning of his tenure he relied on supervisors when he was unsure, Now, he can look back and say I have seen this before and know how to classify it. (Exh K Garner at P. 26 L. 1 to P. 27 L.  2) With respect to the suicide line he does not find that his master's degree helps to de-escalate these calls.  It is something you learn over time and the textbooks do not help very much. His classes in abnormal psychology really do not help. He did not come in knowing what to do.  (P.  35 L, 6 to P. 36 L. 18) In college there was a script and they would say x and y. In real life that is not how it works, the suicide calls, they do not follow a script. (P.  81 L 7- 24)

- Jennifer Jubilee has a master's degree and is a licensed social worker, but she testified that while knowledge about psychology helps, it does not make you any better at this job. It is the on the job training which teaches you the skills to determine whether the situation falls within the four criteria of the Mental Health Act (Exh. L Jubilee at page 21 line 12 to page 22 line 19).

- Rochelle Morris testified that what she learned in her masters in sociology did not prepare her for her current job (Exh. R Morris at page 67 line 23 to page 69 line 24). It was all on the job and learning from co-workers and supervisors. (Id. page 71 lines 6- 24).

- Kimberly Rodriquez received a bachelor of arts in psychology and a minor in criminal justice from Temple. She does not think the bachelor in psychology prepared her for the job. It gave her a foundation in mental health and helps her by providing background knowledge, but the day to day tasks are what she was trained for on the job (Exh. I Rodriquez at page 48 line 6 to page 49 line 7).

20

In fact, Ms. Vasko, then the acting head of the Department, testified that when dealing with a 302, the Coordinators are making an assessment about the danger as set forth in the Act, and that the assessment is based on their "experience with the law". Absent from that statement is any suggested need for a master's degree in the fields listed. (Exh. A Vasko at page 65 lines 8-13).

## D. Delegate Line Types of Calls Handled

### 1. Involuntary Commitments

#### a. 302 Procedure

If a police officer, a medical doctor, or the prison files a 302 involuntary commitment petition, the petition is approved automatically. This is called a "review". The coordinator cannot change this decision and simply enters the information into the computer system (Exh. C Carter page 31 line 14 to page 33 line 6); (Exh I Rodriquez at page 10 line 11 to page 11 line 19). With respect to other 302 petitions, these are commonly referred to as "civilian petition" and Coordinators will approve or deny these petitions based on the four criteria of the Act. These can come from a mobile team, a crisis response center, or a facility (Exh I Rodriquez at page 10 lines 1-15). When it is a civilian petition, a Coordinator must determine if the caller is from a Crisis Center, a mobile team, or a facility trained by the Acute Services Department. If an individual calls to initiate a civilian 302 petition, they are directed to a Crisis Center, a community mental health center, or to a case manager or an emergency team (mobile team). (Id. at page 14 line 1 to page 15 line 7).

The Crisis Centers were part of an older system comprised of psychiatric hospitals for individuals. There are five centers: Temple, Mercy Hospital, Children's Hospital, Friends, and Einstein. A family member can go to these centers to inquire about a 302, and a member of the

staff gathers the information for the petition and calls it into the delegate (Exh. C Carter page 33 lines 8 to page 34 line 12). A 302 could also be initiated from other mental health agencies, with them calling into the Unit. These facilities include Northwest Human Services, Warren E. Smith, and JFK (Id. at page 20 line 22 to page 21 line 21). A caller from a facility fills out the paper work based on the observations of a member of the staff (Exh C Carter at page 21 line 2 to page 23 line 4).

In addition, as set forth infra, mobile teams can be dispatched to assess an individual who is in a crisis for purposes of a 302 commitment.  The policy of the department is to send a mobile team out upon request to an individual or a facility (Exh. C Carter at page 38 line 4 to page 41 line 22). The person in crisis is commonly referred to as the client (Exh. I Rodriquez at page 14 lines 9-14). The mobile team assesses the situation and conveys to the Coordinator their firsthand knowledge. The mobile team may attempt to convince the client to go without being involuntarily committed (Id. at page 24 lines 5-8).  If the client is acting fine when the mobile team arrives, but the person who called in reiterates that the client is acting in a manor consistent with a 302, then the mobile team has to further assess the situation. The mobile team would then have to determine, after meeting with a client and with the person who initiated the call whether a 302 is appropriate. There are times when the mobile team thinks everything is fine. In that instance, the mobile team leaves the client there. Other times it is not so clear, so the mobile teams file a petition and seeks approval for a 302. There have been other times but very rarely when a mobile team is called out and the petition is denied  (Id. at page 23 line 23 to page 25 line 17). When the 302 request is from a mobile team, the Coordinators agree with the mobile team 99.9% of the time. (Id. at page 25 lines 17-20).

A 302 does not mean you have to be in the hospital; it just means you need to be assessed to see if you need to go to the hospital. The Coordinator is approving a petition to issue a warrant served by the police to bring a person in for an evaluation, which is conducted by a psychiatrist (Exh. I Rodriquez page 23 lines 11-22). The evaluation of the individual subject to a 302 is required to be done within two hours unless the person is intoxicated or under the influence of alcohol, or there is a medical issue. In that case, they have to wait to see the psychiatrist before they can leave (Id. at page 29 line 20 to page 30 line 24). The Coordinators receive calls for a review or approval during both the day and night shifts. However, typically at night, Coordinators get mostly reviews, as you do not have many people going to a crisis center in the middle of the night. (Id. at page 11 line 16 to page 12 line 14)[4].

### b. Approving or Denying the 302

The Coordinator makes the decision to approve or deny a 302 based on a strict criterion. It is based on whether or not the facts fit the four criteria set forth in the Act which governs involuntary commitments.  The petition is based on conduct of the person within a 30-day period

 prior to the petition.  (Exh. G Leslie P. 24 L 1 to P. 25 L. 5)

The criteria for approving or denying a 302 commitment are: clear and present danger to self and others, inability to care for one's self, suicide attempt, self-mutilation. Expanding on

---

[4] During the day as well as the night, the breakdown of delegate calls versus the suicide calls varies day-to-day. Some days a Coordinator might primarily get suicide calls or all lifeline calls, which are the national suicide line. Other days might be all delegate calls. This could vary by person depending on how calls are received.  As Ms. Rodriquez  testified,  "the person next to me could have ten 302s but I only have five general question calls and I could have two suicide calls (Exh. I Rodriquez on page 43 line 23 to page 45 line 22). In 13 years, Catherine Gaither testified she has had some nights with one call, three with zero calls, and some with 40 calls. (Exh H Gaither at  P. 11 L.`12  to  P. 13  L. 21.)

this, as one delegate explained, the criteria in the Code and the Law sets forth for clear and present danger. As Ms. Rodriquez elucidated:

> The first one is harm to others, meaning the person is harming others to the point that, you know, it could be serious bodily injury done. Second is inability to care, where they don't care for themselves so much that it causes them harm. The next one is suicidal ideations or suicide attempt, meaning that they hurt themselves or are talking about hurting themselves. The last one is self-mutilation or self-injurious behaviors, that they're doing things to injure themselves, not necessarily want to kill themselves but doing something like cutting themselves, things like that that can lead to bodily injury or death.  (Exh. I Rodriquez at page 90 Line 10 to page 91 line 13).

The Crisis Center, mobile team, or approved agencies fill out the 302 form and read the information to the Coordinator. These callers are providing the Coordinator the facts and asking if the Coordinator agrees that the conduct fits within the parameters of the Act (Exh. C Carter at page 34 lines 8-24). The Coordinators are guided by the Act, the office policy, and the skill set acquired through their on the job training. A copy of a sample filled out 302 is attached as (Exhibit T-Form Filled Out 302 From Training).

It is the delegate's job to look at the information provided by the crisis center, mobile team or the facility. When deciding whether or not to grant the 302, it is generally not necessary to examine the client's history in the computer, because you are looking at the history of the past thirty days, and you cannot commit a person because they have been committed in the past (which is prohibited by the Act). Frequently the person initiating the petition is familiar with the client's history, and will oftentimes include that information (Exh. K Garner page 79 line 14 to page 81 line 7).

If petitioners have not provided sufficient information, the Coordinators will ask additional questions. The delegate can also refer it back to the caller, and ask them to obtain more information, putting the caller on hold or requesting a return call (Exh. I Rodriquez at page

22 lines 4-19). The same standard applies to calls from a community health agency that are calling in a 302.  However, as this is generally a known patient of the community health agency, the agency would often know a great deal about this individual (Id. at page 22 lines 15-22). The Delegate may ask for more background information, in particular, in spousal situations as this situation could involve an ulterior motive. (Exh L Jubilee at page 24 line 4 to page  25 line 3).

The Coordinator will approve or deny a 302 involuntary petition based on information given to them over the phone (Exh. C Carter page 33 line 12 to page 34 line 24). The Coordinator does not perform a diagnosis; it is part of the petition that is read to them over the telephone. The Coordinator would hear the assessment and diagnosis of the individual in question, however they would not hear the examination of the individual (Exh I Rodriquez at page 31 lines 4-15). On the second page of the petition, the four criteria are set forth and explained and the petitioner decides which criterion of the Act is met by checking off a box. (Exh. G Davis at page 27 line 6 to page 28 line8); (Exh. T Form Filled out 302 From Training)**.** The petition indicates what criteria in the Act the petitioner is relying upon. At that juncture, the delegates examine what has been put into the statement to make sure that it matches or meets the criteria of the Act  (Exh. B Council page 19 line 13 to page 20 line 2).

*The job of the coordinator is to make a decision as to whether the petition should be approved based on the criteria set forth in the Act.* (Exh. L Jubilee page 16 line 5 to page 17 line 16). *This is not so much a decision as it is a response to the information provided.*   As one Coordinator explained, her independent judgment is not what she personally thinks of the situation but whether it meets the criteria of the Act. Therefore, she is looking at the four criteria. (Exh. H Gaither page 56 lines 1-25). If the matter is not routine, they will consult with their

supervisors (Exh. L Jubilee at page 17 lines 4-16). As Ms. Gaither testified they are "on a short leash" (Exh. H Gaither at page 21 lines 1-18**)**.

### c. Mobile Teams

Calls come into the Delegate line concerning people in crisis, and the policy is to dispatch a mobile team if requested (Exh. C Carter page 38 line 12 to page 49 line 4). The function of the mobile teams is to go out and determine if a 302 is justified, or if they are able to transport a person willing to be evaluated for a voluntary commitment (Id. Carter page 37 lines 13 to 18). If they decide that a 302 is warranted, the mobile team calls the Unit to have the 302 approved. Petitions filed by the Mobile Teams are approved 99% of the time (Exh. I Rodriquez at page 23 line 2 to page 25 line 20).

There are two different kinds of mobile teams. One is the adult mobile team that is run by JFK Mental Health Clinic and on Broad Street. The children's teams are divided into three different agencies: Bethann, Elwyn and PATH (Id. Rodriquez at page 26 line 22 to page 27 line2). The children's mobile teams can be dispatched to schools or homes. The children's teams came into existence because of all the calls the Coordinators were receiving which resulted in the inability to send out a mobile team due to the number of calls concerning children (Exh. I Rodriquez page 46 line 2 to page 47 line 5). Mobile teams are dispatched to schools on a daily basis. In fact, during the school year, the Coordinators' time can be monopolized by request to have a children's mobile team dispatched to public schools. Ms. Rodriquez estimated that the Coordinators receive at least 25 to 30 calls during the day shift for children's teams [5] (Id. at page 45 lines 4-20**).**  The amount of time dealing with dispatching is significant for the Coordinators.

_____

[5] There is also a community team that deals with one section of the city in West Philadelphia. Previously there were teams for each section of the City, however due to budget cuts this is the

### d. Information on the Delegate Line

A large number of the calls on the Delegate line deal with information requests. These cover a variety of topics including where to take a child for an evaluation or calls about insurance, which are, directed elsewhere (Exh. C Carter at page 65 line 20 to page 17 line 7). It could be a member of the public calling to ask general questions about the 302 process (Id. Carter at page 19 line 4 to page 20 line 18). A number of calls come in that are not related to the function of the unit.  For example, the Coordinators can get calls about where to pay an electric bill or water bill, how do I get in touch with a case manager, what other services are available, etc., all these calls are referred to City of Philadelphia's 311 number (Exh. G Davis at page 102 lines 13-22).

### E. Suicide Lines-Local And National

There are two suicide lines, the local line and the national lines, with calls from as far away as Texas (Exh. C Carter at page 51 lines 11-23). The Coordinators provide information, referral and stabilization and they do the same thing on the local and national line. (Exh. G Davis page 42 line 14 to page 43 line 9). The amount of information that can be provided is limited on the national line, as calls come in from as far away as Texas. (Exh. C Carter at page 51 lines 8-13). Ms. Taylor testified that the national line also includes any 215 area calls outside the Philadelphia area (Exh. F Taylor at page 34 lines11-20). The calls on the suicide line are often longer (Exh. H Gaither at page 13 lines 9-19). The call volume has increased dramatically on the

---

only one left. They used to see adults and children but when children's teams came into place, they only started dealing with adults. This team works Monday to Friday. This team has the ability to take someone to a doctor but can also do crisis calls (Exh. G Davis page 34 line16 to page 35 line 22).

suicide lines. Many of the callers are not really in crisis or suicidal, in particular on the national line[6]. A number of calls on the national suicide line are people who have friends that are suicidal or just want to talk because their relationship is going badly, they have money problems or they cannot stand the government, they hate Trump etc, (Exh. B Council page 61 lines 1-7). The Lifeline is advertised on the trains so you get calls if Anthony Bourdain kills himself or from people who cannot sleep (Exh. H Gaither at page 37 lines 1-17).

What the Coordinator does on the suicide line depends on the calls. Sometimes people want to talk or want information about someone else, or they might want to know how to talk to someone who is suicidal (Exh. K Garner at page 34 lines 8-17). Additionally, some calls are pranks or annoying. There are calls from people who scream or masturbate, or they call at 3:00 A.M. to ask what the talk line is for. The Coordinators try to listen to determine who really needs to be directed to a service (Exh. I Rodriquez at page 50 lines 1-20).

Notably, the unit manager agrees that they are not engaged in any clinical counseling on the suicide line. As Ms. Taylor explained, the Coordinators' response to calls from the suicide line,

> well, they make a determination what needs to be done with that person, whether or not that person just requires a referral to a mental health facility or to a crisis center. They could say, well, you know, maybe have you thought about maybe going to talk to someone about your feelings? It may require that the delegate or the counselor stay on the line with the 911 dispatcher because a person is at risk (Exh. F Taylor page 33 line lines 1-10).

The goal is to determine the level of danger and whether you can tell them where to get services.

(Exh. J. Jubilee page 34 line 2 to page 35 line 3), not to directly providing counseling services.

---

[6] The City of Philadelphia participates in the National Line for $1,500.00 a year (Exhibit P Answer to First Set of Interrogatories, Interrogatory # 9). The volume of calls has increased on this Line, as previously the Coordinators only answered this line during the day and not at night.

All the Coordinators agree that they do not provide clinical counseling on the suicide hotlines. Jennifer Jubilee, who is a licensed professional counselor, testified that they are not doing clinical counseling on the phone; they are de-escalating to get the person out of a crisis mode (Exh. L Jubilee page 56 line 14 to page 57 line 9). Ms. Jubilee explained,

> Well, the difference is – well, when you're counseling somebody on a licensed professional level, you're actually, you know, engaging with them and providing certain interventions, certain modalities and therapeutical techniques. On a crisis hotline, you don't really have the time or the ability to do that with the high volume calls we receive. You have to kind of really get to the heart of what's going on with them and really assess what they need at that moment and provide that intervention immediately (Id. at P. 36 lines 3-15).

In fact, the Coordinators, even those with master's degrees, are not qualified to do counseling given their educational background and lack of a license (Exh. Morris at page 70 line 1 to page 71 L. 2) (Exh K Garner at page 69 line 18 to page 70 line 7). They are also not qualified to recommend treatment: that is the job of the psychologist or psychiatrist. (Exh. B Council at page 56 lines 7 to page 57 line 24).

The assessment is not a clinical diagnosis. The coordinators try to assess what is going on to find out if the caller is actively suicidal; because not everyone who calls the suicide hotline is actually suicidal. As Ms. Rodriquez explained, "you talk to them and ask them what's going on today, ask how are you feeling, and then you ask the question are you feeling suicidal, because you're not going to put that thought in their head, and if they say yes, you ask what's going on, why do you feel that way, are you interested in treatment" (Exh. I Rodriquez at page 49 lines 13-18) .The Coordinator listens, gives the caller comfort and tries to calm them down. If someone is blatantly dangerous or they said they were going to harm themselves, the Coordinators talk them down a bit, keep them on the phone and call a mobile team, fire rescue or the police (Exh. C Carter page 52 line 1 to page 53 line 18); (Exh. K Garner page 36 lines 8-20).

As to whether the delegates get more suicide calls during the day or night that depends on the day, the time of year or the full moon, or a payday. At times you can have all suicide calls at night**.** Typically, you have busier suicide calls during the holidays, Christmas and New Year's when people are feeling down and out. There are more calls if a celebrity dies because of advertisements on the National Suicide Hotline. If you go on SEPTA, you see 1-800 275-Talk. The national line is also advertised on television (Exh. I Rodriquez at page 51 line 11 to page 52 line 11). When questioned about the percentage of time that they spent on the lines, the Coordinators said that it varied, however the Coordinators generally agreed more time was spent on the suicide lines (Exh. R Morris at page 17 line 11 to page 18 line 21); (Exh. H Gaither at page 36 lines 9-13). Many of the Coordinators felt that between the two lines that they spent the majority of their time on the suicide line calls. Gregory Garner testified he spend as much as 70% of his time on the two lines (Exh. K Garner at page 16 line 1 to page 17   line 9). Additionally, the calls are generally longer on the suicide calls. Ms. Gaither noted the average call on these lines could be 20 minutes but the longer ones are an hour. Whereas a 302 approval or denial takes only 3 to 4 minutes when the crisis center knows what they are doing (Exh. H Gaither page 10 line 1 to page 13 line 13, page 54 line 12 to page 55 line 2).

**E. Data Entry**

Data entry is a major Coordinator job duty. Virtually every call on both lines requires entry of information into the system (Exh. I Rodriquez at page 75 lines 5-13); (Exh. L Jubilee page 58 line 18 to page 61line 9), The forms used to be in paper, but now are entered into the computer system. The same rules apply for data entry during standby time. Every phone call concerning a 302 is entered into the system, as well as the review and the approval or denial. (Exh. L Jubilee at page 55 lines 7-8). Entries are made whenever a mobile team is dispatched**.**

(Id. Jubilee at page 60 lines12-24). For every line there are forms to fill out, and if the system is not working you must handwrite them and then later type it into the computer (Exh. H Gaither at page 54 line 12 to page 55 line 2). They also enter information on calls on the suicide line (Exh L Jubilee at page 60 line 23 to page 60 line 3). Coordinators do not follow up for the results for either a 302 involuntary commitment or suicide call, At various times the Coordinators have been required to fill out other forms (Exh I Rodriquez at page 97 line 1 to page 98 line 4). They also fill out forms on missing persons (Exh G Davis at page 61 lines 10-18).  The Coordinators do not do anything with this data. They do not maintain the data base; they do not analyze the data and they do not use the data to make policy (Exh H Gaither at page 25 lines 11 to 19). To the Coordinators, at times, this data entry seems like their primary job (Exh L Jubilee at page 58 line 15 to page 61 line 13). Gregory Garner estimated that 30% of his time is spent entering data (Exh K Garner at page 63 lines 8-23).

**F. The Illustrative Examples Of The Work And Job Responsibilities Are Not Accurate In The Position Specifications, Nor Is The Acute Service Delegate Task List Accurate**

When the Plaintiffs are promoted into the position of Mental Health Coordinator II, they are doing the same job functions as Coordinator I (Exh. A Vasko page 17 lines 1-5). As the side-by-side comparison shows many of the job responsibilities are virtually the same for Coordinator I and II. The job specifications are provided as Exhibits D and E.   The job specifications of the Coordinators provide illustrative examples of their duties. (Exh. D Coord. I and Exh. E Coord. II). Ms. Taylor Smith stated that the Coordinators are trying to provide emergency services to people who are in need of behavioral health service (Exh F Taylor page 16 lines 5-20). However, illustrative examples show a more engaged process by using terms such as consultation or referral. In fact, a consultation simply means that they are providing information to a caller. An assessment means to glean information to determine what service to dispatch or provide

information about. The examples inaccurately suggest a job in which the Coordinators are making treatment decisions. In fact listed are numerous jobs that the Coordinators do not perform, or even fully comprehend, let alone or have time to do properly.

| COORDINATOR I | COORDINATOR II |
|---|---|
| • Acts as a delegate for the county administrator ensuring that actions of the public and professionals in the field are in accordance with established legal mandates, state law and the Office's policies and procedures | • Acts as a delegate for the county administrator ensuring that actions of the public and professionals in the field are in accordance with established legal mandates, state law and the Office's policies and procedures |
| • receives calls for emergency involuntary commitments and gives instructions for the proper procedure to be followed to effectuate the commitment process | • receives calls for emergency involuntary commitments and gives instructions for the proper procedure to be followed to effectuate the<br>• commitment process |
| • reviews and evaluates petitions received from crisis response centers and other authorized facilities throughout the City; | • reviews and evaluates petitions received from Crisis Response Centers and other authorized facilities throughout the City |
| • makes a clinical assessment of the patient's condition via telephone | • makes a clinical assessment of the clients' condition via telephone |
| • approves or disapproves the request based on the assessment made and the stipulations set forth in the Mental Health Procedures Act | • approves or disapproves the request based on the assessment made and the stipulations set forth in the Mental Health Procedures Act |
| • maintains records of all calls, petitions, and outcomes | • documents reasons for decisions, as required; maintains records of all calls, petitions, and outcomes |
| • reviews and assigns documents from the treating authority when received. | • reviews and signs documents from the treating authority when received |
| • Assesses client's clinical history from | • Assesses clients' clinical history from |

| | |
|---|---|
| computer file or users of Crisis Response Centers for involuntary commitment cases or other prevailing situations | computer file of users of psychiatric emergency services for involuntary commitment cases or other prevailing situations |
| • uses the computer to enter involuntary commitments (302's) and other work-related documents; | • uses the computer to enter involuntary commitments (302's) |
| • accesses client data base | • accesses client data base |
| • makes preliminary recommendation for treatment; | • makes preliminary recommendation for treatment |
| • arranges sites for emergency psychiatric evaluations. | • arranges sites for emergency psychiatric evaluations. |
| • Prioritizes and assesses behavioral health emergencies for appropriate action | • Prioritizes and assesses behavioral health emergencies for appropriate action |
| • prioritizes cases when multiple requests are received based on information gathered for each individual case; | • prioritizes cases when multiple requests are received based on information gathered for each individual case; |
| • recommends appropriate service options and checks for availability | • recommends appropriate service options and checks for availability |
| • may dispatch a crisis specialist, a mobile emergency team, or other crisis resource service if it is determined that immediate care is needed or further assessment is necessary | • may dispatch a crisis specialist, a mobile emergency team or other crisis resource service if it is determined that immediate care is needed or further assessment is necessary |
| • may recommend subsequent action following clinical diagnosis by Crisis Response Center psychiatrist based on client's prior history, present state, and available resources | • may recommend subsequent action following clinical diagnosis by Crisis Response Center psychiatrist based on clients' prior history, present state, and available resources. |
| • Periodically visits crisis response centers to ensure that behavioral health emergency services are being provided as required | • Makes regular scheduled site visits and monitors Crisis Response Centers to ensure that behavioral health emergency services are being |

|  | provided as required |
|---|---|
| • reports findings to superior | • reports findings to superior |
| • follows up with providers as required. | • prepares written account and follows up with providers as required |
| • Provides a referral and informational service when calls are received; interprets and explains Office policy and procedures, court proceedings, and the laws governing the commitment process when appropriate; |  |
| • may respond to other city-wide crisis and emergencies that require behavioral health and crisis intervention | • may respond to other city-wide crisis and emergencies that require behavioral health and crisis intervention; |
| • may provide training to a wide variety of agencies and the public regarding services offered by the Acute Services Unit |  |
| • may handle politically sensitive situations that may involve other City departments; | • handles politically sensitive cases that may involve other City departments |
| • may monitor Crisis Response Centers |  |
| • receives calls regarding missing persons and mentally ill homeless persons |  |
| • assesses and approves admission into a Crisis Residence |  |
| • Receives calls regarding missing persons and mentally ill homeless persons | • Receives calls regarding missing persons and mentally ill homeless persons |
| • assesses and approves admission into a Crisis Residence | • assesses and approves admission into a Crisis Residence |

34

| | |
|---|---|
| • receives calls on the suicide and crisis intervention phone lines | • Receives calls on the suicide and crisis intervention phone lines |
| • attempts to determine the source of the problem | • attempts to determine the source of the problem |
| • provides support to caller, informing him/her of available resources; tries to determine if suicide attempt has been initiated or if caller is in immediate danger of harm | • provides support to caller, informing him/her of available resources; tries to determine if suicide attempt has been initiated or if caller is in immediate danger of harm; |
| • tries to calm caller and to talk him/her out of attempt | • tries to calm caller and to talk him/her out of attempt; |
| • attempts to ascertain the location of the caller | • attempts to ascertain the location of the caller; |
| • may have call traced; | • may have call traced; |
| • occasionally contacts the Police Department to dispatch a squad car to the location if necessary. | • occasionally contacts the Police Department to dispatch squad car or medical personnel to the location if felt necessary. |
| • Performs related work as required. | • Performs related work as required. |
| | • Provides a referral and informational service when calls are received; interprets and explains Office policies and procedures, court proceedings and the laws governing the commitment |
| | • Evaluates complaints received in the Office regarding services received; researches the circumstances surrounding the complaint in an attempt to reach a satisfactory workable solution; informs complainant of recommended solution. |

35

| | |
|---|---|
| | • Gives presentations to groups upon request speaking on specific mental health topics or disseminating general information about the services provided by the Office along with its governing policies and procedures. |
| | • Takes lead and active role in disaster preparedness and planning activities for behavioral health actions and involvement in possible disaster events; works closely with the City's disaster planning initiative; takes responsibility for ensuring that the behavioral component of the plan is in place and workable. |
| | • Serves as a point person for the police crisis intervention team training program. |
| | • Works on data collection and statistical research to analyze call center operations; participates in the<br>• creation and revision of call center operational memoranda, guidelines and directives when necessary and assists in the ongoing updating and revisions of the call center operations |

During their depositions, the Coordinators were also shown an exhibit, which summarized their job duties: Delegate Tasks Acute Services Bates Number City001653 with sentences numbered 1-22. Some of these sentences correspond to the Job Specifications and this document omits or adds certain job duties and responsibilities found in the Job Specifications. The version below, unlike the Illustrative Examples, did not suggest that the coordinators engage in treatment decisions while on the delegate line or suicide line but still suggest an expanded job.

36

In order, to explain what the coordinators do and do not do, these will be explained by set forth what the Coordinators do and don't and when necessary reference the job specifications.

## DELEGATE TASKS: ACUTE SERVICE UNIT

### 1. Approval, denials and reviews of Applications for Involuntary Emergency Examination and Treatment

The Coordinators review petitions, which mean an automatic approval (Exh. I Rodriquez at page 10 line 16 to page 11 line 4). Employees approve or deny a 302 petition by following the four criteria in the Act and the determination of danger as set forth in the statute (Exh. A Vasko at page 64 line 8 to page 65 line 14); (Exh. B Council at page 15 line 9 to page 20 line 2).

Contrary to the suggestion in the Illustrative Examples, the Coordinators do not do a clinical assessment (Exh. C Carter at page 58 line 20 to page 59 line 8). The Coordinators do not make a diagnosis (Exh. K Garner at page 35 lines 17-19). This is often provided to them (Exh. I Rodriquez at page 32 lines 4-10). A full history is generally not necessary because generally only the previous 30 days is relevant under the applicable law. The Illustrative Examples also suggest that the Coordinators make preliminary recommendation for treatment, a subsequent recommendation after a diagnosis by a psychiatrist, and follow-ups. None of this is done by the Coordinator (Exh. B Council at page 54 line 11 to page 55 line 5); (Exh. H Gaither at page 60. lines 10-17); (Exh. K Garner at page 60 line 1 to page 61 line 3; page 70 lines 19-22; page 72 line 24 to page 73 line 11).

### 2. Dispatching JFK Emergency Mobile Teams, other Regional City Based Mobile Teams and the Children's Mobile Crisis Teams

Employees perform this task; however, they cannot divert without supervisor approval (Exh. C Carter at page 40 line 20 to page 41 line 12); (Exh. L Jubilee at page 24 line 14 to page 27 line 19).

### 3. Assessment of the need for a Crisis Specialist and subsequent deployment in case situations where appropriate.

The Coordinators do not do this: the decision to send a Crisis Specialist is made by the JFK mobile team (Exh. C Carter at page 69 line 17 to page 70 line 9); (Exh. G Davis at page 39 line 2 to page 40 line 1).

### 4. Assessment and approval of admission for clients Into the Crisis Residence when appropriate

The Coordinators do not recommend and approve admissions into a Crisis Residence. They may receive a call to verify when a bed is made available, but they have no role in the admission decision (Exh. C Carter at page 67 lines 1- 21); (Exh. G Davis at pages 39 lines 3-10); (Exh. L Jubilee at page 31 lines 4-13).

### 5. *Information and Referral on mental health and substance abuse issues*

The delegates do provide information, which is called a referral, on mental health but not substance abuse issues to callers (Exh. G Davis at page 40 line 12 to page 41 line 3). The delegates are providing information about whom to call (Exh. K Garner at page 39 line 9 to page 40 line 2).

### 6. *Review of Police and Physician 302 petitions*

Yes, a review is an automatic approval and includes prisons (See pages 21).

### 7. *Providing technical advice, guidance and consultation to the public, professionals, clients, Crisis Response Centers, end a wide variety of other agencies regarding behavioral health matters*

The delegates do not provide technical advice (Exh. K Garner at page 40 lines 7-21); (Exh. L Jubilee at page 32 lines 14-21). They do provide guidance on psychiatric emergencies (Exh. G. Davis at page 41 line21 to page 42 line 2). They do not provide a full consultation; they are simply providing information (Exh. K Garner at page 40 lines 7-21). A consultation merely means providing "information about how to access resources or information about the Mental Health Procedures Act" (Exh. F Taylor at page 30 lines 6-23). The Coordinators, contrary to the Illustrative example, are not visiting Crisis Response Centers, writing reports to their supervisors or providers (Exh. K Garner at page 61 lines 1-23).

### 8. *Providing service to a variety of callers involving a wide array of behavioral health specific case issues*

The services are information, dispatching, working on the suicide line and delegate line. The options of services are limited on the suicide line to talking to the individual to calm them down or provide help. The services on the delegate lines are limited to information, sending a mobile team and approving or denying a 302.

### 9. *Using the computer to enter 302's; access client data base; Mobile Team Dispatches; use of Veoci Application to enter data, etc; send E-Mails; prepare memoranda on various procedures, guidelines and directives relating to the behavioral health system*

The coordinators enter data but do not analysis the data (Exh. A. Vasko at page 72 line 23 to page 7 line 15); (Exh. H Gaither at page 25 lines 16-19; page 62 line 16 to page 63 line 4); (Exh. K Garner at page 42 lines 15-22). They are not involved in preparing memorandum on procedures, guidelines or directives relating to behavioral health system (Exh. C Carter at page 10 lines 12-16); (Exh. B Council at page 67 lines 15-16); (Exh. H Gaither at page 25 lines 11-15); (Exh. Jubilee at page 33 line 14 to page 34 line 6).

**10. *Responding to other City-Wide Crisis and Emergencies that could and do occur that require mental health and crisis intervention knowledge and skills***

The Coordinators do not do this. They might receive a phone call to send a mobile team (Exh. G Davis at page 42 lines 6-13); (Exh. H Gaither at page 25 line 20 to page 26 line 16); (Exh. L Jubilee at page  24 line 19 to page 35 line 16).

**11. *Providing crisis counseling and suicide prevention services to individuals who contact the local Suicide and Crisis Intervention Line***

The coordinators do not provide counseling; it is crisis intervention (Exh. G Davis at page 43 lines 3-5); (Exh. L Jubilee at page 35 line 8 to page 37 line 4); (Exh R Morris at P. 72 lines 6-10). Their goal is to listen to the caller and calm the caller down. They will direct the caller to services, dispatch a mobile team or if necessary, call the police if given a location.

**12. *Serving as a network provider to the National Suicide Prevention Lifeline and providing service to those persons who call that Line***

The City is the network provider and it is staffed by the delegates. Services are provided to the entire 215 area code region, but delegates also receive calls from across the country (Exh. C Carter at page 51 line 14 to page 52 line 17.); ( Exh. F Taylor at  page 34 lines 1-22 ).

**13. *Providing 30 to 50 trainings annually to a wide variety of agencies, Universities, Hospitals and the public regarding services offered by the Acute Services Unit.***

The Coordinators do not do this (Exh. C Carter at page 73 line 1 to page 74 line 2); (Exh. G Davis at page 43 line 10 to page 44 line 7); (Exh. L Jubilee at page 37 lines 9-16); Gaither noted he had accompanied a consultant to 3 trainings (Exh. H Gaither at page 26 lines 17 to page 28 line 4); Gregory Garner testified he did two training over his +10 year career (Exh. K Garner at page 43 lines 1-6).

**14. *The diversion of clients only when necessary from Crisis Response Centers that may be temporarily overloaded.***

Yes, but this must be done with the approval of a supervisor (Exh. C Carter at page 74 lines 1 - 20); (Exh. G Davis at page 44 lines 9-24).

**15. *Handling politically sensitive behavioral health case situations referred by City Council and other political sources that involve situations in other City Departments as well as the Community***

They may be contacted by a council person or an agency about an employee or a constituent (Exh C Cater at P.74 L. 21 to P. 75 L.  22).

**16. *Provision of a 24-hour 7 day a week available phone line for a wide variety of behavioral health problems and issues that need to be immediately communicated to administrative staff for possible action***

The Coordinators bring any questions to supervisors (Exh. J-Rules for Standby Time).

### 17. Participation on the Crisis Response Centers Behavioral Health Monitoring Teams

All of the Coordinators say they do not have a role with the Crisis Response Centers (Exh. C Carter at page 75 line 15 to page 76 line12); (Exh. H Gaither at page 29 line 17 to page 30 line 7); (Exh. K Garner at page 43 line 20 to page 44 line 2); (Exh. L Jubilee at page 38 lines 6-11).

The Illustrative Example suggests that they visit the Centers to monitor the services, write reports for supervisors, and make report to providers. This is not the case (Exh. C Carter at page 55 lines15-20); (Exh. H Gaither at page 29 line 7 to page 30 line 2).

### 18. Participation on various advisory boards of social service organizations

All of the Coordinators say they do not do this (Exh. C Carter at page 77 lines 13-14); (Exh. G Davis at page 42 lines1-9); (Exh. H Gaither at page 30 line11; page 61 lines 10-13); (Exh. K Garner at page 44 lines 3-5); (Exh. L Jubilee at page 76 lines 13-16).

### 19. Troubleshooting and assisting in the designing and redesigning of new procedures and services to improve the delivery of behavioral health crisis services

All of the Coordinators say they do not do this (Exh. C Carter at page 77 lines1-3); (Exh. G Davis at page 45 lines 11-15); (Exh. H Gaither at page 30 lines 11-13); (Exh. K Garner at page 44 lines 12-15); (Exh. L Jubilee at page 39 line 20 to page 40 line 2).

### 20. Major and extensive training of police officers in the Crisis Intervention Model for working with persons who have a behavioral health issue.

All of the Coordinators say they do not do this (Exh. C Carter at page 77 line 11 to page 78 line 14); (Exh. G Davis at page 46 lines 16-20); (Exh. L Jubilee at page 39 lines 2-17). At times some people have participated in role-playing exercises (Exh. G Gaither at page 30 line 15 to page 32 line 12); (Exh. Garner at page 44 lines 12-15).

### 21. Ongoing collaboration, planning and preparedness training with the Philadelphia Office of Emergency Management pertaining to handling behavioral health issues caused by major natural or terroristic disasters

The delegates do not participate in ongoing collaboration, planning and preparedness training with the Philadelphia Office of Emergency[7] (Exh .F Davis page 78 lines 16 to 20); (Exh. H

---

[7] Obviously, if the Coordinators are not involved in police training, they are not taking a lead role as suggested by the Illustrative Examples. Likewise, if they are not involved in Emergency Planning, they are not taking a lead role as suggested in the illustrative Example in the job specifications. In the Illustrative Examples, it states that the Coordinators go to community groups, for presentations. This has been referred to as outreach and for this they are paid regular overtime (Exh. G Davis at page 50 line 3 to page 51 line 5) (in that event she received overtime). The Illustrative Examples also refer to handling complaints in  the department and "interpreting" policy for callers. They are not involved with complaints as these are handled by the supervisors (Exh. H Gaither at page 61 lines 17-19); (Exh. K Garner page 61 lines 14-16). The Coordinators

Gaither at page 32 line 1 to page 33 line 4); (Exh. K Garner at page 44 lines 6-15); (Exh. L Jubilee page 37 lines 16-20).

**22. Conduct various screening in the community to assess behavioral health issues and to make referrals for further assistance when necessary**

This is not a regular part of the Coordinators' work (Exh. C Carter at page 78 lines 16- 20). Some Coordinators on rare occasions have attended screening at the train station or suicide walks (Exh. G Davis at page 50 line 3 to page 51 line 5) (in that event she received overtime); (Exh. K Garner at page 44 line 20 to page 45 line19).

Whether it is the job description or a two-page summary describing the job responsibilities, these are not true representations of the work done by the Coordinators in the Unit. The testimony establishes that many of the alleged job tasks, duties, or work are simply never performed or are exaggerated. The delegate line involves calls "related to involuntary commitments and calls related to the involuntary commitment process, such as the mobile team, also consultation, for people who want information about how the act works". However, the words in these descriptions are often used in a manner that a layperson would think of as services being provided on a higher level. As an example, when Ms. Taylor said that the delegates engage in "consultation", that is not how the term is actually used in medical nomenclature or understood by the majority of people. When she is referring to consultation, she means the callers are unsure of what they want, and so they seek information on how to access resources and (Exh. F Taylor at page 29 line 5 to page 30 line 2). So why not just say they are providing information? The "referral" nature of the job was made clear in Ms. Taylor's testimony:

> Q. What are the options that a delegate has after he talks to the person, investigates what the problem is, and assess, what are the options?

---

are not involved with interpreting policy (Exh. H Gaither at page 60 line 10 to page 61 line 15); (Exh. K Garner page 61 lines18-23). These are just more examples that are erroneous.

A. Well, it depends on the situation. They can determine that the person may need to go to a crisis center. They can refer the person to a Crisis Response Center. They could request for a police officer to go out to the location to do a health and welfare check. They can offer the mobile emergency team to go out to assess the person. And they can make referrals to an outpatient program. They can tell the person where – they won't make that referral themselves, but they can give information to the person as to where they need to get help (Exh. F Taylor page 36 line 13 to page 37 line 5).

While, the job specifications suggest that the Plaintiffs undertake a clinical assessment or evaluation of the client or follow up this is absolutely not true (Exh. D Coord; Exh. E Coord. II). The job specification refers to a "review" and evaluation of a 302 petition. In fact, a review involves merely an approval and entry into the computer for petitions filled out by law enforcement, medical doctors, or the prisons. The entire process takes place over the telephone; the delegates never see the client and they are basing their decisions on the criteria set forth in the Act. All decisions are based on the information provided to them by others. Most importantly, the Coordinators are not making any preliminary decisions about the treatment of the individual or recommending any subsequent treatment after the individual is seen following a clinical diagnosis by a psychiatrist, and they do not make a clinical disposition. In fact, the Plaintiffs all stated that they are not qualified to make a clinical assessment, which is in fact done by a psychiatrist for a 302, and from a qualified medical provider for a caller on the suicide line.

When stripped of the inflated job duties, the Coordinators (1) dispatch mobile teams, (2) enter data about the 302 petitions, calls received on the suicide line and other required entries, (3) provide information services (as opposed to medical referrals), (4) answer calls from the public, agencies, and other callers on the delegate line, and (5) approve or deny a 302 based on the criteria set forth in the Act. On the delegate line they provide no counseling, do not recommend treatment, and do not follow up after an approval or denial of the petition. Likewise, on the suicide lines the Coordinators do not provide counseling, rather attempt to deescalate the

situation and providing information on available services. If requested, or it appears that the person is in need of immediate assistance; they dispatch ta a mobile team or the police.

## III. THE SUMMARY JUDGMENT STANDARD

A motion for summary judgment[8] shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 106 S. Ct. 1348, 1358 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must evaluate whether the evidence could persuade a reasonable factfinder that the non-moving party is entitled to a verdict Mitchell v. City of Pittsburgh, 995 F. Supp. 2d 420 (W.D. Pa. 2014).

In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. Matsushita Elec. supra. at 475 U.S. 587-88, 106 S. Ct. at 1356. The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to defeat a motion for summary judgment Anderson v. Liberty Lobby, Inc., 477 US.

---

[8]Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. Cross motions simply require the Court to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury". See Chambers v. School Dist. of Phil. Bd. of Educ., 827  F. 2d Supp. 2d 409 (E.D. Pa. 2011).

242, 252; 106 S. Ct., 2505, 2512 (1986). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial Id. at 255, 106 S. Ct. at 2515). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment" Brock v. Int'l Union of Operating Eng'rs Local 542, 140 F Supp. 3d 432 (E.D. Pa.2015). When evaluating a motion for summary judgment, the court "is not to weigh the evidence or make credibility determinations" Peruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993). Credibility determinations are the province of the factfinder, not the court Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact Hunt v. Cromartie, 526 U.S. 541, 553, 119 S. Ct. 1545, 1552 (1999). If the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim" Celotex Corp. v. Cartrett, 477 U.S. 317, 330, 106. S.Ct. 2548, 2557 (1986). (Brennan, J., dissenting) (on the basis that grounds for summary judgment were not met). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial"  Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999);

Buckner v.  Gen  Signal Tech, Co., 163 F. Supp. 2d 617 (E.D. PA. 2011). There can be "no

genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial" Celotex Corp., supra, 477 U.S.  at 322-23; 106 S. Ct at 2553-55.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial" Id. at 323, 106 S.Ct. at 2553 ;  Katz v. Aetna Cas.

& Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).; Malibu Media LLC v. Poe, 82 F. Supp. 3d 650 (E.D.

Pa.  2015).

     This is a claim brought for overtime pursuant to the FLSA. The application of the

exemptions is a mixed question of law and fact. How the employee spends his or her time is a

question of fact and whether an employee is exempt is a question of law. *See* Reich .v. Gateway,

Press, Inc.,  13 F. 3d  685, 691( 3rd Cir 1994). It is the burden of the employer to establish that

the Plaintiffs are exempt employees, and therefore, the City had no obligation to pay the Plaintiff

overtime wages under the FLSA. The employer, in order to avoid paying the mandated FSLA

rate of 1.5 times the employee's hourly rate, bears the burden to establish that its employees fall

within an exemption. "The burden of proving these exemptions is upon the employer based on a

preponderance of the evidence. See McGrath v. City of Philadelphia, 864 F. Supp. 466 (E.D. Pa.

1994); If the record is unclear as to some exemption requirement, the employer will be held not

to have satisfied its burden" Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir.

1991) Perez v. Davison Design and Development, 2014 U.S. Dist. Lexis, 147571 (W.D. Pa).

     Plaintiffs contends that they are entitled to summary judgment on their  FLSA overtime

claim because defendant cannot satisfy its burden of  proof.  Lawrence v. City of Philadelphia,

527 F.3d 299, 300 (3rd Cir. 2008) (quoting Arnold v Ben Kanowsky"s Inc, 361 U.S. 388, 392; 80 S. Ct. 453, 456 (1960) This is because the Defendant is unable to meet all the required elements of the "administrative" or "professional" exemption.

## IV. ARGUMENT

### A. Summary of Argument

The FLSA is a remedial statute and must be interpreted to effectuate its "humanitarian and remedial" purpose. Sec United States DOL,v. AM Future Sys, 873  F. 3d 420 (3rd Cir 2017);  Antenor v. D & S Farms, 88 F.3d 925, 933 (11th Cir. 1996). In this case, overtime, as much as three all night shifts and one weekend shift is mandatory, however, overtime is not paid  at the their regular rate of pay, let alone the FLSA rate. This is because the City maintains that the Coordinators are exempt employees. The claim that the employee is not entitled to overtime is an affirmative defense and the employer bears the burden of proof Martin, supra, 940 F.2d at 900. The exemption is to be withheld except to persons "plainly and unmistakably within their terms and spirit" Arnold v. Ben Kanowsky, Inc, 361 U.S. 388, 392; 80 S. Ct. 453, 456 (1960); Resch v. Karpf's   Coaches, Inc, 7845 F 3d 869 (3rd Cir. 2015); Jonas v. Judge Tech Servs, 2013 U.S. Dist. Lexis 153343 (E.D. Pa ).

The regulations that set forth the exemption are to be narrowly construed. See Smiley v. DuPont de Nemours, & Co.. 839 F.3d  325 (3rd Cir 2018); Mazareella v.  Fast Rig Support, LLC, 823 F.3d 786 (3rd Cir. 2016); Carr v. Flower, Food, Inc., 2019 U.S. .Dist. Lexis 77571 (E.D. Pa. 2019); Myers v. Mercy Health System of Southeastern Penn., 2017 U.S. Dist. Lexis 160970 (E.D.  Pa)[9]. *Additionally,"the employer bears not only the burden of proof, but also*

---

[9] In the case of Christopher v. SmithKline Beckham  Corp., 567  U.S. 142, 132 S.Ct. 54  (2012), when addressing an outside sales force exemption the Court declined to construe the regulation

*the burden on each element of the claimed exemption"* <u>Martin,</u> 381 F.3d at 578*.* Because "the burden is shifted, [plaintiffs are] entitled to summary judgment unless the defendant[s] can come forward with evidence at least creating a genuine issue of material fact as to whether [plaintiffs] meet [] each and every element of the exemption**"** <u>Martin</u>*,* 381 F.3d at 578. If defendants fail to meet even one element summary judgment must be granted in Plaintiffs' favor.

The FLSA requires that employer pay employees at a rate of time and a half their regular rate of pay for all hours worked in excess of 40 in a workweek, 29 U.S.C § 207. The overtime falls into three categories (1) overtime approved by a supervisor which is not the subject of the lawsuit, (2) overtime for training or work as community out-reach which, is not the subject of this lawsuit either and (3) mandatory standby tine which is the subject of the suit.  Overtime was not paid at 1.5 times their hourly rate for standby time, which is evening and weekends, and requires the Coordinators to answer the phone in three rings. It is undisputed that Plaintiffs in this case worked over 40 hours a week, working standby, and were not paid at the FLSA rate. The Defendant has raised as an affirmative defense to this action that the Plaintiffs have failed to state a claim, however the Defendant has not indicated which exemption they are relying upon. Plaintiffs presume that the City is contending that the Coordinators were employed in an "administrative capacity" or in a "professional capacity" under 29 U.S.C. § 213(a). The Plaintiffs maintain that the Defendant cannot meet its burden to establish all of the elements for these exemptions.

---

in a narrow fashion, finding that the regulation had not been subject to appropriate notice and requiring a fair reading.  To date, this standard has not been adopted by the Third Circuit.

On the matter of damages, the Plaintiffs also contend that the City cannot rely on the Accountability regulation promulgated by the Department of Labor, 29 C.F.R, §531.710. This Regulation allows an employer to deduct time from the Plaintiffs vacation and compensation bank when they are late. It cannot be the intent of the regulation to allow a deduction when the City of Philadelphia has created a schedule which requires the Plaintiff to end one shift, report at the same time for another shift, and travel between two points which may take an hour.

In the event that this Court finds that the City of Philadelphia has misclassified them, they are entitled to their back wages of two years and liquidated damages provided for in the statute for doubled damages. Additionally, an issue in this case is whether the failure to pay the Plaintiffs overtime was in good faith under 29 U.S.C. § 259, which is an affirmative defense. If the City is unable to show good faith, and it is established that the City acted willfully then an additional year of damages is awarded which is doubled. The Plaintiffs move for entry of summary judgment on each defense as follows:

> The Plaintiffs are not exempt under the "professional" exemption because their position is not a recognized profession, there is no specialized course of intellectual instruction, and the job duties do he duties do not utilize knowledge acquired by a course of study as the skill set was acquired by on the job training and work experience Nor, does the position, in any event, involve the exercise of discretion.
>
> The Plaintiffs are not exempt under the "administrative" exemption because they did not perform work directly related to the management and business operations of the Defendant.
>
> The Defendant cannot rely on the justification of accountability to deduct time from the Plaintiffs" vacation or work bank when the Defendant has created the scheduling issue which causes the Plaintiffs to be late.
>
> The Defendant cannot establish that it exercised good faith in its decision to classify the Plaintiffs as non-exempt employees. The City cannot even demonstrate how the job descriptions were created, that it engaged in any audits, or that is sought legal advice when the employees raised question about their pay.

48

The City acted with reckless disregard of the FLSA; therefore the statute of limitations should be extended to three years and liquidated damages awarded.

## B. The Bona Fide Professional Capacity Exemption

The FLSA does not define the requirements of the "professional" exemption and, therefore, the courts have looked to the regulations promulgated by the Department of Labor for guidance. Through its legislative rulemaking authority, *see* 29 U.S.C. §213(a)(1), the Department of Labor ("Department") has defined an "employee employed in a bona fide . . . professional capacity" to mean, in relevant part, an employee paid on a salary basis at a rate of not less than $455 per week" whose primary duty is the performance of work that requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. §541.300.  This is referred to as "the learned professional" exemption. The regulations further expand what is necessary to satisfy the three elements of the test, 29 C.F.R. §541.301(a) The phrase "customarily" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of an academic degree" 29 C.F.R. §591.301(d)[10]. The regulations further explain that this the learned professional exemption is not available for occupations that:

> customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by

---

[10] The regulation does provide that the word "customarily" also  "means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry".

49

experience rather than by advanced specialized intellectual instruction." 29 §C.F.R. § 541.301(d).

In the regulations at 29 C.F.R. §541.301(b), work is defined as "requiring advanced knowledge as work which is predominantly intellectual in nature, must be varied and not routine or mechanical and most include the consistent exercise of judgment and discretion".

The Defendant will point to the job specification to argue that this exemption requirement has been met. Ms. Taylor testified that it was her preference to hire an individual with a master's degree (Exh. F Taylor at page 27 lines 1-7; page 98 line 1 to page 99 line 13). That is not sufficient basis to find an employee exempt from overtime. In this case, the job specification provided that someone with an equivalent combination of education and experience could fill the position [11]. Some of the Coordinators met the requirement of experience and a degree, and some had a master's degree but not the requisite experience. Some of the coordinators were hired with a bachelor's degree and experience. The degree requirements are broad and do not require specific course work. Nor, are the all the required degrees recognized as being in the field of science or learning, thus taking the position out of the professional exemption.

The "advanced knowledge" must not simply be a requirement in the job specification but one's duties must be examined to determine if advanced knowledge is applied, or if this is simply a matter of on the job learning. Here, an examination of the facts demonstrates that

---

[11] EDUCATION: Completion of a master's degree program at an accredited college or university with major course work in psychology, sociology, mental health counseling or social work, AND EXPERIENCE: Two years of experience providing emergency services in the mental health field which has included processing voluntary and involuntary psychiatric commitments, working on a psychiatric mobile team, working in a crisis response center, answering calls in a mental health crisis or suicide prevention hotline, or providing mental health case management, OR: Any equivalent combination of education and experience determined to be acceptable by the Office of Human Resources, which has included the completion of a master's degree as an educational minimum.

training, not education, is the most important component to be successful in the position. Further, when the job duties are examined, it is apparent that the education requested is not required for the position.

In fact, the description of the job duties provided by Ms. Taylor fails to establish that an advanced degree is required for the position, or that specialized academic training is required, or that the position is one that could be classified as primarily intellectual. Ms. Taylor stated that their "first duty is to investigate what the problem is. There are guidelines they must follow, and they must apply the criteria of the Act (Exh. F Taylor at page 105 lines 16-17). The Defendant cannot satisfy all the elements of the professional exemption, and summary judgment should be granted on the professional exemption.

## 1.  Work Requiring Advanced Knowledge in Field of Science or Learning Through a Course of Specialized Learning

The term "field of science or learning" includes traditional professional fields such as law or medicine (see  29 C.F.R. §541.300-304) and "other similar  occupations that have a recognized  professional status…."29 C.F.R. §541.301(c)[12] .  Whether a position has a professional license, accreditation or a certification are significant indicators of whether individuals in that position are exempt learned professionals.  See 29 C.F.R. §541.301(e ). Here, Ms. Taylor testified that the Commonwealth of Pennsylvania did not have a licensing requirement for the position nor did the nor did the City (Exh. F Taylor at page 54 line 22 to page 55 line 3).

The position in question is titled Mental Health Emergency Coordinator. This is not a recognized profession. If someone overheard the Coordinators talking about their jobs and they

---

[12] The phrase " field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering,  architecture, teaching various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical art or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning. The same   regulation in section ( e)  addressed  positions without a degrees or licenses, such as  paralegals, bookkeepers and licensed practical nurses do not meet the requirement 29 C.F.R.  §541.302 (e ).

wanted to pursue this job, it would not be found listed on the Department of Labor website [https://www.oalj.dol.gov/] or in the Dictionary of Occupational Titles [https://occupationalinfo.org/].

No one at the City really knows how this job specification was created for the position, however, in order to be hired into this position, the job specification provides for "completion of a master's degree program at an accredited college or university with major course work in psychology, sociology, mental health counseling or social work". There are no specific courses to be taken for the degrees. Alternatively, one can be hired with a master's degree and work experience. While wage and hour opinions and case law have recognized that social work can qualify as a learned profession, there are no cases which have held that simply by obtaining a masters degree in psychology or sociology, or the broad description of mental health counseling (without a license) qualify as having professional status under the Fair Labor Standard Act Professional Exemption, Nor has any Court held that obtaining a master degree means that you are automatically qualified as a professional for purposes of this exemption. See Kadden v. Visualex LLC., 910 F,Supp. 2d 523 (S.D.N.Y 2012) (inclusion of masters degree did not result in an automatic finding the person is a professional within the FLSA).

There are no reported cases that are directly on point. The Coordinators are not providing anything close to the services of social workers. Nevertheless, cases addressing social workers as exempt professional and other cases construing this exemption are instructive. From these cases the following principles can be derived (1) a generalized course of study is not sufficient without courses matched to the position in question, (2) soft sciences are not accepted as "advanced knowledge, (3) one cannot use experience to substitute for specialized instruction, and (4) a license can establish that one is a professional. The job specifications fail when these factors are

considered which fails to establish that the position meets the standard for advanced knowledge and specialized knowledge.

Solis v. Washington State, 656 F. 3d 1079 (9th Cir 2011) addressed whether social workers were professionals. The question presented was whether or not the position met the requirement of advanced knowledge in a field of science or learning. The City will likely attempt to distinguish this case on the grounds that virtually any degree was acceptable for the position when the actual practices were examined. The reasoning, however, is inapplicable here. The Solis Court held that "positions that do not require a particular course of instruction do not  come within the learned professional exemption"  Id. at 523. The Court drew the distinction between a general degree requirement and specialized courses that are directly related to the employee's job duties. The Court discussed cases in which there was no particular advanced degree awarded but there was a license requirement combined with a required courses.  The examples relied upon by the Solis Court are far different from generalized courses of study in sociology or psychology in this case. The Solis Court also discussed instances in which the DOL had recognized social workers as professionals in which specific courses of instruction were  required for social work positions.  The decision in Solis indicated that it was important to determine  whether the position required  a sufficient amount of specialized learning or a combination of educational requirements and a license  to be qualified under the learned profession exemption.

A case which addressed the degree requirement was Chatfield v Children's Social Services, 555 F .Supp. 2d532 (E.D. Pa. 2008). While not finding that the case was correctly decided, the Court in Solis acknowledged that the hiring standards for social workers were more exacting than a bachelor's degree in any field. The Chatfield Court  distinguished the DOL cases which found that the social worker did not meet the requirement of an advanced degree where

the degree was in the social sciences, which included studies in psychology or social services. In the Coordinator's job description there is no course of study required for psychology or sociology, which are social sciences as opposed to hard sciences,  or even the broad course of study for social workers. This factor of distinguishing social sciences as opposed to hard sciences, demonstrated through a course of study, was deemed important in <u>Solis</u> and <u>Chatfield</u> and weigh against a finding herein that the Coordinators meet the professional requirement[13].

The <u>Solis</u> Court also examined cases in which the professional exemption was recognized when there was a licensing requirement and a specific course of study. The <u>Solis</u> Court agreed with the holding of the Sixth Circuit in  <u>Rutlin v. Prime Succession</u>, 220 F.  3d 737 (6th Cir 2000) that funeral directors are a learned profession because even without a  bachelor's degree or a master's degree; the specialized nature of their studies  were   directly related to their job  of embalming corpses. The requirement for obtaining a license to practice included two year of college courses in chemistry and psychology, one year of mortuary science, and passing a national test which included anatomy, pathology, embalming and cosmetology Likewise, <u>Owsley v. San Antonio Independent School District</u>, 187 F.3d 521 (5th Cir.1999), relied upon by the <u>Solis</u> Court, the Fifth Circuit concluded that state-licensed athletic trainers were exempt even though applicants could qualify with a bachelor's degree in any field. This was based on the license requirement that to become a trainer one had to complete course work in specific areas of "(a) human anatomy; (b) health, disease, nutrition, fitness, wellness, or drug and alcohol education; (c) kinesiology; (d) human physiology or physiology of exercise; and (e) athletic

---

[13]  The American Society of Sociology shows the vast number of careers paths one can purse with a degree in sociology https://www.asanet.org/ . In fact, university websites show  the career paths for this degree: https://www.pfw.edu/departments/coas/depts/sociology/sociology-careers/   . The same is true for psychology which encompasses a broad range of topics: https://careersinpsychology.org/50-best-jobs-psychologists/   . Not all course offerings deal in a psychology department deal with counseling subjects: https://psychology.yale.edu/graduate/training/courses.

training". Both the position of the funeral director and the athletic trainer required courses specifically related to the position. That is not the case before this court.

After Solis was decided, in Levine v Unity Health Systems,  847  F. Supp.  2d 507 (W.D.N.Y.  2012) the Court addressed the issues of whether  the social workers were exempt professional  employees.  The  Levine  court  examined  their  duties  and  their  educational requirements, the primary therapists were required to obtain a master's degree in social work, mental  health  counseling,  marriage  and  family  therapy,  or  creative  therapy.  They  were  also required to obtain a license or state permit within two years and then an actual license[14], as a Master  Health  Counselor,  in  one  of  these  designated  areas  by  New  Yok  State  as  following  a separate professional classification and requiring specific  areas  of study, an internship and  300 client contact hours.  The Court ifound this to be a specialized course of study. At the outset, the Coordinators do not engage in social work, however,  job  specifications when weighed against those in Levine, Owsley or Rutlin  do not even come close to  establishing that a specialized course of study was required to fill this position.

Moreover, Coordinators with only a bachelor degree and experience have performed in this position for years. See   Clark v. Centene Co. of Tex., LP, 656 Fed. App'x 688, 693-694 (5th Cir. 2016) (concluding that the professional exemption did not apply to utilization review nurses because LPNs were also conducting reviews).   For example, Larry Carter was hired with a

---

[14] Pennsylvania also has licenses for social workers, 63 P.S. § 1907. An individual with a bachelor's degree can be licensed, however, they must work under supervision. To be a licensed social clinical social worker, one must take a test and perform prescribed numbers of supervised clinical social work. No license was required in this case and even the individuals who have a master's degree have stated they are not qualified to do therapy or counseling, which is not a required part of their job. There is also no accreditation process for this position. See also  29 C.F.R. . §541.301(e) (dental hygienists were professional as they had a four year course work at a university or college approved by the Commission of Accreditation of Dental and Dental Auxiliary Educational Programs of the American Dental Association).

degree in education and a minor in psychology. Leslie Davis had a bachelor's degree and was hired with less than the two year experience requirement. Further, a Philadelphia police officer, who is only required to have a high school diploma or a GED can file a 302, which is automatically approved [https://joinphillypd.com/qualifications-and-requirements]. The position does not meet the requirement of advanced knowledge in a field of science, as social sciences are accepted, and there is no requirement for specific major subjects in science or any licensure, accreditation or certification.

**2. The Coordinator's Required Knowledge is Not Customarily Acquired by A Prolonged Course of Specialized Knowledge And Instead is Based On Experience and Skill Derived From Training and On the Job Experience**

The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the professions in areas such as law or medicine 29 C.F.R. § 541.301(d).  "An experience requirement will not satisfy the professional exemption in any event because it is restricted to 'professions where specialized academic training is a standard prerequisite for entrance into the profession'" 29 C.F.R. §5 41.301(d). See Fife v. Harmon, 171 F. 3d 1173 (8th Cir. 1999)  (exemption not applicable to aviation expert with a bachelor's degree in aviation or a related field and four years of full time experience in aviation or a combination of the two). Ms. Taylor testified that experience was the required to be successful in the position. (Exh. F Taylor at page 17 lines 9-20; page 37 lines 7-13).

The Defendant's written policy states that a person can be hired for this position based on a degree or experience. An employer's decision to require a particular degree does not itself establish the applicability of the exemption. See Pippins v. KPMG, LLP, 759 F.3d 235, 251 (2d Cir. 2014) ("[I]f journalists are not 'learned professionals' because they acquire their skills on

the job, a newspaper cannot deprive them of overtime pay by arbitrarily setting a PhD in literary studies as a condition of hiring" (internal citations omitted). Also, <u>Raimondi, v Central Dupage Hospital,</u> 2017 U. S. Dist. Lexis 47499 (N. Ill.)  ("[t]he key question is whether [plaintiff's] primary duties, as she actually performed them, required the use of advanced knowledge acquired through a course of specialized instruction"). An employee who performs work requiring an advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances 29 C.F.R. §541.301(b).

While some of their education may have made it easier for them to understand medical information, such a skill was  not necessary to perform their job.  In fact, the Coordinators do not even look at any notes or records from a psychologist or mental health counselor in making their determination whether to grant or deny 302 petitions, and rely on the diagnosis of a third party. The fact that previous experience or training proves useful or helpful does not change the focus of inquiry**.** See <u>Raimondi</u>,  supra**.;** <u>Stell v. Eng'g & Fire Investigations, Inc.,</u>  2007 U.S, Dist. Lexis 21882 (S.D.Tex)  ``An experience requirement will not satisfy the professional exemption in any event because it is restricted to "professions where specialized academic training is a standard prerequisite for entrance into the profession"  29 C.F.R. §541.301(d).  The Defendant's written policy states that a person in the Coordinator's position can be hired based on a degree or experience.  Additionally, the plaintiffs completed at least a six-month to a one year training period before they could handle a case independently. They were required to get approval an before granting or denying a 302 petition, and they received direct training and supervision training. They also received training on the local suicide line and additional training on the national lines.

The knowledge required to perform must come from "advanced specialized intellectual instruction" rather than practical experience.  Solis v. Washington, supra, 656 F.3d at 1088 (citing 29 C.F.R. § 541.301(d)). "Whether a position requires a degree in a specialized area or merely a specific course of study, a 'course of specialized intellectual instruction' must be sufficiently specialized and relate directly to the position" Id. (internal citations omitted).  The exemption is not available for occupations that "customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes" 29 C.F.R. § 541.301(d). "[T]he learned professional exemption is not that the employees are trainable, or able to learn a skill through on-going work and study, but rather that the work they are hired to do requires 'advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction'" Solis v. Sunroc, Inc., 49 F. Supp. 3d 502, 509 (N.D. Ohio 2014). The learned professional exemption "does not apply to occupations in which most employees have acquired their skill by experience[15] rather than by advanced specialized instruction Id. at  § 541.301(d). After being hired, the Coordinators received training lasting six months or longer. In fact, Ms. Taylor emphasized that training, not education, was essential "they are assessing a situation and that comes from experience, training—and training basically" (Exh. F Taylor page 17 lines 18-

---

[15] In addition, the promotion requirements for being a Coordinator I to II support the view that experience is the key. This is an internal promotion and the only difference in the job duties is the requirement of two years on the job experience.  No one has ever been hired from outside the office and the job duties remain the same**. AND SPECIFIC EXPERIENCE**: Two years of full performance level experience consulting, advising, and providing mental and behavioral health crisis and suicide intervention in the twenty-four hour, seven days a week crisis call center for the City of Philadelphia's Department of Behavioral Health and Intellectual Disability Services**. OR:** Any equivalent combination of education and experience determined to be acceptable by the Office of Human Resources, which has included the specific experience and completion of a bachelor's degree as an educational minimum.

20). While they are expected to come with some skills, assessment skills are largely developed through the experiences of the coordinators. Id.

Further, Ms. Taylor testified that during the training they learned about the Mental Health Act, the law and policies and procedures in the unit (Id). The Act is the framework for everything (302 involuntary commitment) they do and the Coordinators are bound by the Act and the manual they receive in training (Id. at page 101 line 1 to page 102 line 8).  Ms. Taylor testified that she preferred a master's degree, because she felt that the potential hire would get through training faster (Id. at page 96 line 1 to page 99 line 13) Notably, this was not the case with Ms. Council, who does have a master's degree in social work (Exh. B Council at page 11 lines 7-12). Faster training is not a valid basis for claiming the position is exempt.

The learned professional exemption is not based on the fact that the employees are trainable, or able to learn a skill through ongoing work and study, but rather that the work they are hired to do requires advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" Solis v. Surnoc, supra, at 509. The regulations require that an "employee who performs work requiring advanced knowledge uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances "Id.  See also Stell , *supra*, at 3, ( the learned professional exemption is not simply met by holding a bachelor' s degree in a specialized field  and instead "the outcome depends upon whether the particular job requires the employee to apply that advanced knowledge). That standard cannot be met. In fact, all of the individuals who had a master's degree did not find that they drew on their education; it was training and on the job experience. They learned about the Act during training.

59

The Mental Health Coordinators are also  guided by the manual provided to them during training. This manual contains examples of conduct which fit the criteria of the Act. While the Act and manual provide detailed instructions, it does not involve highly technical, scientific, legal, financial, or other similarly complex matters. 29 C.F.R.. §541.704 is applicable, and shows the evidentiary value, which the manual plays in demonstrating that mental health coordinators are not exempt. The later portion of 29 C.F.R. §541.704 provides the section 13(a)(1) exemptions are not available, however, for the employees who simply apply well established technique or procedures detailed in manuals or other sources with closely prescribed limits to determine the correct response to an inquiry or set of circumstances. After all these years, the Coordinators still go back to the binder to find answers (Exh. C Carter at page 61 line 21 to page 63 line 15); (Exh, G Davis at page 28 line 12 to page 29 line 9). All of the Coordinators testified that their education did not prepare them for the position of Processing 302s or working on the suicide line. It did not matter if the Coordinator had a master's degree[16] or prior experience with

---

[16] *Tiara Council*, who does have a master's degree in social work, testified that she learned how to do her job as a delegate by on the job training and she developed her skills by working (Exh. B Council at page 58 line 14 to page 60 line 8).

 *Gregory Garner*, who has a master's degree testified that he uses his on the job experience to justify the grant or denial of a 302. He has runs through a lot of scenarios in the past and he knows what category to put each type of call in (Exh. K Garner at page 26 line 1 to page 27 line 2).  He did not find that his master's degree helps to deescalate these calls. It is something you learn over time, and the textbooks do no help very much. His classes in abnormal psychology really don't help; he did not come in knowing what to do (Id. at page 35 Line 6 to page 36 line 7). In college there was a script and they would say x and you would say y.  In real life that is not how it works the caller does not follow a script (Id. at page 81 Line 7-24).

*Jennifer Jubilee* has a master's degree, and is a licensed social worker, testified that knowledge about psychology helps, but it does not make you any better at the Coordinator job. It is on the job training which teaches you the skills to determine whether the situation falls within the four criteria of the Mental Health Act (Exh. L Jubilee at page 21 lines 3-24).

*Rochelle Morris* testified that what she learned in her master's program in sociology did not prepare her current job (Exh. R Morris page 67 line 23 to page 69 Line 24). Her university did not prepare her for this job. It was all on the job and learning from co-workers as well as supervisors (Id. at page 71 line 2 to page 72 line 24).

mental health even in the required experience listed in the job specifications. They all testified that they learned how to perform the handling 302 commitments and the suicide line through training and on the job experience while working on the job; this is a skill, not advanced knowledge[17].

The Plaintiffs frequently rely on good ol' fashion common sense, by relying on prior experiences learned on the job, as well as skill to complete the process for a civilian petition. This type of evaluation does not require the consistent exercise of discretion and judgment within the meaning of the regulations. First, this evaluation work simply consists of "connecting the dots," or "matching" the criteria set forth in the petition to applicable criteria and ensuring that no information is missing. It does not even involve an evaluation of the medical records. In other words, the job consists of comparing the request for a 302 against the criteria of the Act and to determine if the form is properly filled out and meets the criteria. In fact, many of the petitions are subject to an automatic approval.

---

[17] *Larry Carter* learned how to do the work on the job (Exh C Carter at page 104 lines 9-10*).* *Leslie Davis* learned how to do her job at the office and not in college (Exh. G Davis at page 31 line 17 to page 33 line 16). She has developed those skills after the past 14 years in her role as a delegate (Exh. G Davis at page 50 line 4 to page 51 L 24).
*Katherine Mackey-Gaither* does not believe she uses anything she learned in her college courses to help with the lifeline or suicide line. She does not know of any school or college that would teach you to talk someone off a bridge. She had some psychotherapy classes but that is a different because you can be schizophrenic and not want to kill yourself (Exh. H Gaither at page 39 line 4 to page 40 line 3). She learned her delegate job through training and on the job experience. (Id at page 19 lines 8-17). With respect to the 302 criteria under the Mental Health Act, when approving or denying a petition, she is looking for the four criteria and she learned on the job**.**
*Kimberly Rodriquez* received a bachelor of arts in psychology and a minor in criminal justice from Temple. She does not think the bachelor in psychology prepared her for the job. It gave her a foundation in mental health, it helps her on a day to day basis by providing her background knowledge, but the day to day tasks are what she was trained for (Exh, I Rodriquez at page 48 line 6 to page 49 line 6).

A major part of their workday does not require any specialized education to answer the phone, log in calls, or dispatch mobile teams. See Dep't of Labor, Wage & Hour Div., Opinion Letter, 2007 WL 506578 (Feb. 1, 2007) (stating radiology technologists, although highly skilled and requiring significant training, performed more routine mental, manual, mechanical, or physical work as opposed to predominantly intellectual). The last hires did have a master's degree. However this does not change the fact that the position is based on training and skills derived from working at the position, and have done successfully for years. The Coordinators are simply connecting the dots to get the people to the services they need, a skill learned not through an advanced degree but in training and on the job experience.

### 3.   The Coordinators Did Not Perform Work Requiring Advanced Knowledge or Discretion

The fact that one has a college degree, even in a specialized field, does not automatically exempt them from overtime requirements.  Rather, 29 U.S.C. § 213(a)(1) requires that in order to be an exempt professional, an employee must be "employed in a bona fide ... professional *capacity*" (Emphasis supplied). The key inquiry "focus[es] on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations" Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 401 (6th Cir. 2004). Stated otherwise, an overqualified employee will not be exempt based solely on the education requirement selected by an employer.

Thus, the determinative factor is the job requirement and not the education in fact acquired by the employee. See   Dybach v. Florida Department of Corrections, 942 F.2d 1562, 1564-65 (11th Cir. 1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee."); *see also* Raimondi v. Central Dupage Hospital, 2017  U.S. Dist. Lexis 47499*10 (N.D. Ill. ) (stating "[t]he key question is whether [plaintiff's]

primary duties, as she actually performed them, required the use of advanced knowledge acquired through a course of specialized instruction"); Flood v. Premier Internal Med. Assoc., 2000  U.S. Dist. Lexis, 8493 (M.D. Fla.) (stating dismissal of unpaid overtime claim under the FLSA was not required simply because the plaintiff was a RN); Thus, the exemption requires an examination of the employee's actual duties to determine whether the employee is in fact performing **work** requiring advanced knowledge. See  Kadden v. VisuaLex, LLC, 910 F. Supp. 2d 523, 539–40 (S.D.N.Y. 2012) (holding graphics consultant with law degree was not an exempt learned professional where the job did not require advanced legal training to prepare exhibits for litigation support and it was not acceptable to argue that a legal degree helped  them understand the needs for trial);  Stell v. Eng'g & Fire Investigations, Inc., 2007  U.S. Dist. Lexis 31882 *2 (S.D. Tex) (the Court stated that  the learned professional exemption "is not simply met by holding a bachelor's degree in a specialized field" and instead "the outcome depends upon whether the particular job requires the employee to apply that advanced knowledge").

Ms. Taylor when asked what the duties of the Coordinators, on a daily basis testified they were facilitators as they coordinated services and part of their job was to dispatch mobile teams (Exh. F Taylor at page 14 line 24 to page 15 line 5). Absent from Ms. Taylor's description of the Coordinators job duties are any tasks that would require an advanced degree. On the suicide line the caller is in crisis or family members call seeking help about a loved one who is suicidal. Anyone can call on that line and they don't have to be suicidal but can be depressed or simply want to talk. But even if the majority of callers were suicidal, which they are not, all the Coordinators are doing is to calm them down and keeping them on the phone to ascertain the issue. The Coordinators might make a referral to a source for help by providing a phone number or staying on the line for police or calling a mobile unit (Exh. F Taylor at page 32 line 7 to  page

33 line 7). Neither Ms. Taylor nor the Coordinators testified that they engage in any diagnosis, client counseling, treatment plans or follow up.

The description of the Coordinator's duties by Ms. Taylor lacks any obvious link to the educational experience, which is required. In short, the Coordinators name is appropriate to their duties - they coordinate getting people who call to the service needed. They are coordinators, not counselors or case managers.  Perhaps it would be different if there were a requirement that to be hired they had to be licensed in their field, but even then one would have to look to the job duties. It is the actual primary job duties that determine whether or not the exemption applies, no matter what the employee's education or experience. The court should focus on the requirements of the job. See Dybach supra,. 842 at 1565; Stell, supra (stating the learned professional exemption "is not simply met by holding a bachelor's degree in a specialized field" and instead "the outcome depends upon whether the particular job requires the employee to apply that advanced knowledge").

Among the qualifications for the Coordinator's  job is  a master's in social work. However, the Coordinators do not come close to  performing  the duties of a social worker. In Levine v. Unity Health System, 847 F.Supp.2d 507, 510-51(W.D.N.Y.2012) the Court found that a combination of the job duties and the licensing requirement established that the primary therapists, providing mental health services along with their exercise of discretion resulted in a finding that they were exempt. The plaintiff in Levine claimed that they were not exempt based on the duties, however, the Levine Court, after examining their duties held otherwise:

> Here, plaintiffs' duties as PTs primarily consisted of making assessments of patients' mental conditions, identifying specific clinical problems, devising plans of action specific to each patient based on those assessments, coordinating with therapists, specialists, and health care providers to identify and incorporate the resources required for the treatment plan, and individually leading group, individual, family, and/or crisis psychotherapy sessions. While the plaintiffs' job

duties also included administrative tasks, such as completing necessary paperwork, the primary duty and purpose of the PT position, as reflected by plaintiffs' and Unity's affidavits, and the plaintiffs' written performance review forms, is to assess patients, help develop appropriate treatment plans, and administer therapy directly to patients. These tasks were performed with little oversight, and of necessity, required reliance on the PT's own independent judgment. I find that the primary duties of PTs, including leadership of group therapy sessions and assessing patients' medical conditions and needs, manifestly required the exercise of professional judgment and knowledge of an advanced type, typically requiring a prolonged course of specialized intellectual instruction.

In this case, Ms. Taylor has stated that they do not perform counseling duties.  In fact, they have no direct contact with the person who is the subject of a 302. Nor do they perform any counseling on the suicide line. So unlike the employees in Chatfield or Levine, the Coordinators are not performing the duties of a social worker. Even when Ms. Taylor uses the terms consultation, she acknowledges that the Coordinators are simply providing information on resources because the callers are seeking information on how to access resources about the Act (Exh. F Taylor page 29 line 5 to page 30 line 21). Ms. Vasko likes to use the word "assessment" to connote a serious task, however, she explained that it really is gathering facts to determine the urgency and pass it on the next level (Exh. A. Vakso at page 22 lines 7-18).

To argue that this is a professional position, the Defendant will point to the fact that the Coordinators are involved with the 302 process. But that argument must fail. A key component of the definition of a professional is the "consistent exercise of discretion and judgment". The facts show that while the Plaintiffs have no shortage of work or responsibilities, they are permitted very little real discretion or judgment.

Nowhere is this more evident than the fact that they simply get the person to the next level for help; they do not make any diagnosis, follow up, or create any treatment plans. Even with a 302, their exercise of discretion is limited.  They review petitions that are automatically approved, or they approve or deny a 302. No further action, besides data entry, takes place. The

civilian 302 form is already filled out, read to them over the phone, and the Coordinator must check that the facts fall within the four criteria of the Act. Their only choice is to approve or deny a 302 based on the four criteria set forth in the Act and the standard of clear and present danger. From there, an approval is passed on to a psychiatrist for an evaluation. The Coordinators do not even need to take a history, as this is largely irrelevant because conduct is based on the last 30 days, and a history is often already filled in. A diagnosis is provided to them with the petition. The treatment and even whether an admission is warranted is decided by a psychiatrist. This is in contrast to individuals who are engaged in one on one development of a treatment plan for an individual, and do use judgment as in Levine, supra. The level of discretion and judgment by the Coordinators falls short of that accorded a learned professional.

The City will most likely argue that there are numerous possibilities of conduct that could fall within the 302 petition, and there is a great deal of discretion. But that is not true. The Coordinators are bound by the criteria of the Act and the standard of clear and present danger. The Coordinators have testified that the scenarios under the act are redundant, repetitive and there are few gray areas (Exh. K Garner at page 24 lines 2-3). When there are questions, the Coordinators refer to the training binder and if it is out of the routine they go to a supervisor. (Exh J Rules for Standby Time). Ms. Mackey has testified they are on a tight leash (Exh H Gaither at page 21 lines 11-12).

The Managers cannot spin the job into something it is not by using terms like "assessments". You may call it what you want, but any "assessment" for a 302 is not subject to discretion and judgment. It is based on the four criteria set forth in the Act; they are checking to see whether the petition falls within the criteria, and this is an application of the law not a clinical assessment. Sandra Vasko, who was acting head of the unit, testified the Coordinators

are following the commitment procedures in the Act and the assessment of danger standard as set forth in the act. They have some discretion to ask questions but they must follow what is mandated by the Act and their experience with the law (Exh. A Vasko page 64 line 7 to page 65 line 2). Every job has some discretion, but in this job you are narrowly confined by the Act and not what your belief system tells you to do.

Assuming for the sake of argument, that the plaintiff's duties involved some use of advanced knowledge to analyze, interpret or make deductions from varying circumstance. Then the professional exemption would still not apply. The majority of the work done by the Coordinators does not "require[e] the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work" 29 C.F.R. § 541.301(b). As the regulations require, "[a]n employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances". Coordinators feel that the majority of their time is spent on the suicide line and that the calls on the suicide line take more time than the approval or denial of a 302 (Exh. H Gaither at page 36 lines 9-19). These calls do not require consistent exercise of judgment.

On both lines, the Coordinators engage in routine tasks. The percentage of time spent on 302s is limited. There are other duties that the Coordinators perform on the delegate line, as well as the suicide line that can only be described as routine. They include answering questions, providing phone numbers, entering the 302s that are automatic, entering data of all the calls received, informing people about where to go for services, providing information to callers on the suicide line, de-escalating callers, dispatching mobile teams, as well as collecting data for each call. On the suicide line there are no choices involving advanced knowledge. The amount

of time spent on the lines may vary, however when the total work is assessed it cannot be remotely suggested that the majority of their time is spent on intellectual matters or those involving discretion or judgment.

The Coordinators all testified that the type of calls vary every night and every day. The Coordinators believe the suicide line takes up the majority of the time. Many of the 302s are automatic approvals or close to an automatic approval.  In fact, 99.9% of the petitions processed by Mobile Teams are approved (Exh. I Rodriquez at page 25 line 25). Most of the Coordinators testified that there were more calls on the suicide line, Counsel for the City aggressively asserted that the statement could be checked. However no documents were identified in discovery or in the disclosure to establish how many calls came in over the delegate line or how many 302s were actually approved or denied.

It is questionable if the 302s are their primary duty. When they are on the delegate line, the plaintiffs describe their position as a 911 operator for mental health because of the time spent on answering questions. A great deal of time is spent dispatching mobile teams: this clearly does not require an advanced degree. Likewise for every call data must be entered, which similarly does not require advanced education. When the duties are examined, the Coordinators spend more time doing routine tasks for which an advanced degree is not required[18].

---

[18]  Gregory Garner testified that he answer one of three lines. On a typical shift 30% of the calls are on the delegate line, 30% on the national line, and 40% on the local line. The calls to the delegate lines are primarily calls where you are asked to either approve or deny a 302, dispatch mobile teams, answer questions, and provide information (e.g. where do I take my son for an evaluation), and a lots of misdirected calls about insurance (Exh. K Garner at page 15 line 10 to page 17 line 9). Rochelle Morris  answers calls on three lines and she would say that about 15 to 30 per cent of her calls are the delegate line. On regular shift  she gets at least 10 or 12 calls on the delegate (Exh. R Morris at page 17 line 8 to page 18 line 1). On the national line she estimates about doubled the number of calls, from 10 to 20, and less on the suicide line, about 5

**C.  The "Bona Fide Administrative Capacity" Exemption**

Section 213(a)(1) does not define what constitutes an "administrative" employee under the FLSA act exemption 29 U.S.C. § 213(a). The Department of Labor has issued detailed regulations interpreting the administrative exemption contained in See 29 C.F.R. §§ 541.200 et seq. Courts, including the Third Circuit, have repeatedly deferred to these regulations in determining whether an employee was covered by the FLSA.  See, e.g., Martin v. Cooper Elec., supra, 940 F.2d 896, at 904 (3rd Cir 1991); Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 804-05 (11th Cir. 1991); Dalheim v. KDFW-TV, 918 F.2d 1220, 1230-21(5th Cir 1990). Exemptions to the FLSA's overtime requirement are to be "narrowly construed against the employers seeking to assert them. Defendant bears the burden of proving that each element of the exemption has been met. If defendants fail to satisfy even one element, summary judgment must be granted in favor of plaintiffs".  See  Karali v..Branch Banking & Trust Co., 2018 U..S. Dist. Lexis 167690 (D.N.J)  Manuele v. City of Springfield, Ill., 718 F.Supp.2d 939, 949 (C.D. Ill. 2010) (granting employee summary judgment where employer did not meet one criteria for FLSA exemption).

In order to meet the administrative exemption, 29 U.S.C. §213(a)(1) states that three elements must be me (1) a salary test. which is not at issue (2) that plaintiffs' primary duty "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"  and (3) which "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §541.200. While, the Coordinators agree that they meet the salary requirement and that

---

or 10. Tiara Council testified that during the week, both day and evening, she averages about 10 to 20 302s a week (Exh B Council at page 50 lines 10-15).

they do perform office or non-manual work, the Defendant cannot meet the remaining elements, and summary judgment should be granted in the Coordinators' favor.

### 1. What Do the Coordinators Do Besides Work Long Hours

The Job Specifications and the Delegate Tasks suggest duties that are not performed by the Coordinators. When examined in light of the testimony of Ms, Taylor, Supervisor of the Unit, and Ms. Sanda Vasko, the then Acting Head of the Department of Behavioral Health, it is apparent the Coordinators provide a service to third parties who call on the delegate and suicide lines. Devoid in the testimony of Ms. Vasko or Ms. Taylor is any suggestion that the Coordinators are involved in management. To the contrary, they both testified as to how the Coordinators were involved in the day-to-day production process (Exh. F Taylor at page108 line 14 to Page 109 line 10); (Exh. A Vasko at page 62 line 1 to page 63 line 8).

Sandra Vasko, the Acting Department head, has been with the Department for 23 or 24 years. She testified that the department broadly encompasses the overview and oversight of all things related to mental health services, behavioral health services, and drug and alcohol services in the City. All of the units that she supervises support the efforts in and around services in the City related to this purpose (Id. at page 8 line 1 to page 10 line 24). She testified that the Coordinators' function in the office is a response to telephone calls from a person in crisis, a family member, or an agency caller. She did not mention running the daily operation of the Department (Id. at page 62 line 2 to page  63 line 6).

Ms. Taylor, Health Service Manager, supervises the Coordinators and their supervisors (Exh, F Taylor at page 11 line 7 to 12 line 22). Ms. Taylor stated that the delegates are trying to provide emergency services to people who are need of behavioral health services. (Id. at page 16 lines 5-20). Ms. Taylor described the delegate line as related to processing

involuntary commitments, providing information about the 302 process to callers and dispatching a mobile team. She described the suicide line as providing information on services, talking, or staying on the line for dispatch**.** (Id at page 29 line 5 to page 33 line 6). None of these tasks make it sound as if they are policy-makers, and Ms. Taylor agreed that the Coordinator's have no role in policy. (Exh. F Taylor at page 54 lines 15-19).

The City's managers agree that the Coordinators provide information to users of the City's services. On the delegate line and the suicide lines, the Coordinators act as dispatchers and are involved in processing 302s, answering questions and providing service to callers (Exh. I Rodriqez at page 44 lines 4-20; page 45 lines 18 to page 47 line13); (Exh. G Davis at page 46 lines 11-18); (Exh. H Gaither at page 55 lines 3-7). Try as the City wants to spin these activities, there is nothing in their job duties that turn them into administrative employees under the Fair Labor Standard Act regulations and case law. Under the City's theory police dispatchers, information operators, as well as, employees in the Court system who assist the public with filings would be exempt employees. While the position may be unique and mental health is important, the Coordinators are still worker bees.

## 2. The Coordinators Work Is Not Directly Related To Management Or General Business Operations

Section §541.201(a) defines "work directly related to the management or general business operations of the employer or the employer's customers" as follows: The phrase

> directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

In determining whether an employee's primary duty is administration or production, the Court must consider the employee's role in his or her employer's business. See Cooper Elec., 940 F.2d at 903-04;  Reich v.  Chicago Title Ins. Co., 853 F. Supp. 1325, 1330 (D. Kan. 1994). The term administration refers to the work of "servicing" a business Cooper, 940 F2d at  902 (citing  29 C.F.R 541.201(b), Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002) ( Servicing a business is met when the employee engages in running the business itself or determining policy). Administrative responsibilities are those that "every business must undertake in order to function," regardless of what the company sells or what services they provide Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 614 (D. Conn. 2007). These basic operational issues are set forth in the regulations and identify "functions that must be performed no matter what the business produces," Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009). This includes such activities as:

> work concerning tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 C.F.R. § 541.201(b).

There has been no testimony that the Coordinators have been involved in any of these functions in an administrative capacity.

Further, the regulations define exempt administrative responsibilities in part by explaining what they are not. Administrative work (or work related to the running of the business) does not include work "on a manufacturing production line or selling a product in a retail or service establishment" 29 C.F.R. § 541.201(b). This anti-administrative "production work," relates "to the goods or services which constitute the business' marketplace offerings" that the enterprise exists to produce and bring to market rather than simply traditional notions of

manufacturing and work which contributes to 'running the business itself'" See <u>Bothell v. Phase Metrics, Inc.</u>, supra. 299 F.3d at 1127 (9th Cir. 2002), quoting <u>Bratt v. County of Los Angeles</u>, 912 F.2d 1088 1070 (9th Cir. 1990) <u>cert. denied</u>, 498 U.S. 1086 (1991)**;** <u>Dalheim</u>, supra, 918 F.2d at 1230; <u>Davis v. J.P. Morgan, Chase & Co</u>., 587 F.3d 529,t 535–36 (Cir. 2002); Cooper <u>Elec.</u>, 940 F.2d at 903-904 ("production" includes "non-manufacturing" employees as well).

Employment may thus be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not. The analysis of whether a responsibility qualifies as production work as opposed to administrative work is known as the administrative/production dichotomy.   Under this framework, production work includes service-oriented jobs where the workers produce no tangible goods.  <u>Davis</u>, supra, 587 F.3d at 536 (citing <u>Martin v. Cooper Elec. Supply Co</u>., 940 F.2d 896, 903–04 (3rd Cir. 1991). This analysis of the administrative/production determination subsumes two other inquiries about the nature of the primary duty: (1) is it related to "the administrative operations of a business as distinguished from 'production' work" and (2) does it affect the business operations to a substantial degree.  <u>Cooper Elec.</u>, 940 F.2d at 902; <u>Roe v. Debt Reduction Services</u>, 2007 U.S. Dist. Lexis 31503 (E.D Wash.)  quoting Department of Labor Final Rule <u>Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed.Reg</u>. 22122, 22138 (April 23, 2004)

The word production is not limited to manufacturing in the classic sense of a factory but is looking at the day to day carrying out of business affairs. See <u>Bratt v Los Angeles</u>, supra, at p. 1070, This analytical framework focuses not on the color of the employee's 'collar' or whether the job is performed in an office or a factory, but on the nature of the work itself." <u>Chicago Title</u>

Ins. Co., supra, 853 F. Supp. at 1330.  "An administrative employee "engages in 'running the business itself or determining its overall course or policies," not just in the day-to-day carrying out of the business' affairs."[19]  Roe v. Debt Reduction Services, supra. quoting Bothell, 299 F.3d at 1125); Hickton v. Enterprise Rent-A-Car,, 2012   U.S. Dist. Lexis 136252 *65 (W.D. Pa. 2012).

The administrative/production analogy has been applied to cases involving the public sector. While one might argue that the  "analogies between business and government often are somewhat strained, the general principles and rationales underlying the regulations are instructive in a government context." Bratt., supra, 912 F 2d at 1070 (applying analysis to probation officers.) Roney v. United States, 790 F. Supp. 23 (D.D.C. 1992) (applying analysis to deputy U.S. marshals); Harris v. District of Columbia, 741 F. Supp. 254 (D.D.C. 1990) (applying analysis to housing inspectors). The public employee cases that have addressed the issue have examined what product or service is involved.  In the cases that have found a public employee to fit into exemption, the positions either involved a higher-level manager, giving advice to the mayor or a public face on policies. See Copas v.  East Bay Mun. Utilities, 61 F. Supp. 2d 1017 (D.C.C.  1999)  [20]

---

[19] Employees who ae performing tasks such as typing or clerical date entry do not perform work that affects business operations to a substantial degree, even if they are "indispensable" to their employer. Clark v. J. M. Benson Co., Inc., 789 F.2d 282, 287 (4th Cir. 1986). A  position can be important but not fall within the administrative exemption.  Reich v  American Int'l Adjust. Co.,902 F.Supp. 2d 304 (D.Conn.1994).

[20] There are no comparable reported cases involving a government worker in a position being classified as administrative.  In Levine, supra, and Solis, supra, which involved providing mental health services, there no indication that the Defendant raise the administrative exemption. There are no reported Wage and Hour Cases which address this type of position under the administrative exemption The one case that did involve gathering information, coordinating a response and determining whether the accident met a legal criteria found that the medical

Most public employees are involved in the day to day operations of the business that the government unit is involved in but not the management[21]. For example in Bratt v. County of Los Angeles, 912 F.2d 1066 (9th Cir. 1990), cert. denied, 498 U.S. 1086, 111 S. Ct. 962 (1991) eight County employees filed suit, claiming that they had accumulated overtime hours for which they had not been paid. Six of the employees were employed as deputy probation officers, and the remaining two employees were employed by the Department of Children's Services as counselors. The probation officers conducted factual investigations for, and make recommendations to, County courts, either to aid in sentencing an adult offender or to determine whether and how to detain a minor who has been arrested. Some of them also supervise a crew of minors who have been ordered as part of a court sentence to participate in the Juvenile Alternative Work Service program or other correctional activity. The County argued that the employees were exempt because their duties were akin to those of advisory specialists or consultants such as stock brokers or insurance claims agents and adjusters -- positions the regulations characterize as meeting the test of "directly related to management policies or

investigator who determined whether an autopsy was required based on legal criteria did not fall within the administrative exemption. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1998 WL 852752, at *2 (Jan. 23, 1998) (opining that medical investigators perform "line" work rather than administrative work in deciding "whether scene response is required under established criteria" by "gathering information and documentation concerning circumstances of the death" at the scene, preparing a report, coordinating paperwork, and by acting as a liaison with law enforcement officials").

[21] In fact, 29 C.F.R 541.203(jj) states that many government employees  do not fall within the Fair Labor Standard Act definition of an administrative employee. " Public sector inspectors or investigators of various types, such as fire prevention or safety, building or construction, health or sanitation, environmental or soils specialists and similar employees, generally do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer. Such employees also do not qualify for the administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met".

general business operations" 912 F.2d at 1069-70 (citing 29 C.F.R. § 541.200(a)(2)). The County claimed that the employees should be considered exempt administrative employees because they were, essentially "servicing" the "business" of the courts by "advising the management" Id. at 1070. The Ninth Circuit disagreed noting that the "services" provided by the employees to the County's court system "do not relate to court policy or overall operational management but to the courts' day-to-day production process" Id. at 1070. As an example, the court found that while the probation officers did offer recommendations to the courts, those recommendations did not constitute advice on the proper way to conduct the business of the court, but rather simply involved information that the court used in the course of its daily production activities. The court found that "the test [stated in the regulations] is whether the activities are directly related to management policies or general business operations," and that none of the employees were engaged in "activities primarily related to management] policies or general business operations." Id at 1071, Here, there is no evidence that the Coordinators do have input into how their handle daily duties could be improved, let alone policy for the department.[22]

In a private sector case, Rego v.  Liberty Mutual Managed Care, 367 F.Supp. 3d 849 (E.D. Wis,.2019) registered nurses and LPNs conducted specialized clinical reviews for medical necessity of worker's compensation claims based on state regulations. They gathered information and applied the appropriate clinical guidelines. Their employer argued that the were administrative personnel exempt from overtime because they performed duties set forth in 29

---

[22] In Calderon v. Geico,  Ins., Co., Inc, 809 F. 3d 111 (4th Cir.  2011) the court concluded the employee-insurance investigators' primary duty was "conducting investigations to resolve narrow factual questions" concerning potential insurance fraud and reporting the information to others.  Id. at 124.  The Fourth Circuit rejected the argument raised by  the Defendant that they were  indispensable. In so ruling, the Court also considered the fact that they did not do develop, review, evaluate, or recommend [the employer's] business polices or strategies with regard to the" claims they investigated".

C.F.R. § 541.201(b), one example mentioned was health. The Plaintiffs argued that as utilization managers produced the services that the Defendant provides to the market and that utilization reviews are not functional work that "must be performed no matter what the business produces" such that their work can be considered administrative.  Plaintiffs argued, Liberty, a managed care company, is in the business of providing its customers with determinations of whether requested treatments are medically necessary, and that they carried out this essential function. The Court agreed with Plaintiffs that their performance of utilization reviews does not directly relate to the management or general business operations of Liberty. The Court held that one of Liberty's core functions is to determine whether treatment requests are medically necessary under applicable guidelines by conducting utilization review. Plaintiffs primary duty was to conduct these reviews. The Court reasoned that the Plaintiff's carried out the core function of Liberty's service; therefore, the Plaintiffs' work cannot be considered administrative.

Similarly, the Coordinators are the production line workers who are getting the services to the callers. The Coordinators who are essential to performing this service function cannot be administrative employees (Exh. F Taylor at page 108 line 14 to page 109 line 10). Unlike the probation officer in Bratt, the Coordinators do not even involve offering recommendations to the unit, offering or any advice, or performing any of the other duties set forth in 29 C.F.R. §541.201(b), which are essential to the running of a business (such as tax, finance, accounting, marketing, and personnel management). Nor are the Mental Health Coordinators performing such general business services for the employer's customers, as contemplated in 29 C.F.R. §541.201(c).(for example, an employee acting as an advisor or consultant to their employer's customers).

The foot soldiers of a business who perform tasks pursuant to the policies set by the administration and other management employees, are non-exempt.  See, e.g, Bothell, 299 F.3d at 1127 (technician-representative performs "production" work); Reich v. State of New York, 3 F.3d 581 (2d Cir. 1993), cert. denied, 510 U.S. 1163 (1994) (police investigators conduct or "produce" criminal investigations; Bratt, 912 F.2d at 1070 (probation officers); Reich v. American Int'l Adjustment Co., Inc., 902 F. Supp. 321, 322 (D. Conn. 1994) (auto appraisers); Chicago Title Ins. Co., supra, (escrow closers); Harris v. District of Columbia, 741 F. Supp. 254, 262  (D.D.C. 1990) (housing inspectors); Iaria v.Metro Fuel Corp., 2009 U.S. Dist  Lexis 6844 (E.D.N. 2009 (dispatcher not within administrative exemption when they did not exercise independent judgment). The Coordinators "work" is not directly related to the management or general business operation of it or its customers".  Their sole activity was to "facilitate" the provision of mental health services to callers from the public.

### 3. The Coordinators' Job Duties Do Not Involve The Exercise Of Discretion On Matter of Significance To Their Employer

Given that the Defendant cannot meet this first primary job duty requirement, it is not necessary to analyze the remaining element. This prong does not have to be decided at all because **it** is the Defendant's burden to satisfy *all* elements of the administrative exemption. See Martin, supra  381 F. 3d  at 578. If this prong is examined, however, summary judgment should still be granted. Plaintiffs reserve the right to expand on this argument as the City has failed in the course of discovery to provide any support for a claim under the administrative exemption.

To satisfy this prong, Defendant must prove that the Coordinator's primary duty involves "the exercise of discretion and independent judgment with respect to matters of significance..." 29 C.F.R. § 541.200(a)(3). It does not become significant simply because of any consequences. See Chicago Land Title, supra at  332. "In general, the exercise of discretion and independent

78

judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered" *Id.* § 541.202(a). Exercising discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate discretion or supervision *Id.* § 541.202(c). *See also* 29 C.F.R. § 541.202(a) and (b)(to meet the discretion prong of the administrative exemption, the work performed by an employee must include the "exercise of discretion and independent judgment with respect to matters of significance**,**" defined as making decisions within a company's operations relevant to the overall company such as formulating policies of the business or binding the company to contracts, and/or assisting with long-term business planning). The regulations recognize that almost every employee exercises some discretion, however, to demonstrate administrative status the discretion and independent judgment exercised must be real and substantial.

What is a matter of significance is defined in the regulation. Further, the discretion and judgment identified must be in respect to "matters of significance". The term "matters of significance" refers to the level of importance or consequence of the work performed *Id.* 541.202(a). Administratively exempt work is "significant, substantial, important, or of consequence" 60 Fed. Regs. at 22,143. It is not enough that a job duty "will likely affect matters of significance" Ahle v. Veracity Research Co., 738 F.Supp.2d 896, 908 (D. Minn. 2010). The DOL regulations provide:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to

commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. *Id.* § 541.202(b)

These are all functions that pertain to the management of the business as opposed to a duty performed on the job. The Coordinators do not engage in any of the tasks ser forth in the Regulation. In the Novartis Litigation, 611 F. 3d 141. 156-157 (2d Cir. 2010) The Court held:

Comparing the record as to the Reps' primary duties against the illustrative factors set out in § 541.202(b), for example, we see no evidence in the record that the Reps have any authority to formulate, affect, interpret, or implement Novartis's management policies or its operating practices, or that they are involved in planning Novartis's long-term or short-term business objectives, or that they carry out major assignments in conducting the operations of Novartis's business, or that they have any authority to commit Novartis in matters that have significant financial impact. Although Novartis argues that the Reps do commit Novartis financially when they enter into contracts with hotels, restaurants, and other venues for promotional events… " Nor have we been pointed to any evidence that the Reps have authority to negotiate and bind Novartis on any significant matters, or have authority to waive or deviate from Novartis's established policies and procedures without its prior approval. What Novartis characterizes as the Reps' exercise of discretion and independent judgment--ability to answer questions about the product, ability to develop a rapport with a physician who has a certain social style, ability to remember past conversations with a given physician, ability to recognize [*157] when a message has been persuasive--are skills gained and/or honed in their Novartis training sessions.. As described in Part I.A. above, these skills are exercised within severe limits imposed by Novartis. Thus, it is undisputed that the Reps, inter alia have no role in planning Novartis's marketing strategy; have no role in formulating the "core messages" they deliver to physicians; Accordingly, we conclude that the district court should have ruled that the Reps are not bona fide administrative employees within the meaning of the FLSA and the regulations.

The Mental Health Coordinators' daily activities, despite inaccurate language in the jobs specifications, do not meet these factors. Indeed, these descriptions are inconsistent with the description provided by Ms. Taylor at her deposition, which she described as a facilitative

80

service (Exh. Taylor at page 14 line 9 to page 15 line 5). The Coordinators testified as to the scope of their job duties, and none involved the activities set forth in the Regulation. This Court should be suspect of any affidavits that attempt to suggest the Coordinator involvement in policy, advice of management See, Reich v. Chicago Land Title, 853. Supp, 853F. Supp.1325, 1331(N.D. Ill. 1994) (the Court rejected affidavit which tracked the language of the statute and used term such as "advice" when it really meant information and was critical of creative vocabulary to explain their job duties).

For purposes of the administrative exemption, Defendant must prove that Plaintiff had a primary duty that includes work requiring the exercise of discretion and independent judgment. Clerical duties, even those that may require a small amount of discretion, do not satisfy this prong of the exemption. See Vanstory-Frazier v. CHHS Hosp. Co., LLC, 2010 U.S. Dist. LEXIS 387, at *21 (E.D. Pa. 2010). Significantly, the exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" 29 C.F.R. § 541.202(a). As courts have cautioned, "the most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects" Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 404 (6th Cir. 2004) (citing 29 C.F.R. § 541.207(c)(1) (2003)). While the use of manuals, guidelines, or procedures does not per se preclude the application of the exemption, "employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances" do not meet the exemption's requirements Id. § 541.704. As previously discussed the Coordinators went through

training, and are required to meet the standards of clear and present danger, as defined by the Act and the Code.

Even in approving a 302, the Coordinators are bound by the criteria of the Mental Health Act. Strict adherence to and application of guidelines or policies does not permit the exercise of discretion and independent judgment.  *See* Zannikos v. Oil Inspections (U.S.A.), Inc., 605 F. App'x 349, 354-59 (5th Cir. 2015) (finding no exercise of discretion or independent judgment where employees' primary duties "did not entail making discretionary decisions based on guidelines but rather strictly applying guidelines and reporting noncompliance"); Bullard v. Babcock & Wilcox Technical Servs. Pantex, LLC, 2009 WL 1704251, at *17 (N.D. Tex. June 17, 2009), *vacated on other grounds sub nom.,* Stokes v. BWXT Pantex, L.L.C., 424 F. App'x 324 (5th Cir. 2011) (holding administrative exemption inapplicable where employees followed mandatory instructions to apply well-established policies and procedures).

Again, the administrative exemption requires "more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources". *See* Ingram v. Hagen, 161 F. Supp. 3d 639, 646 (S.D. Ill. 2015) (citing McKee v. CBF Corp., 299 Fed. App'x 426, 429 (5th Cir. 2008) (holding that an employee cannot meet the requirements for an administrative exemption if specific instructions or prescribed procedures have delegated authority)); *see also* Zelenika v. Commonwealth Edison Co., 2012 WL 3005375, at *16 (N.D. Ill. July 23, 2012) (noting that although the plaintiffs were highly-trained employees, "it does not necessarily follow that the training was meant to cultivate or channel the exercise of discretion and independent judgment"); *See* Urnikis-Negro v. Am. Family Prop. Servs., Inc., 2008 WL 5539823, at *2–3 (N.D. Ill. July 21, 2008).  Dep't of Labor, Wage & Hour Div., Opinion Letter, 1998 WL 852752, at *2 (Jan. 23, 1998) ("It is also our view that the investigator's work involves

82

the use of skills and the application of standards or established procedures, as distinguished from work requiring the exercise of discretion and independent judgment as required by § 541.207 of the regulation").

In <u>McComb v. Robert W. Hunt Co.</u>, 172 F.2d 751, 752 (7th Cir. 1949), the plaintiff was employed as a senior inspector who inspected various items such as structural steel and engineering materials. The Court noted that the senior inspector standards included broad, subjective requirements. "The specifications…contain broad language, involving unexpressed details, such as the materials or equipment shall be suitable for the specified purpose, free from injurious defects, of best quality, of good workmanship, according to best standards, capable of certain degrees of operating efficiency, possessed of certain characteristics, and the like" *Id.* at 753. The Court succinctly rejected any argument that the inspector's job involved exempt duties of "discretion and independent judgment."

> The inspectors did not exercise the independent judgment and discretion intended by the regulations. They went out on the job armed with their credentials and other instructions and data to guide them. The latter was their yardstick. They had nothing to do with the making of the yardstick. They only applied it. In the application, they used only such judgment as any skilled employee or technician might use in the performance of his task in a factory.

Similarly, public inspectors (for example, environmental inspectors, fire inspectors, and zoning inspectors) perform non-exempt work. See *Wage and Hour Opinion Letter*, March 11, 1998, 1998 WL 852755. Even though there may be some leeway in their decisions, and the prescribed decisions they make involve complex interpretation of regulations and policies, their job is comparing facts with prescribed standards and hence non-exempt. The Department of Labor has cited this decision with approval in the most recent regulations. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales And

83

Computer Employees, 69 Fed. Reg. 22,147 (2004).  Further, paralegals have long been held to be nonexempt employees, despite the significant latitude they have in performing their job duties.  See *Wage and Hour Opinion Letter*, February 19, 1998, 1998 WL 852701; *Wage & Hour Opinion Letter,* February 19, 1998, 1998 WL 852691.  In sum, to be exempt, the employee must "exercise authority within a wide range to commit their employer in substantial respects" *Wage and Hour Opinion Letter*, February 14, 2003, 2003 WL 23374602.

In sum, employees who apply an employer's policies to a particular situation are not exercising discretion and independent judgment, even if the policy provides some or significant subjective leeway.  Only employees who are not tethered to established policies and who exercise wide latitude in their decisions are exercising the independent judgment and discretion required under the statute. In fact, the purpose of the Coordinator is to act as a check when a civilian petition is presented, and to hold that they have broad discretion would be contrary to their role. See Ale v. TVA, 269 F.3d689  686-87 (6th Cir. 2011) ("Rather, they were more like inspectors who used their skill or knowledge 'in following prescribed procedures or determining which procedure to follow, … or in determining whether specific standards were met'").

The above principles foreclose any argument that the Coordinators  exercised independent judgment and discretion.  Applying skill and knowledge to determine whether an applicant's qualifications fit within the credit guide is **exactly** what the underwriters did. *See Ale,* 269 F.3d at 687 ("Rather, they were more like inspectors who used their skill or knowledge 'in following prescribed procedures or determining which procedure to follow, … or in determining whether specific standards were met'").  Objectively is defined as "based on facts rather than feelings or opinions". *See* Merriam-Webster, www.m-w.com, accessed April

84

22, 2014. At no point is a Coordinator supposed to be making a subjective, personal decision about how to handle the file.  As Ms. Gaither testified, it is not what she feels but what the Act requires. See e.g. <u>Ale,</u>, supra, at 686-87  (holding lieutenants did not exercise discretion and independent judgment where "nearly everything that the lieutenants did and nearly every decision the lieutenants made was prescribed, controlled, or governed" by various regulations, policies and procedures).

Finally, it is questionable that the majority of the  Coordinators time is even spent on matters involving non-exempt work or discretion. Courts do not focus on employer job titles which are often creative, inapplicable, or not reflective of a job, but rather, *focus on allocations of job duties*[23]. *See* <u>Marshall v. Nat'l Freight, Inc.</u>, 1979 WL 1977, at *10 (D.N.J. 1979)(explaining that although accounts payable supervisor had a complex and laborious job, he was non-exempt because the *majority percentages* of his daily duties involved processing transactions and document review pursuant to company guidelines); *Shultz v. A.E. Burgess Co.*, 1970 WL 668, at *4 (N.D. Ala. 1970)(field office manager was non-exempt under FLSA because the ***majority*** of his time was spent on nonexempt duties);. Although time alone does not establish whether an employee's "primary" duty is administrative or managerial in nature, the amount of time dedicated to those functions is a good rule of thumb. <u>Marshall v. Western Union Tel. Co.,</u> 621 F.2d 1246, 1252 (3d Cir. 1980).

The Coordinators spend a great deal of time doing secretarial work or clerical work as they are entering data: all calls must be logged and all 302s must be logged. Secretarial and

---

[23] *See also* "29 C.F.R. § 541.2 Job titles insufficient. "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part.

clerical work is expressly rejected as being a job duty that can qualify under the administrative exemption. *See* 29 C.F.R. § 541.202(e) (explaining the discretion prong of the administrative element does not apply to "clerical," "secretarial" or "tabulating data" or other routine work guided by company policies. See <u>Clark v. J.M. Benson, Co.</u>, Inc., 789 F 2d 282, 287 (4th Cir, 1986)' <u>McKinney v.  Storage All Centr's  LLC</u>,  656 F.Supp. 114 ((D.D. C. 2000) See also <u>In re Novartis Wage and Hour Litigation</u>, supra.

The only arguable aspect of their day that involves discretion or judgment is the approval of a 302. The Coordinators as set forth above do not have discretion in approving or denying a 302, as they are bound by the criteria of the Act. The majority of their time is spent on answering questions, dispatching mobile teams, talking to individuals calling on the suicide line, and data entry. In fact, many of the coordinators put their tine on the delegate line as less than 50%, including activities such as dispatching. Taylor described the two lines as the delegate lines and suicide lines as (1) the delegate line related to processing an involuntary commitment (2) providing information about the 302 process to callers (3) dispatching a mobile team and (4) on suicide line providing information on services, talking or staying on the line for the police. (Exh. F Taylor page 29 line 5 to page 31 line 5).

In determining whether one falls within the administrative exemption, one can examine the time spent on exempt work or non-exempt. While the 302 process may be important to the public this is not their primary job, nor is it an administrative function; it is part of the daily work production. In fact, the time spent on the delegate line is sufficiently below 50%. Many of the 302s are subject to automatic review. Similarly, a 302 from a mobile team is approved in almost every instance. That leaves a small percentage of their calls in which the approval of the 302 is at

all times material uncertain. For all reasons set forth above the Defendant cannot meet all the elements of the Act.

### D.  The Accountability Provision Should Not Be Utilized To Justify Deduction

The Coordinators end their standby shift and have to report for their morning shift at the same time. Needless to say this causes tardiness. The FLSA is supposed to be a remedial statute to prevent abuse to employees, and yet here they are being charged when it is the City's own scheduling policy causing the problem. They are given an option to have money deducted from a vacation bank or a compensation bank or they can work late (Exh. C Carter at page 48 line 5 to page 49 line 20). Larry Carter has testified that it takes a minimum of 45 minutes to get to the office from his home (Id). Ms. Gaither has testified that she has been docked because of not being relieved from the standby line by her supervisor (Exh. H Gaither at page 34 Line 14 to page 35 line 18). Ms. Jubilee testified she must work late because she does not have much time in her bank (Exh. L Jubilee at page 11 line 21 to page 12 line 3). Moreover, they had been given a small grace period prior to this lawsuit. Therefore, the real issue is not accountability, but rather of retaliation.

The City has defended this practice under the mantra of  "Accountability".  A private employer can lose an exemption if partial day deductions are made from a salaried employee. The practice of government agencies making partial deduction was at risk. Many governmental agencies had accountability standards to ensure that government employees worked a full day. This was an important issue for government agencies, as deduction from pay could result in a finding that the employee was not an exempt employee under the Fair Labor Standards Act. Regulations were adopted to prevent a partial day deduction to cause a government agency to lose exemption and pay overtime to employees who would otherwise be exempt.

Plaintiffs are not challenging the principle behind the policy, but rather its application to the facts in this case. Like all matters under the FLSA, the Defendant has the burden to establish the application of the defense. The Tenth Circuit requires a municipality claiming this defense to offer facts leading to the inference that its system for docking pay is actually a policy based on principles of public accountability. Spradling v. City of Tulsa, Oklahoma, 95 F.3d 1492, 1499-1500 (10th Cir. 1996) (upholding district court finding that the city had not offered sufficient evidence on this issue when the  city argued that state constitution permitted tax collection only for public purposes and that paying employees for time not worked was not a public purpose). This Circuit has not ruled on the issue of what facts are necessary to establish that a public employer's pay docking system is part of a policy or practice established pursuant to principles of public accountability.

It simply cannot be the intent of the accountability standard to penalize an employee based on the scheduling conflict caused by the employers themselves. One cannot even understand any justification for this practice when steps could be taken to prevent this problem, such as allowing an employee to work late, having a supervisor come in early for coverage, or shortening their time on the night standby. The issue is worked out on later shifts. Moreover, the City previously allowed some leeway in the reporting time. This changed after this litigation was commenced. The City had previously given the employees some leeway in reporting by not deducting time. Mysteriously, this policy changed after the lawsuit was instituted (Exh. L Jubilee at page 53 line 3 to page 54 line 13); (Exh. H Gaither at page 34 line 12 to page 35 line 7). This is just another way that the City tries to save money at the expense of these employees.

The Coordinator's request that the practice be declared unlawful and any sums that have been deducted be returned to their vacation or compensatory time bank.

**E. The Violation of the FLSA-Damages**

**1. Defendants are Liable for Liquidated Damages in an Amount Equal to their Liability for Back Wages**

Plaintiffs may recover both unpaid wages and an additional equal amount in liquidated damages for violations of the overtime provisions of the FLSA. See 29 U.S.C. § 216(c). Liquidated damages are not punitive, but compensatory – they compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due. *See* Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir. 1991). In challenging the appropriateness of liquidated damages, the employer bears the "plain and substantial" burden of establishing both good faith and reasonable grounds for the violation. "In the absence of such proof, a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages" Marshall v. Brunner ,668 F 2d 748 (3rd Cir. 1981);  Brock v. Claridge Hotel and Casino, 846 F.2d 180, 187 (3rd Cir. 1980).

To carry its burden of establishing good faith, an employer must first show that it took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions. See Cooper Elec. Supply, 940 F.2d at 908. The employer must prove "an honest intention to ascertain and follow the dictates of the Act" *Brunner*, 668 F.2d 748 at 753. Next, the "reasonableness" requirement requires that the employer had reasonable grounds for believing it was in compliance, *Id*. Reasonableness is an objective standard, and to satisfy the standard the employer must act "as a reasonably prudent man" under the same circumstances. "[I]gnorance alone is not sufficient in meeting the objective test" Brooks v. Village of Ridgefield Park, 185 F.3d 130, 137 (3d Cir. 1999). Merely proving that the employer did not act intentionally, had good intentions, or was ignorant of the law is not sufficient to avoid liability for liquidated damages once a violation of the law is found, *Reich v. Brenaman Electrical Service*, 1997 WL

164235, at *8 (E.D. Pa. Mar. 28, 1997) (citing Williams v. *Tri-County Growers, Inc.*, 744 F.2d 121, (3rd Cir. 1980) (noting that "[a] good heart but an empty head does not produce a defense" against liquidated damages). An employer's burden of proof is thus "a difficult one to meet" Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987). "Double damages are the norm, single damages the exception" Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir 1986); Solis v. A-1 Mortgage,Corp, 934 F.Supp. 2d 778 (W.D.Pa. 2013).

The City has admitted that it never sought a legal opinion or a letter from the Department of Labor (Exh. O-Answer to Second Set of Interrogatories). Indeed, the City is unable to even state whether an audit was ever done through the job descriptions existence. In this case reliance on a general regulation or guideline of the Department of Labor is not sufficient. See Cole v Farm Fresh Poultry,Inc, , 824 F.2d 923. 928. (11th Cir 1097) "The administrative interpretation relied upon must provide a clear answer to the particular situation in order for the employer to rely on it." Id. at 928. "Administrative interpretations hedged with qualifications, here the caveat that the correct answer depends upon particular circumstances, cannot provide the definitive opinion necessary to raise the statutory bar of section".

Defendant cannot simply rely on its interpretation of the exemptions, which are fact specific. This defense is only available if the employer actually in fact relied on the administrative interpretation at the time it engaged in the practice at issue, and the City cannot even establish who wrote the description and if they even had an audit ever. Internat'l Ass'n of Firefighters v. City of Rome, 682 F.2d 522, 532 (11th Cir. 1988);Kreig v. Pell's Incorporated, 2002 WL 449797 (S.D. Ind. Jan. 28, 2002). In fact, the request for admissions and the document production are devoid of any research into the issue. There was never any attempt to ascertain the Coordinators status and the City chose to buy them off with a small increase. This was a

business decision. The City has admitted that it never sought a legal opinion or a letter from the Department of Labor. In this case reliance on a general regulation or guideline of the Department of Labor is not sufficient.  Cole v Farm Fresh  Poultry,Inc, , 824 F.2d 923. 928. (11th Cir 1097) "The administrative interpretation relied upon must provide a clear answer to the particular situation in order for the employer to rely on it." Id. at 928.  "Administrative interpretations hedged with qualifications, here the caveat that the correct answer depends upon particular circumstances, cannot provide the definitive opinion necessary to raise the statutory bar of  good faith

Defendant's failure to show affirmative steps at FLSA compliance defeats any "good faith" defense to liquidated damages. In Cooper Elec. Supply Co.,supra. the Third Circuit held that the employer's failure to take affirmative steps to ascertain the FLSA's requirements precluded a finding of "*reasonable* good faith." 940 F.2d 896, 908-09 (emphasis in original). Defendants have admitted that they took no such steps, and therefore cannot show as a matter of law that they had reasonable grounds for their violations. Therefore, the Court must award liquidated damages in an amount equal to Defendants' liability for back wages to be determined at trial.

## 2. The City Acted With Reckless Disregard Therefore Damages Should Be Awarded for Three Years

After the Plaintiffs approached the City Director about their classifications, the City never performed a job evaluation for the position to determine whether it should pay more, and that evaluation did not happen. There are no notes associated with any evaluation of the positions when modifications were made other than changes in language and the file produced by the City of Philadelphia and the file only  allegedly contains the job description.

In <u>McLaughlin v Richland Shoe.Co.</u>,486U.S. 128, 108 S. Ct.1677 (1988) the Supreme Court in an Fair Labor standard case put an end to the split in the circuits on the meaning of a willful violation. The Supreme Court adopted the approach of the Third Circuit case before and held that an act is willful when a party knew or showed reckless disregard. It is hard to comprehend that the City does not meet those standards. The City's own memorandum show knowledge of the issue. They knew they were saving money and at no time was there evidence of any job audit or study.

There is no genuine issue of material fact that Defendants made a good-faith effort to comply with the FLSA and recklessly disregarded the FLSA. The Defendant has not established that it took any steps to conduct an audit of the positions or to determine if these were in accordance with the FLSA. The City of Philadelphia paid the employees for overtime but not for standby time and even at a lower hourly rate of the regular pay. The City's own documents establish that this was a business decision based on costs

In 1997, around the time the position was created, the City examined payment for overtime (Exh.V-Memorandum Pay on Pay 1997). In fact, the memorandum discussed how hard working the Coordinators were in the job. More importantly, the Memorandum discusses how many people would have to be hired to do Coordinators job on evening and weekends: an additional twelve people! The Memorandum then discusses how much would be saved by not paying the Coordinators the FLSA mandated rate.

Again, in 2001, the idea of overtime at the mandated rate was rejected (Exh.W-Memorandum on Pay 2017).

Years go by, the City saves money and ignores the Coordinators request to deal with the overtime issue  (Exhibit X-Affidavits of Coordinators).

The job specifications show revisions for language; however, no issue of the issue of the propriety of the exemption was put on the agenda (Exh. Y-Agenda Civil Service Commission 2017).

The City has utterly failed to identify anything they relied on to demonstrate that their decision to classify the Coordinators as exempt was not, at the very least, in reckless disregard of the FLSA. An additional year of overtime is a small penalty to pay given the savings through the years by the City given its blatant disregard for their employees and the FLSA. As such, a three year statute of limitations should be imposed.

## VI. CONCLUSION

Based upon the arguments set forth herein, the Court should enter judgment as a matter of law under Fed. R. Civ .P 56 for the Plaintiffs on liability, as well as a finding on willfulness, and set the case for a trial on damages only.

July 19, 2019             /s/ Howard K. Trubman, Esq.
Date                      Howard K. Trubman, Esq.
                          Attorney for Plaintiffs

93