IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARRY CARTER, LESLIE DAVIS, THE ESTATE OF TIFFANY CAPERS-ALLEN BY SHAWN ALLEN, ADMINISTRATOR, SHARON AGBEDE, TIARA COUNCIL, CATHERINE MACKEY-GAITHER, GREGORY GARNER, JENNIFER JUBILEE, ROCHELLE MORRIS, and KIMBERLY RODRIQUEZ, Plaintiffs, v. CITY OF PHILADELPHIA, Defendant. | CIVIL ACTION NO.  18-4404 |

**MEMORANDUM AND ORDER**

JOYNER, J.                                    October    17, 2019

This Fair Labor Standards Act case is presently before this Court on motion of the Plaintiffs for the entry of summary judgment in their favor.  For the reasons outlined below, the Motion shall be granted.

**Factual Background**

Plaintiffs are a group of some ten individuals who are and have for the past three or more years been employed[1] by the City of Philadelphia's Department of Behavioral Health ("DBH") in the Division of Mental Health/Disability Services' ("MHDS") Acute

---

[1]  One of the plaintiffs, Tiffany Capers-Allen was so employed until her death on January 18, 2018.  Her claim is being brought by Shawn Allen, her husband, who is the Administrator of her Estate.

1

Services Unit as "Mental Health Emergency Service Coordinators 2." Specifically, in their positions, Plaintiffs provide 24-hour, 7-day-a-week coverage of three mental health crisis telephone lines – a mental health "delegate" line[2], a local suicide line and a national suicide line. To accomplish this objective, Plaintiffs are required to work 8.5 hour shifts – either a day shift starting anywhere from 7:30 a.m. to 9 a.m. and ending anytime between 4 p.m. and 5:30 p.m., or a night shift commencing anytime from 4:30 p.m. and ending at 1 a.m.[3]

In addition to these regular workweek shifts, Plaintiffs are required to work the "standby" overnight and/or weekend and holiday shifts which are some 7 hours in length three times per week. The standby shifts are scheduled on a rotating basis with the schedule being set on a monthly basis. Plaintiffs may trade their shifts with one another but unless they can find a volunteer to take a shift which they want to give away or trade, they must work their assigned shifts. While Plaintiffs work their regularly-scheduled day or night shifts at the Acute

---

[2] The Mental Health Emergency Service Coordinators are also referred to as "delegates." The "delegate line" is generally confined to calls from police officers, crisis control center employees, family members or concerned individuals seeking to have someone brought in involuntarily for a psychiatric evaluation. It is this line on which approval for petitions under Section 302 is sought.

[3] The start times for the in-office regular day or night shifts are staggered at half-hour intervals between 7:30 and 9 a.m. and 4 and 5:30 p.m. A slight schedule adjustment is typically made when a night shift delegate is assigned to work a weekday overnight standby shift. In that case, the delegate will begin work at 3 p.m. and leave at 11:30 p.m.

Services Unit's office location at 801 Market Street in
Philadelphia, they are required to work their standby shifts
from their homes.  Plaintiffs are paid their regular hourly rate
of approximately $31 for their regular, assigned day or evening
shifts and some $21 per hour for their standby shifts.[4]  There is
no difference at all between their job duties[5] on the standby
shifts and their regular day or night shifts; the only
distinction is that they are required to work the standby shifts
from their homes.

In working their standby shifts from home, Plaintiffs must
answer incoming calls within three rings and while they can use
a Bluetooth or similar headset, they cannot move too far from
the phone's base or the calls will drop off.  Plaintiffs
therefore all have a dedicated area within their homes for
working their standby shifts.  Regardless of whether they have
worked an overnight standby shift until 7:30 a.m., day-shift
Plaintiffs are required to report to work their regularly-
assigned shift the following day at the usual time.  For those
plaintiffs who work day shift and are scheduled to report at

---

[4] None of the plaintiffs who testified at their depositions knew exactly what
their hourly rates were for either their regular or standby shifts.

[5] Specifically, Plaintiffs' primary job responsibilities are to listen and
assess callers' needs and provide them with information about where to obtain
help or to send out a mobile unit to assess the mental health status and
needs of individuals who are seeking help for themselves or for others and to
approve or deny applications for involuntary commitment evaluations under
Section 302 of the Mental Health Procedures Act, 50 P.S. §7302.

7:30 or 8 a.m., they have the option of using their vacation or compensatory leave time or of working their required eight-hours from the time they arrive to work *i.e.*, they may choose to add the time which they missed by arriving late in the morning onto the end of their regularly-scheduled shift.

On October 12, 2018, Plaintiffs commenced this action alleging that Defendant willfully violated the Fair Labor Standards Act, 29 U.S.C. Section 201, *et. seq.* by intentionally failing and refusing to pay them all of the compensation due under the Act. See, 29 U.S.C. §207(a)(1). Plaintiffs seek to recover, *inter alia*, liquidated damages, pre- and post-judgment interest, other monetary damages, reasonable attorneys' fees and expenses and their costs in filing and pursuing this action under 29 U.S.C. §216. Discovery in this action has now closed and, on July 15, 2019, Defendant City of Philadelphia moved for summary judgment on the grounds that Plaintiffs' claim fails because they meet two exemptions to the overtime compensation provisions of the FLSA. Specifically, the City asserted that the Plaintiffs' positions fall under the administrative and the learned professional exemptions and that they therefore are *not* entitled to overtime compensation. Plaintiffs opposed the motion and in further response, filed the motion for summary judgment which is now before us. Insofar as we denied

Defendant's motion on September 26, 2019, the Plaintiff's motion is the sole matter presently pending before the Court.

## Summary Judgment Standards

It has long been the rule that any party may move for summary judgment on any claim or defense or any part of a claim or defense and that judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…; [f]actual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  In re Tribune Media Co., 902 F.3d 384, 392 (3d Cir. 2018) (quoting Anderson, supra.); Stone v. Troy Construction, LLC, 935 F.3d 141 (3d Cir. 2019).

Further, a "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Salazar-Limon v. City of Houston, 137 S. Ct. 1277, 1280 (2017) (quoting Anderson, 477 U.S. at 249).  "In so

doing, the court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.'"  Id, (quoting Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L. Ed.2d 686 (2007) and United States v. Diebold, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed.2d 176 (1962)).  Thus, in order to survive summary judgment, an opposing party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249.

## Discussion

As noted, Plaintiffs brought this action for Defendant's alleged violation of the overtime provision of Section 7 of the Fair Labor Standards Act, 29 U.S.C. §207, subsection (a) of which reads as follows in pertinent part:

**(a)   Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions.**

    **(1)**   Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

…

6

However, notwithstanding this general rule and as Defendant correctly asserts, there are a number of "exemptions" to and from the overtime requirements set forth in the Act.  Generally speaking, "[w]hen an employee brings a claim under the FLSA, he ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'"  Rosano v. Township of Teaneck, 754 F.3d 177, 188 (3d Cir. 2014).  "Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly," the Supreme Court recently held that "there is no reason to give them anything other than a fair … interpretation," one that is "neither narrow nor broad."  Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142, 200 L. Ed.2d 433, 442 (2018); Secretary United States Department of Labor v. Bristol Excavating, Inc., 935 F.3d 122, 135 (3d Cir. 2019).  The question whether an employee is exempt is a mixed question of law and fact.  Pignataro v. Port Authority of New York and New Jersey, 593 F.3d 265, 268 (3d Cir. 2010); Levitt v. Technical Education Services, Civ. A. No. 10-CV-6823, 2012 U.S. Dist. LEXIS 111195, *9 (E.D. Pa. Aug. 7, 2012).  The burden of proving these exemptions is upon the employer, and if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden. Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206, 86 S. Ct. 737, 15 L. Ed.2d 694 (1966); Friedrich v. U.S. Computer Services, 974 F.2d 409, 412

(3d Cir. 1992); <u>Martin v. Cooper Electric Supply Co.</u>, 940 F.2d 896, 900 (3d Cir. 1991); <u>Southerton v. Borough of Honesdale</u>, No. 3:17-CV-0165, 2018 U.S. Dist. LEXIS 189493 at *25 (M.D. Pa. Nov. 6, 2018).

In determining the employer's burden of proof, the Department of Labor Regulations are given "considerable and in some cases decisive weight." <u>Brooks v. Village of Ridgefield Park</u>, 185 F.3d 130, 138, n.7 (3d Cir. 1999) (quoting <u>Skidmore v. Swift</u>, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)). In this case, the Defendant city is invoking the so-called "learned professional" and "administrative" exemptions both of which require that the employee be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week, … exclusive of board, lodging or other facilities." <u>See,</u> 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1). Given that the parties here agree that Plaintiffs meet this primary threshold for both exemptions, this Court need not analyze this element any further. Instead, we turn now to more closely scrutinize the other requirements of each of the claimed exemptions.

*Administrative Exemption*

The "bona fide executive, administrative or professional capacity" exemption is outlined in 29 U.S.C. §213(a)(1), which states:

8

(a)   **Minimum wage and maximum hour requirements.**  The provisions of sections 6 (except section 6(d) in the case of paragraph (1) of this subsection) and 7 [29 U.S.C. §§206, 207] shall not apply with respect to –

   **(1)**  Any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act [5 U.S.C. §551 *et. seq.*] except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities;

Further explanation of this exemption is offered in the Code of Federal Regulations.  29 C.F.R. §541.200 sets forth the general rule for administrative employees.  Under subsection (a)[6], the term "employee employed in a bona fide administrative capacity" in section 13(a)(1) is said to mean "any employee:

   (1)  Compensated on a salary or fee basis pursuant to §541.600 at a rate per week of not less than the 40th percentile of weekly earnings of full-time non-hourly

---

[6]  As subsection (b) explains, further relevant definitions are set forth at various other sections of the regulations:

   (b)  The term "salary basis" is defined at §541.602; "fee basis" is defined at §541.605; "board, lodging or other facilities" is defined at §541.606; and "primary duty" is defined at §541.700.

workers in the lowest-wage Census Region …, exclusive of board, lodging or other facilities…

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

Thus, in order to be categorized as an administrative employee subject to the exemption, the employee must (1) be compensated on a salary basis, (2) conduct primary duties[7] which qualify as "administrative,"[8] and (3) exercise independent

---

[7] To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. §541.700(a). And, as §541.700(b) further explains:

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

[8] 29 C.F.R. §541.201 further clarifies what it means to be "[d]irectly related to management or general business operations:

judgment and discretion[9] in the performance of his/her duties.

O'Bryant v. City of Reading, No. 05-4259, 197 Fed. Appx. 134,

137, 2006 U.S. App. LEXIS 18360, *5 (3d Cir. July 20, 2006).  As

---

**(a)**  To qualify for the administrative exemption, an employee's primary duty must be directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

**(b)**  Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.  Some of the activities may be performed by employees who also would qualify for another exemption.

**(c)**  An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

[9]  As to discretion, 29 C.F.R. §541.202(c) provides, *inter alia*:

The exercise of discretion and independent judgment implies that the employee has the authority to make an independent choice, free from immediate direction or supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.  Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.  The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.  The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. …

a "`rule of thumb,'" primary duty means a duty at which an
employee spends the major part, or over 50% of his or her time."
Reich v. Gateway, 13 F.3d at 699; Kelly-Myers v. Mercy Health
System of Southeastern Pennsylvania, Civ. A. No. 16-CV-5194,
2017 U.S. Dist. LEXIS, *13 (E.D. Pa. Sept. 29, 2017).  And,
"[a]s to the administrative nature of the employee's primary
duties, the employee's activities must be directly related to
assisting with the operation of the business of the employer…"
O'Bryant, supra, (citing 29 C.F.R. §541.201).  "[T]his standard
is flexible," however "depending on the importance of the
administrative duties conducted, the frequency of use of
discretionary power, the freedom from supervision, and
comparative wages."  O'Bryant, supra, 197 Fed. Appx. At 136.

Finally, "[a]n employee's discretion and independent
judgment must be evaluated 'in the light of all the facts
involved in the particular employment situation in which the
question arises.'"  Carter v. Sungard Availability Services, LP,
2019 U.S. Dist. LEXIS 38275, *16 (E.D. Pa. March 11, 2019)
(quoting 29 C.F.R. §541.101(b)).  "Factors to consider when
determining whether an employee exercises discretion and
independent judgment with respect to matters of significance
include, but are not limited to:

> whether the employee has authority to formulate, affect,
> interpret, or implement management policies or operating
> practices; whether the employee carries out major

12

assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

29 C.F.R. §541.202(b); <u>Carter v. Sungard</u>, <u>supra</u>.

Applying all of the preceding principles to the matter now before us, we do not find that Plaintiffs are employed in a "bona fide administrative capacity" such as to render them exempt from the City's obligation to pay them overtime.  Indeed, it is undisputed in this case that the plaintiffs are required to work, on average, 71 hours per week: five 8 ½ hour "regular" shifts in the workplace,[10] and three 7 hour "standby" shifts in their homes.  The standby shifts are mandated – Plaintiffs may only avoid working these shifts if they are able to find another delegate who is willing to take their standby shift or if they

---

[10] One hour is allotted for lunch or meal-breaks out of Plaintiffs' regular shifts.  As testified to in deposition, these meal breaks are not always taken at the same time each shift as the timing is dependent on the volume and nature of the calls being handled at the call center and on occasion the meal breaks are missed altogether.  Generally most, if not all, of the plaintiffs get to take their meal breaks most of the time.

13

are able to obtain advance permission to not work due to an
extenuating circumstance.[11]

It also appears undisputed that the work performed is the
same regardless of the location and that the rate of pay for
Plaintiffs' regular shifts is some $10 - $12 per hour more than
the rate paid for the standby shifts.[12]  (Rodriguez Dep., p. 94).
Interestingly, on those days when the rest of City government is
closed as, for example, in the event of a snowstorm or holiday,
Plaintiffs are required to work their regular shifts from their
homes, earning the standby rate of pay, in spite of the fact
that all other city employees who are *not* working because of the
closure receive their regular wages.

All of the witnesses testified that in answering the
national and local suicide hotline calls, Plaintiffs are charged
with listening to the callers, assessing the severity of the
needs of the callers, providing them with information on where
mental health help can be obtained and, when necessary, calling
for the Philadelphia police or fire rescue to go to the caller's

---

[11]  For example, in Mr. Carter's case, he was authorized to skip the standby
shifts for approximately one year in order to provide care for a family
member.  (Carter Dep., 49-50).

[12]   And, as all of the witnesses deposed acknowledged, the work performed by
Mental Health Emergency Coordinators ("Coordinator") II is identical to the
work performed by Mental Health Emergency Coordinators I.  Each of the
plaintiffs in this action began working for the Acute Services Unit as a
Coordinator I and after variable periods of time ranging from two to ten
years, they all were promoted to Coordinator II positions, an in-grade
promotion with a several dollar-an-hour raise in regular hourly pay rate.

location.  At times, the calls on those lines will come to the
Plaintiffs through the 911 operators.  On those occasions,
Plaintiffs will also stay on the line with the caller until
police or emergency medical help has arrived on scene to the
caller's location.[13]

Plaintiffs' job duties on the "delegate" line are similar
in that they need to determine the severity of the mental health
need, but the calls on that line are typically not from the
patients themselves but rather from other individuals such as
representatives from crisis centers, police departments or
agencies, school authorities and occasionally, family members.
Much of Plaintiffs' time on the delegate line is spent
determining whether the person who is the subject of the call
meets the criteria under the Pennsylvania Mental Health
Procedures Act, 50 P.S. §§7101, *et. seq.* for being brought to a
crisis center for an involuntary emergency examination and
possible treatment, and/or for involuntary confinement until
such time as an emergency examination can be conducted.  Those
criteria are set forth in the Act itself[14] and, if Plaintiffs

---

[13]  One of the plaintiffs, Leslie Davis, described her position as that of a
"glorified telephone operator."  (Dep. Of Leslie Davis, Exhibit "G" to Pl's
Motion for Summary Judgment ["MSJ"], at p. 46.

[14]  More particularly, Section 301 of the MHPA, 50 P.S. §7301, reads in
relevant part:

    **(a)**   **Persons subject. –** Whenever a person is severely mentally
        disabled and in need of immediate treatment, he may be made subject

to involuntary emergency examination and treatment.  A person is severely mentally disabled when, as a result of *mental* illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b), or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c).

**(b)    Determination of clear and present danger.** –

(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated.  … For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed *acts* in furtherance of the threat to commit harm.

**(2)** Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i)    The person has *acted* in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this *act,* or

(ii)   The person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this *act*.  For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed *acts* which are in furtherance of the threat to commit suicide; or

(iii) The person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this *act*.  For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed *acts* which are in furtherance of the threat to commit mutilation.

…

16

find that the criteria are sufficiently established, they will authorize the issuance of a warrant requiring the subject person to be taken to a designated mental health facility for an emergency mental examination.[15]

On average, Plaintiffs receive 25 phone calls or more on the delegate line during their regular workweek (in-office) shifts each day seeking §302 authorizations. As a result, much of their work days are spent determining whether to approve or disapprove a §302 warrant request. The number of calls on the

---

[15] The criteria and procedures necessary for issuance of a warrant are also prescribed in the MHPA. In this regard, Section 302(a) of the Act, 50 P.S. §7302 provides:

> **(a)** **Application for emergency examination. –** Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.
>
> > **(1)** **Warrant for emergency examination. –** Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.
> >
> > **(2)** **Emergency examination without a warrant. –** Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

overnight and weekend standby shifts varies but Plaintiffs
seldom receive fewer than 5 calls on their overnight shifts and
sometimes field as many as 20. (Mackey-Gaither Dep., p. 12;
Rodriguez Dep., pp. 43-44, 84).  While many calls are somewhat
repetitious in that they are relatively similar to one another,
there are times when Plaintiffs may not be certain whether the
facts given in a particular application fit the criteria
necessitating the issuance of a §302 warrant.  In those
instances, Plaintiffs will consult with and/or defer to their
supervisors to make the decisions as to whether to grant or deny
the warrant applications.

In addition, Plaintiffs are also responsible for entering
all of the §302 warrant requests which they consider into their
Unit's database notating whether they were approved or not and
why.  This ensures that there is a history which can be
consulted should an individual be the later subject of another
302 petition.  (Carter Dep., pp. 26-27; Mackey-Gaither Dep. 59;
Rodriguez Dep., pp. 72-76; Jubilee Dep., pp. 33, 58-61).

Plaintiffs do not provide any clinical psychological
counseling or treatments to the subjects of the warrants and
have no follow-up whatsoever as to those patients after they
grant or deny requests for §302 warrants.  (Carter Dep. p. 99;
Rodriguez Dep., p. 95; Mackey-Gaither Dep., 58-60).  It is the
crisis center psychiatrists who determine whether someone needs

to be involuntarily held and treated under the MHPA, not the plaintiffs. (Carter Dep., pp. 65-68). Nor is it part of Plaintiffs' regular job responsibilities to conduct trainings/training sessions for police officers or other employees of other city agencies on the handling of people with behavioral health issues, to collaborate on planning and preparedness training with the Philadelphia Office of Emergency Management, or to do site visits at the city's Crisis Response Centers. (Rodriguez Dep., pp. 59-63).

Likewise, Plaintiffs do not make, interpret, or explain office policies and procedures, participate in social service agency and advisory committees, plan strategies, formulate recommendations or play any role in preparing for disasters. Very occasionally, they do participate in some community outreach activities, such as walks to raise funds to fight suicide, or by staffing a unit information table at local fairs or participating in community meetings to combat the opioid crisis. (Mackey-Gaither, pp. 61-63; Davis Dep., pp. 38-46; 48-51). Plaintiffs also do not do any analysis of or statistical research on any of the data collected on call center operations. (Carter Dep., pp. 100-101). As Health Program Manager Patty Stewart-Taylor acknowledged, Plaintiffs' "job is to implement policy and not set policy." (Stewart-Taylor Dep., pp. 36-37).

In light of all of this, we cannot find that the plaintiffs' "primary duty" as Delegates/Mental Health Emergency Service Coordinators is the "performance of work directly related to the management or general business operations of the [City] or the [City's] customers." So saying, judgment as a matter of law in favor of Plaintiffs is properly entered as to the City's claim that they are exempt from the payment of overtime compensation on the basis of the administrative exemption.

*Professional Exemption*

The Defendant City alternatively asserts that Plaintiffs' positions are exempt from the FLSA's overtime requirement by virtue of the "learned professional" exemption also set forth in 29 U.S.C. §213(a)(1). "An employee's status as a 'learned professional' is determined by his or her duties and salary." Pignataro, 593 F.3d at 268 (citing 29 C.F.R. §541.3). Plaintiffs rejoin that the skills that they use to perform their daily jobs do not require that they possess any specialized or advanced knowledge and that those skills were not acquired through their formal educations, but rather were all learned through their on-the-job training. Consequently, Plaintiffs submit that they are not learned professionals or professional employees within the meaning of the Act.

20

As a general rule, an "employee employed in a bona fide professional capacity" is one who, in addition to satisfying the salary requirement agreed to earlier, has as his or her primary duty the performance of work: "(i) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (ii) requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. §541.300(a)(2). The primary duty test for the learned professional exemption thus "includes three elements: (1) the employee must perform work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." Chatfield v. Children's Services, Inc., 555 F. Supp.2d 532, 534 (E.D. Pa. 2008); 29 C.F.R. §541.301(a)(1)-(3).[16]

---

[16]   Further clarification of the learned professional exemption is provided in 29 U.S.C. §541.301(b) – (d):

**(b)**   The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level.

**(c)**   The phrase "field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various

The City's official written job description for the Mental
Health Coordinator's position requires that delegates possess a
master's degree in psychology, sociology, mental health
counseling or social work plus two years of experience in the
mental health field providing "full performance level experience
consulting, advising and providing mental behavioral health
services and suicide intervention" "or any equivalent
combination of education and experience determined to be
acceptable by the Office of Human Resources." (Exhibit "F" to
Pl's MSJ, Dep. Of Patty Stewart-Taylor, pp. 19-22).
Notwithstanding this description, only a few of the plaintiffs

---

types of physical, chemical and biological sciences, pharmacy and
other similar occupations that have a recognized professional status
as distinguished from the mechanical arts or skilled trades where in
some instances the knowledge is of a fairly advanced type, but is
not in a field of science or learning.

**(d)**    The phrase "customarily acquired by a prolonged course of
specialized intellectual instruction" restricts the exemption to
professions where specialized academic training is a standard
prerequisite for entrance into the profession.  The best prima facie
evidence that an employee meets this requirement is possession of
the appropriate academic degree.  However, the word "customarily"
means that the exemption is also available to employees in such
professions who have substantially the same knowledge level and
perform substantially the same work as the degreed employees, but
who attained the advanced knowledge through a combination of work
experience and intellectual instruction.  Thus, for example, the
learned professional exemption is available to the occasional lawyer
who has not gone to law school, or the occasional chemist who is not
the possessor of a degree in chemistry.  However, the learned
professional exemption is not available for occupations that
customarily may be performed with only the general knowledge
acquired by an academic degree in any field, with knowledge acquired
through an apprenticeship, or with training in the performance of
routine mental, manual, mechanical or physical processes.  The
learned professional exemption also does not apply to occupations in
which most employees have acquired their skill by experience rather
than by advanced specialized intellectual instruction.

22

possess master's degrees and not all of the plaintiffs possess bachelor's degrees in the designated areas of study/expertise. For example, Plaintiff Carter has a bachelor's degree in early childhood education and a minor in psychology.  (*See, e.g.*, Carter Dep., p. 91-92; Davis Dep., p. 8; Mackey-Gaither Dep., p. 6; Rodriguez Dep., p. 74).

Again, the primary function of Plaintiffs' jobs is to "assist people in mental health crisis to obtain services." (Rodriguez Dep., p. 74).  In so doing, Plaintiffs answer three telephone crisis lines, listen to the callers, assess their needs for purposes of determining whether to send out a mobile unit to evaluate them and/or transport them (if they are willing) to a facility where they can receive treatment.  In the case of the delegate line, Plaintiffs are charged with listening to the facts recited to them by police or other emergency personnel, school authorities or other interested party and determining whether or not the actions described fall within the criteria for issuance of a Section 302 warrant.  Those criteria are contained in the Mental Health Procedures Act and, while many of the factual scenarios presented by the calls are repetitive, if the Plaintiffs are uncertain whether the criteria have been met in any given case, they generally defer to their supervisors.

In addition to and usually while they are answering telephone calls, Plaintiffs also perform data entry as they are also responsible for entering the information underlying all of the §302 warrant requests presented into the Acute Services Unit's database.  The Plaintiffs do not provide any clinical counseling or offer or provide psychological treatment to the subjects of the §302 warrants.  Likewise, they do not do anything other than listen and talk to the callers on the local and national suicide lines for the purpose of informing those callers as to where they can seek help, although they will occasionally direct police or rescue services to those callers' locations.  Plaintiffs do not have any follow-up contacts with the callers or §302 subjects after the calls have terminated. As each of the Plaintiffs testified, virtually all of the knowledge and skills which they use to perform and fulfill their job functions as delegates/mental health coordinators for the City was learned and acquired not from their academic backgrounds but rather from their on-the-job training and through their years of experience in doing the job.  This testimony was unrebutted and uncontradicted.

Accordingly, while the Plaintiffs may themselves indeed be learned professionals, the jobs which they are performing for the City are not.  Plaintiffs are therefore entitled to receive overtime compensation at the rate of 1 ½ times the regular rate

24

at which they are employed on their regular shifts for all hours worked in excess of 40 hours per week.  Summary judgment is properly entered in their favor as a matter of law.

An Order follows.