**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| **LARRY CARTER, et al.,** |
| *Plaintiff,* |
| v. |
| **CITY OF PHILADELPHIA,** |
| *Defendants.* |

Case No. 5:18-cv-04404-JDW

## MEMORANDUM

Mental Health Emergency Service Coordinators ("MHESC") filed this civil suit alleging that the City of Philadelphia violated the Fair Labor Standards Act by misclassifying them as exempt and failing to pay overtime wages. The Court granted summary judgment on the misclassification issue. It held a bench trial on damages. After thorough consideration of the evidence presented at trial and relevant law, the Court makes the following findings of fact and conclusions of law pursuant to Fed R. Civ. P. 52(a).

## I.      FINDINGS OF FACT

### A.      Creation Of The MHESC Position

1.      At all relevant times, the City of Philadelphia has employed each Plaintiff as a MHESC.

2.      The City created the MHESC job classification in 1987 pursuant to the process in its Civil Service Regulations for creating new positions.

3.      Under the Civil Service process, the City's Office of Human Resources and at least one operating department work together to define the job role at issue by describing and documenting typical examples of work along with any educational or experiential requirements.

4.      The Office of Human Resources distributes the resulting document, known as a job specification, to various stakeholders, including unions if the position is union-represented, before presenting it to the City's Civil Service Commission at a monthly public meeting for the Commission's approval.

5.      In 1987, following its Civil Service procedures, the City defined the MHESC responsibilities and experiential requirements at creation as follows:

> This is a full performance mental health work consulting, advising, and providing a facilitative service to mental health professionals and other city workers on matters pertaining to accessing and managing care for seriously mentally ill persons. Crisis intervention. Referral, and information services are additionally provided for individuals having mental, emotional and social problems. Employees in this class act on behalf of the county administrator, ensuring that actions of the public and professionals in the field are in accordance with established legal mandates, state law and the office's policies and procedures. Work involves frequent telephone contact with members of the general public, social and mental agency staff, and medical and mental health care professionals, on mental health matters. Significant aspects of the work include reviewing, evaluating, and authorizing psychiatric commitment requests, assessing, prioritizing and diverting psychiatric emergencies, deploying resources, and handling a variety of situations which may be deemed as a threat to life or public safety. Work is performed under the supervision of a technical supervisor.

(Ex. 20 at Appx. 185.)

6.      The City also defined the MHESC experiential requirements:

>   Completion of a master's degree program at an accredited college or university with major coursework in psychology, nursing, sociology or social work. One year of counseling or administrative experience handling psychiatric emergencies, which included voluntary or involuntary commitments. Or any equivalent combination of education and experience determined to be acceptable by the Personnel Department which has included the completion of a bachelor's degree as an educational minimum.

(*Id.* at Appx. 186.)

7.      The Civil Service follows the same procedures when revising existing job descriptions as it does when creating a new one.

8.      The City revised the MHESC job class specification in 2003, 2010, and 2017.

9.      In 2003, the City revised the experiential requirement from one year to two, and it added language to the general job description stating, "positions in this class are required to work any operational on-site or standby shift as necessary. . ." (*Id.* at Appx. 171-176.)

10.     In 2010, the City added "mental health counseling" and removed "nursing" from the job class education requirements, and it increased the amount of general experience required from one year to two. (*Id.* at Appx. 178.)

11.     In 2017, the City revised language within the job specification to conform with current nomenclature on disabilities.

**B.      FLSA Classifications Of MHESCs**

12.     Since at least 1987, the Office of Human Resources has reviewed newly created job positions to determine whether the FLSA covers them.

13.     To make FLSA exemption determinations, the Office of Human Resources might have further discussions with a position's department about the level of responsibility and scope of functions for the position.

14.     The Office of Human Resources may also seek advice from the City Law Department when it has questions about application of the FLSA.

15.     There is no record of the City requesting outside counsel or advice from any state or federal agency with regards to the MHESCs' FLSA determination.

16.     As Deputy Director for Hiring Services for the City of Philadelphia, Janine Labletta is responsible for reviewing FLSA job classifications. Ms. Labletta is familiar with the FLSA via her role within the City of Philadelphia's Office of Human Resources, but she does not have any specialized legal expertise or training.

17.     The City maintains a process to permit position incumbents or their bargaining representatives to file "FLSA Status Appeals," which are questionnaires that document the scope of functions and responsibilities for the position(s) in question. The Office of Human Resources then uses the FLSA Status Appeals to assess whether the City has made the correct FLSA designation for the position.

**C.      MHESC Job Responsibilities**

18.      At all relevant times, the MHESCs have been part of the City's Acute Services Unit. The City employs more than a dozen individuals in this role.

19.      MHESCs provide 24 hour-a-day, 7 day-a-week coverage of suicide prevention and mental health crisis intervention phone lines.

20.      MHESCs worked forty hours of regularly scheduled time per week.

21.      The suicide prevention and mental health crisis intervention lines receive calls from people who are in crisis, their family members, doctors, mental health centers, crisis centers, and members of the general public.

22.      The MHESCs' service responsibilities vary by call type. With suicide prevention line calls, MHESCs are responsible for keeping callers on the line while involving co-workers to get support services to them.

23.      When answering crisis intervention line calls, MHESCs may connect with other behavioral health services, but they may also be asked to dispatch a mobile emergency team or approve a petition for involuntary commitment.

24.      If asked to dispatch a mobile emergency team, an MHESC takes the caller's information and provides it to a team that makes the ultimate decision on whether to go to the caller.

25.     If asked to approve a petition for involuntary commitment, an MHESC may only approve the petition if the behavior described meets four criteria in the Mental Health Procedures Act.

26.     Once an MHESC approves an involuntary commitment petition, the police take the individual in crisis to a crisis response center for a psychiatric evaluation.

27.     MHESCs counsel distressed callers in the colloquial sense, but they do not provide clinical counseling.

28.     The majority of MHESCs are not licensed to conduct clinical counseling.

**D.     MHESC Compensation Prior To October 2020**

29.     MHESCs are unionized employees. AFSCME District Council 47, Local 2187, represents them and negotiates the terms and conditions of their employment, including wages.

30.     MHESCs worked 8.5 hour shifts that started between 7:30 and 9 a.m. or that started between 4 and 5:30 p.m. They worked those shifts at a City office in Philadelphia.

31.     In order to ensure 24/7 coverage of the phone lines, the City also required MHESCs to work "standby" shifts overnight, on weekends, and on holidays. Standby shifts generally lasted 7 hours, and MHESCs worked three standby shifts each week.

32.     MHESCs worked standby shifts at home. They had to answer incoming calls within three rings and remain close to a phone's base.

33.     The MHESCs received an hourly rate, known as "Rate 1," for any regularly-scheduled time that they worked between 8:00 am and 12:00 am on a weekday. The Court refers to Rate 1 as the "Office Rate."

34.     Absent specific Civil Service Regulations to the contrary, the City compensates all Union-represented employees with either cash or compensatory time for work performed beyond eight hours in a day and time worked on regular days off. *See* Phila. Civ. Serv. Reg. ("C.S.R.") 6.1131 (detailing overtime compensation paid to employees represented by District Council 47, Local 2187).

35.     Per this regulation, MHESCs received one-and-a-half times the Office Rate for overtime hours that they worked between 8:00 a.m. and 12:00 a.m. on a weekday or if they performed certain activities on the weekend.

36.     MHESCs received an additional shift differential for Office Rate work they completed between 4 p.m. and 8 a.m.

37.     The City paid MHESCs a lower rate, known as "Rate 2," or a "Standby Rate," for all work that they completed at home between 12:00 a.m. and 8:00 a.m. on weekdays, and most work completed on weekends. *See* C.S.R. 6.155.

38.     The City has paid MHESCs at this lower rate for overnight and weekend work since at least 1997.

39.     Before the City adopted C.S.R. 6.155, it presented it to the Union. The Union had the opportunity to challenge that regulation, but it never did so.

40.     MHESCs performed the same work during standby from home as they did during regularly scheduled time at the office.

41.     MHESCs routinely worked over 20 hours per week of standby shifts, for which the City paid them the Standby Rate.

42.     MHESCs' pay rates varied only based on the time of day and/or day of the week that they performed work, and where that work was performed, not how many hours a particular MHESC worked or was scheduled to work during the week in question.

43.     The City's adoption of the Standby Rate was an exception to its general rule concerning payment of overtime and was specific to MHESCs. *See* C.S.R. 6.155.

44.     The Union could have demanded to bargain an increase to the Standby Rate but did not do so.

45.     City employees authored several memoranda in 1997 evincing a desire to increase the Standby Rate that the City would pay MHESCs. Those memoranda acknowledged that the hours that the City designated as "standby" would ordinarily qualify as overtime under the city's Collective Bargaining Agreement. The memoranda suggested that paying an increased Standby Rate would be a lower-cost alternative to hiring additional staff to cover the standby shifts.

46.     After the exchange of the memoranda in 1997, the City elected not to raise the pay rate for standby time to time-and-a-half.

47.     MHESCs often voiced concerns to their supervisors that they did not receive overtime pay for overnight or weekend work.

48.     Lowell Kennedy, a former MHESC, informed Dave Mora, a union representative, that MHESCs were not paid overtime for night and weekend work.

49.     Plaintiff Larry Carter, a former shop steward for Local 2187, also discussed with Mr. Mora and Cathy Scott, another union representative, that MHESCs were not being paid overtime for night or weekend work.

50.     The CBA between the City and the Union contains a grievance procedure that permits either party to the agreement to raise disputes or disagreements over the interpretation or application of the agreement.

51.     Under the Parties' negotiated grievance procedure, any dispute must first go through the existing grievance procedure; if the parties cannot resolve the dispute, either party may refer the dispute to binding arbitration conducted in accordance with the Voluntary Rules of Labor Arbitration of the American Arbitration Association.
The Union filed a grievance over the pay for MHESCs; the City denied the grievance, and it is now pending in arbitration.

**E.     Late Overtime Payments**

52.     In or around March of 2018, the City of Philadelphia switched its payroll processing from a legacy system to "One Philly."

53.     After the City switched to One Philly, MHESCs complained about having their pay delayed by several months.

54.     Two MHESCs, Kimberly Rodriguez and Leslie Davis, testified that their respective overtime payments were each delayed by several months.

55.     The City's Office of Human Resources maintained a list of the inaccurate and late payments, but that list is not before the Court.

56.     The City has offered no explanation for the alleged late payments.

**F.     Procedural History**

57.     On October 12, 2018, ten MHESCs filed a complaint in this matter alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 203 *et seq.* for the failure to pay overtime compensation. The ten plaintiffs are Catherine Mackey-Gaither, Ms. Davis, Sharon Agbede, Tiara Council, Rochelle Morris, Jennifer Jubilee, Mr. Carter, Gregory Garner, Ms. Rodriguez, and the Estate of Tiffany Capers-Allen.

58.     In July of 2019, the Parties filed cross-motions for summary judgment. Neither motion, nor the Parties' responses and replies to those motions, raised the issue of how to calculate the MHESCs' regular rate for the purposes of determining damages. (*See* ECF Nos. 11, 12, 15, 17, 18.)

59.     The Court denied the City's motion but granted the MHESCs' motion, holding that the City improperly classified the MHESCs as exempt from the FLSA's overtime requirement.

60.    In the Memorandum granting summary judgment, the Court stated, "Plaintiffs are therefore entitled to receive overtime compensation at the rate of 1 ½ times the regular rate at which they are employed on their regular shifts for all hours worked in excess of 40 hours per week." (ECF No. 20 at 24-25.)

61.    On October 5, 2020, four additional MHESCs filed a separate suit under the FLSA raising identical issues. *See Buhler, et al. v. City of Philadelphia*, 2:20-cv-04911-JDW. The plaintiffs in that case are Brian Buhler, Tiffany Hawkins, Shelly Brown, and Amanda Winter. The Court consolidated the cases.

62.    On September 10, 2021, the parties stipulated to several damages-related facts, including (a) the back pay that the Court should award if it concludes that the Office Rate provides the base rate for all overtime hours that MHESCs worked; (b) the back pay that the Court should award if it concludes that a blended rate, consisting of a weighted average of the Office Rate and Standby Rate, provides the base rate for all overtime hours that MHESCs worked; and (c) the amounts of late overtime payments that each Plaintiff claimed. (*See* ECF No. 51.)

63.    The Court conducted a non-jury trial on damages on October 18-19, 2021.

II.     **CONCLUSIONS OF LAW**

A.     **The Office Rate Applies To All Hours The MHESCs Worked**

1.     The FLSA does not permit the City to pay MHESCs an Office Rate for some hours and a Standby Rate for other hours because there is no difference between the work that MHESCs perform when the City pays the two different rates.

2.     The FLSA is silent as to compensation plans that purport to set different rates for the same work, but the interpretive guidance from the Department of Labor's Wage and Hours Division ("WHD") is clear that where parties agree on a particular rate for specified work, they cannot "lawfully agree that the rate for that work shall be lower merely because the work is performed during the statutory overtime hours, or during a week in which statutory overtime is worked." 29 C.F.R. § 778.316. Because the parties cannot agree to such an arrangement, any agreement that only "the hours worked between certain fixed hours of the day or only the first 40 hours of any week will be counted as working time will clearly fail of its evasive purpose." *Id.*

3.     WHD's guidance "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Sec'y United States Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 426–27 (3d Cir. 2017) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

4.     To determine the deference that a court should afford to WHD's interpretations of the FLSA, the Third Circuit has adopted a "'sliding-scale' test in which

the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors." *Sec'y United States Dep't of Lab.* at 427 (citations omitted). Those factors include whether the interpretation was (1) issued contemporaneously with the statute; (2) consistent with other agency pronouncements; (3) reasonable given the language and purposes of the statute; (4) within the expertise of the relevant agency; and (5) part of a longstanding and unchanging policy. *See id.*

5.     The Court concludes that the WHD's interpretation should receive substantial deference under *Skidmore*. Although WHD did not issue its guidance at the time Congress adopted the FLSA, its interpretations of the regulations controlling this dispute have been consistent. The Department of Labor has consistently held that individuals should be compensated for each hour worked over forty at a rate not less than one and one-half times the regular rate at which the employee is actually employed. *See generally* 29 C.F.R. § 778.101; 29 C.F.R. § 778.107; 29 C.F.R. § 778.109; 29 C.F.R. § 778.315. It is also consistent in finding that the regular rate cannot be left to a declaration by the parties, but that it is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed—an "actual fact." 29 C.F.R. § 778.108 (quoting *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419).

6.     The WHD's interpretation is reasonable given the language and purpose of the FLSA. In enacting the FLSA, Congress recognized the effect of labor conditions that are "detrimental to the maintenance of the minimum standard of living necessary for

health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). Safeguarding employees from compensation schemes that manipulate overtime to a lower rate than allowed under the FLSA protects employee efficiency and general well-being by providing employees with compensation commensurate with their efforts

7.      Finally, the interpretive guidance found in section 778.316 is within the WHD's expertise (29 U.S.C. § 204(a)), and it is both longstanding and unchanging. The text of the rule today is identical to the text of the rule when it WHD adopted it in 1968. *See* 33 FR 986-01.

8.      Consistent with WHD's guidance, once an employer and employee agree upon a rate for a particular type of work, the FLSA does not permit them to evade its requirements by adopting a pay structure that provides for a lower rate for statutory overtime hours. *See* 29 C.F.R. § 778.316.

9.      The City compensated MHESCs at the Office Rate during any regularly scheduled time worked between 8:00 am and 12:00 am on weekdays. The MHESCs performed the same work when they worked standby shifts, but the City paid them a Standby Rate. That arrangement has the effect of driving down the rate of compensation that MHESCs receive if they worked standby shifts in a week that included more than 40 hours.

10.     The FLSA did not permit the City to draw that distinction. The City had to pay MHESCs the Office Rate for hours that they worked, including standby shifts, because the work that they performed was the same.

11.     The 1997 memos justifying an increased Standby Rate explain that the alternative to having MHESCs work standby shifts was for the City "to hire the equivalent of 12 additional full-time staff to handle the late night shift." (Ex. 30 at Appx. 250.) Understandably, the City did not want to incur that cost. And, while the 1997 memos appear to focus on the City's obligations under the CBA, rather than the FLSA, they also demonstrate that the City's purpose in setting up this compensation system was to evade overtime obligations. The memos reveal that the pay structure evaded the FLSA's prohibition against setting a lower rate during weeks in which an MHESC worked statutory overtime.

12.     The City contends that this is really a "gap pay" issue. "'[G]ap time' is non-overtime hours worked for which an employee is not compensated. Because an employee has a sufficiently high hourly rate, when all compensated and non-compensated hours are divided into the weekly pay, the employee's average hourly pay still exceeds the FLSA minimum." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 244 (3d Cir. 2014). "Gap time" claims are claims that an employer failed to properly compensate employees for hours worked that "fall between the minimum wage and the overtime provisions of the FLSA." *Id.* at 243. But it's not. Although in any given week, standby shifts might have come before

office shifts, MHESCs were scheduled for 40 hours in the office each week, meaning that the effect of the standby shifts was consistently to push MHESCs past 40 total hours worked for the week.

13.     That said, if there was a week in which an MHESC worked less than 40 total hours, including some hours for which the City paid a Standby Rate, then the City would not have to pay the Office Rate because the FLSA would not apply.

14.     The City also claims that the Court should calculate overtime based on a blended rate that reflects the weighted average of the hours that each MHESC worked each week. But a weighted average only applies if the FLSA allows the City to distinguish between office work and standby work. The statute does not allow that distinction.

15.     Notably, the City's approach to compensation would mean that an MHESC who performed overtime tasks in the office received 1.5 times the Office Rate, but an MHESC who performed those same overtime tasks on a shift designated "standby" would be paid 1.5 times a blended rate. The City offers no principled basis to allow for such a distinction, and the Court cannot conceive of one.

16.     The City suggests that the Court should look to the CBA to determine the applicable rate. But the CBA cannot modify the FLSA, which is a federal statute. Thus, even if the City and Union intended to modify the FLSA, that aspect of the CBA would be void as against public policy.

17.     The Court will award each MHESC the amount of unpaid overtime set forth in Exhibit B to the Parties' Damages Stipulation (ECF No. 51-2).

**B.     The City Did Not Classify The MHESCs As Exempt In Good Faith**

18.     The Court decided in ruling on summary judgment that the City violated the FLSA by classifying MHESCs as exempt.

19.     An employer that violates the minimum wage or overtime provisions of the FLSA "shall be liable" both for any unpaid compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b); *see also Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991).

20.     A District Court may, however, "in its sound discretion, award no liquidated damages" or reduce the amount, "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the FLSA action] was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. "Ignorance alone will not exonerate the employer," *Cooper Elec.*, 940 F.2d at 908 (quoting *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984)), and "[t]o carry [its] burden, a defendant employer must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions[.]" *Cooper* at 908.

21.     The FLSA good faith defense has both a subjective and objective component. *See Williams*, 747 F.2d at 129. The subjective component "requires that the

employer have an honest intention to ascertain and follow the dictates of the Act." *Id.* (quote omitted). The reasonableness inquiry "imposes an objective standard by which to judge the employer's conduct." *Id.* (cite omitted). An employer's failure to take "affirmative steps to ascertain the legality of its pay practices" mandates an award of liquidated damages. *Martin*, 940 F.2d at 910

22.     The City did not take reasonable steps to ascertain and follow the dictates of the FLSA. There is no record of the City requesting an opinion from a lawyer—either outside counsel or the City Law Department office—concerning the FLSA determination. Nor is there any evidence that the City consulted any state or federal agency. Indeed, it no longer knows how it first decided to classify MHESCs as exempt.

23.     Without some evidence concerning the process that it used to make that classification, the City cannot demonstrate its good faith.

24.     When MHSECs complained about not being paid overtime, including to their supervisors, the City did not perform any soft of investigation. The City was on notice that this compensation plan might not be permissible. Regardless of whether the MHESCs invoked the FLSA by name, they made numerous complaints about their overtime compensation dating back to the early 2000s. Despite being on notice, the City did not investigate whether the plan was FLSA compliant. Had it done so, the City would have found the WHD's interpretive guidance from section 778.316, but it did not, and the City therefore bore the risk of ignoring the complaints and applicable guidance at its own peril.

25.     The City cannot rely on an absence of grievances or complaints to demonstrate its good faith. The burden of FLSA compliance falls on the City, not on employees, unions, or anyone else. If the City could demonstrate good faith by relying on third parties, it would effectively shift the compliance burden to those people. The FLSA does not allow it to do so.

26.     In addition, the City did get complaints about a lack of overtime. Employees do not have to use magic words to trigger an employer's obligation to reassess a classification. When MHESCs complained, the City should have conducted a new analysis of its FLSA classification. The record does not contain any evidence that the City did anything to assess those complaints, which undermines any claim of good faith.

27.     Because the City has not shown its good faith, the Court will award each MHESC liquidated damages.

**C.     The City Did Not Willfully Violate The FLSA**

28.     Under the FLSA, a determination that an employer willfully violated the statute extends the FLSA's limitations period from two years to three. *See* 29 U.S.C. § 255(a).

29.     An employer "willfully" violates the FLSA "when the employer, at the time of its FLSA violation, either 'knew' its conduct was prohibited by the FLSA or 'showed reckless disregard for the matter.'" *Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, (1988). "Acting only

'unreasonably' is insufficient—some degree of actual awareness is necessary." *Id*. To prove willfulness, a plaintiff must put forth at least some evidence of the employer's awareness of a violation of the FLSA overtime mandate. *Id*. at 127 (citing, *Flores v. City of San Gabriel*, 824 F.3d 890, 907 (9th Cir. 2016)).

30.     Although the Court concludes the City did not act in good faith in classifying (and maintaining the classification) the MHESCs as exempt, the MHESCs offer no proof that the City knew that its conduct violated the FLSA.

31.     The City knew that MHESCs had complaints about their wages and overtime, but the complaints did not invoke the FLSA. The 1997 memos, with their references to holidays, nights, and weekends (periods that the CBA but not the FLSA designate as overtime) only suggest that the City designed its conduct to save money in light of its contractual overtime responsibilities. Nothing in the record speaks directly to the City's awareness of a violation of the FLSA.

32.     The MHESCs also lack proof that the City acted recklessly, even though it was wrong.

33.     The complains that MHESCs made about overtime do not demonstrate the City's reckless disregard for its FLSA compliance obligations. The City could reasonably have interpreted those complaints to be complaints about the CBA, not the FLSA. The City's failure to consider the FLSA implications of those complaints means it cannot

establish its good faith, but it does not rise to the level of reckless disregard. It just demonstrates the City's negligence in responding to those complaints.

34.     The City's other processes reinforce that, while it might have been negligent, it did not recklessly disregard its FLSA compliance obligations.   It created an open, transparent process to review job specifications for accuracy, and it was not reckless for the City to base its FLSA designations on those job specifications. It also created a process to review FLSA classifications that was open both to job incumbents and their bargaining representatives. While the existence of those processes does not establish the City's good faith, it also reflects an invitation and a willingness on the City's part to consider concerns about job classifications.

35.     The Court concludes that the MHESCs have not carried their burden of demonstrating the City willfully violated the FLSA.

**D.     The Court Awards Liquidated Damages For Late Overtime Payments Only For The MHESCs For Whom There Is Evidence Of Late-Paid Overtime**

36.     The FLSA requires employers to pay overtime promptly. *See* 29 C.F.R. § 778.106. "As long as the overtime is paid as soon after the initial pay period as practicable, 'the requirements of the Act will be satisfied.'" *Brennan v. City of Philadelphia*, No. 13-6635, 2016 WL 3405449, at *2 (E.D. Pa. June 21, 2016) (quoting 29 C.F.R. § 778.106). The WHD's guidance on the matter states, "[p]ayment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of

the amount due and in no event may payment be delayed beyond the next payday after such computation can be made." 29 C.F.R. § 778.106.

37.     Although the Parties do not dispute that the City had problems making timely overtime payments after it switched to the One Philly payment system, Plaintiffs only presented evidence of late payments to Ms. Rodriguez and Ms. Davis. For the other Plaintiffs, the Court would have to assume that they suffered the same harm as Ms. Rodriguez and Ms. Davis, and it has no basis to make such an assumption. Indeed, Plaintiffs' Proposed Findings of Fact and Conclusions of Law do not identify any evidence to permit the Court to make that assumption,

38.     The Court concludes that Plaintiffs have only proved by a preponderance of the evidence that Ms. Rodriguez and Ms. Davis received late payments of overtime, so it will only award liquidated damages to those two. For the other Plaintiffs, the Court concludes that Plaintiffs have not satisfied their burden of proof.

39.     Based on this conclusion, the Court will award Ms. Davis $6,445.89 in liquidated damages, and it will award Ms. Rodriguez $9,955.27 in liquidated damages.

## III.    CONCLUSION

Plaintiffs have demonstrated by a preponderance of the evidence that the Office Rate should apply to all hours they worked and that Ms. Davis and Ms. Rodriguez received late payments of overtime wages. The City has not proved good faith, and Plaintiffs have not proved the City's willfulness or that any MHSEC other than Ms. Davis or Ms. Rodriguez

received a late payment of overtime. The Court will award damages in accord with these findings of fact and conclusions of law. Based on the Parties' stipulation concerning damages found at ECF No. 51-2 (and, for Ms. Davis and Ms. Rodriguez, the amount of late-paid overtime set forth in ECF No. 51-5), the amount to which each Plaintiff is entitled is set forth below:

| Name | Amount |
|---|---|
| Gregory Garner | $111,343.75 |
| Jennifer Jubilee | $125,976.88 |
| Kimberly Rodriguez | $260,077.34 |
| Larry Carter | $155,045.96 |
| Leslie Davis | $180,234.72 |
| Rochelle Morris | $165,501.25 |
| Sharon Holmes-Agbede | $85,665.30 |
| Estate of Tiffany Capers-Allen | $55,007.07 |
| Catherine Mackey-Gaither | $217,876.29 |
| Tiara Council | $80,439.59 |
| Amanda Winter | $46,607.99 |
| Brian Buhler | $69,924.21 |
| Tiffany Hawkins | $35,283.87 |
| Shelly Brown | $31,393.04 |

An appropriate Order follows.

**BY THE COURT**:

/s/ Joshua D. Wolson
Hon. Joshua D. Wolson
United States District Judge

January 19, 2022

23